IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION, AT DAYTON

| | | |
|---|---|---|
| IN RE: | : | Case No. 23-31157 |
| | : | |
| RELIABLE CASTINGS CORPORATION | : | Chapter 7 |
| | : | Subchapter V |
| Debtor-In-Possession | : | Judge Guy R. Humphrey |
| | : | |

## OMNIBUS MOTION OF DEBTOR IN POSSESSION TO (1) ASSUME SOME OR ALL CONTRACTS RELATING TO SALE OF THE DEBTOR'S REAL ESTATE LOCATED IN HAMILTON COUNTY, OHIO, INCLUDING THE PURCHASE CONTRACT, LISTING AGREEMENT, AND, IF NEEDED, SURVEY CONTRACT, (2) APPROVING THE CURE PAYMENT TO THE SURVEYOR, TO THE EXTENT ASSUMED; (3) SELL THE DEBTOR'S REAL PROPERTY IN HAMILTON COUNTY, OHIO, FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS PURSUANT TO 11 U.S.C. § 363(F) AND (4) EMPLOY AND APPROVE COMPENSATION TO REALTOR AND, IF NEEDED, THE SURVEYOR

**NOW COMES** above-captioned debtor and debtor-in-possession, Reliable Castings Corporation ("Debtor"), by and through counsel, pursuant to 11 U.S.C. §§105, 327, 328, 330, 362, 363, 365 and FRBP Rules 6004, 6006, 9014, and 2014; and LBR 2014-1 and hereby moves this Court for an Order as to each of the following:

1.   Authorizing the Debtor to assume some or all of the following contracts relating to sale of real estate located in Hamilton County, Ohio (such property is more specifically described in Exhibit "A" hereto and hereinafter referred to as the "Property"):

A.   The Purchase and Sale Agreement with an effective date of June 22, 2023 (the "Purchase Contract"), as amended in the for attached hereto as Exhibit "B," providing for sale to private buyer the Port of Greater Cincinnati Development Authority an Ohio port authority organized and existing under R.C. Chapter 4582 (the "Buyer");

B.   The realtor listing agreement attached hereto as Exhibit "C" (the "Listing Agreement") provides for the hiring of Josh Young and Newmark Group, Inc. (hereinafter

"Realtor") to sell the Property; and

      C.  The agreement for survey of a portion of the Property performed by Abercrombie & Associates, Inc. ("Surveyor"), an invoice relating to which is attached hereto as Exhibit "D" provided, however, that the agreement with the Surveyor (the "Survey Contract") will only be assumed to the extent that such survey and the updated legal description prepared by the Surveyor is deemed necessary by the Buyer's title company to permit the transfer of the Property to the Buyer in accordance with the Purchase Contract.  Upon determination by the Debtor (in consultation with the title company) that the Survey Contract will be assumed, the Debtor will file a notice of assumption and serve such notice upon the Surveyor.

    2.  To the extent the Survey Contract is assumed, permitting the Debtor to cure such contract by payment of $7,250 as a cure payment to the Surveyor from the proceeds of the sale of the Property.

    3.  Authorizing the sale of Debtor's interest in Property to Buyer, granting the Buyer title to the Debtor's interest in the Property free and clear of any and all liens and encumbrances pursuant to 11 U.S.C. § 363, for the purchase price of $1,000,000 on the terms and conditions and outlined in the Purchase Contract.

    4.  Authorizing the Debtor to execute and deliver a Deed and, pursuant to 11 U.S.C. § 363, to sell the Debtor's interest in the Property free and clear of all liens and encumbrances, so that the Buyer shall obtain free and clear title to the Debtor's interest in the Property at closing.  The Debtor proposes to have the proceeds from the sale of the Property distributed as follows, without further Order of this Court, at the closing of the sale of the Property: (1) commission to the Realtor in the amount of $20,000 (2% of the total purchase price); (2) real estate taxes, transfer taxes, and prorations calculated as identified in the Purchase Contract; (3) payoff of the debt owed to Beck Aluminum International, LLC ("Beck") secured by the Open-End Mortgage recorded on November

11, 2021 as amended, to be ascertained by the title company by a payoff letter from Beck, but which is estimated to be approximately $450,000; (4) payoff of the debt owed to Michael J. Westerfield of Westeck, Inc. (Westech") and secured by the Mechanic's Lien filed on April 20, 2022 against the Property, to be ascertained by the title company by a payoff letter from Westech, but which is estimated to be approximately $17,000; (5) other standard and customary transfer frees/taxes , conveyance fees, settlement fees, etc. in accordance with the Purchase Contract, and, (6) only to the extent the Survey Contract is assumed, $7,250 as the cure required for the assumption of the Survey Contract.

5.     Determining the Realtor to be disinterested and approving the employment of the Realtor and his commission for the sale of the Property to be paid at 2% of the gross purchase price of the Property, with such amount to be distributed to the Realtor at closing from the Purchase Price. Exhibit E hereto is the declaration that demonstrates the Realtor's disinterestedness.

A Memorandum in support is set forth below**.**

Respectfully submitted,

COOLIDGE WALL CO., L.P.A.

*/s/ Patricia J. Friesinger*

_____
Patricia J. Friesinger (0072807)
33 W. First Street, Ste. 200
Dayton, Ohio 45402
Tel: (937) 449-5776 Fax: (937) 223-6705
E-Mail: friesinger@coollaw.com
*Counsel for Reliable Castings Corporation,*
*Chapter 11 Debtor*

## MEMORANDUM

1.     On July 25, 2023 (the "Petition Date"), the Debtor commenced this case by filing a voluntary petition under Chapter 11, Subchapter V, of the Bankruptcy Code.  Pursuant to sections

1107(a), 1108 and 1184 of the Bankruptcy Code, the Debtor is operating its business and managing its affairs as a debtor-in-possession.

2.      Historically, the Debtor operated out of locations in the Cincinnati, Ohio area and in Sidney, Ohio.  Pre-petition, the Debtor began to implement a plan set in place by a prior chief restructuring officer, to close the operations in Cincinnati and shift all of the remaining operations to the Debtor's Sidney, Ohio location.  Two prior property sales took place in 2022.  There are no current manufacturing or forging activities taking place at the Property, but there are business offices that have remained on site at the Property and some equipment remains on site.

## JURISDICTION AND VENUE

3.      This Court has jurisdiction over this matter under 28 U.S.C. Sections 157 and 1334. This is a core proceeding under 28 U.S.C. Section 157(b).  Venue is proper pursuant to 28 U.S.C. Sections 1408 and 1409.

4.      The predicate for the relief requested is based upon Sections 105, 327, 328, 330, 362, 363, 365 of the Bankruptcy Code and Rules 6004, 6006, 9014, and 2014 of the Federal Rules of Bankruptcy Procedure.

## BACKGROUND FACTS AND THE AGREEMENTS

5.      Initially, the Realtor identified the value of the Property to be less than $1,000,000 but recommended using a listing price of $1,000,000.  The Debtor received an initial offer of $1,000,000 from an unrelated third-party buyer pre-petition.  In furtherance of the sale to the unrelated third-party buyer, the Debtor obtained some environmental surveys.  The environmental surveys were not acceptable to the unrelated third-party buyer and that sale did not close.  Then, the Debtor listed the Property for sale with the Realtor in May of 2023 and the Buyer came forward with an offer at $1,000,000 (the "Purchase Price").  The Buyer has been provided copies of the environmental

surveys and still intends to purchase the Property.  Given the price opinion from the Realtor, the

negotiations with the prior third-party buyer and the Buyer, the Debtor believes that the Purchase

Price is a good value for the Property.  Further, the sale of the Property will eliminate the overhead

associated with the Debtor's other locations and finalize the shift of the Debtor's holdings to the

Sidney, Ohio location.

6.       The terms and conditions of the offer to purchase are outlined in the Purchase

Contract attached hereto as Exhibit "B."  The Purchase Contract includes, in part, the deadline for

closing to occur within thirty (30) days following the expiration of the inspection period, which

inspection period has been agreed to be extended to five (5) days after entry of an order authorizing

the sale in this bankruptcy case.  The Purchase Contract also requires the Debtor to remove its

personal property assets from the Property before the closing.  To that end, the Debtor is in the

process of discussing the potential transfer of certain assets to its Sidney, Ohio location and sale of

some of the remaining assets as scrap.  The Debtor anticipates seeking a further order authorizing the

expense for moving the equipment and scrapping of assets in the near future – while the 30-day post-

inspection period time in advance of closing is progressing.

7.       The Realtor is a disinterested person as designated in 11 U.S.C. § 327 and within the

meaning of 11 U.S.C. § 101(14).  The Realtor was provided a copy of the Debtor's matrix to assure

he could attest to this fact.  The Declaration of the Realtor is attached as Exhibit "E."  The Realtor

does not hold or represent any interest adverse to the estate and is a disinterested person within the

meaning of 11 U.S.C. § 101(14).  Further, the Realtor does not have any connection with the above-

named Debtor or creditors of the Debtor, any other party in interest, their respective attorneys or

accountants, the United States Trustee, or any person employed in the office of the United States

Trustee, other than as outlined in Exhibit E hereto.  The Realtor's business address is One East

Fourth Street, Ste. 500, Cincinnati, OH 45202.  The Realtor has agreed to list the Property for a commission of 2% of the gross purchase price, with such amount to be distributed at closing from the Purchase Price.

8.      The Purchase Contract and the Listing Agreement are executory contracts that were in existence as of the Petition Date.  The Debtor has strategically reviewed the Purchase Contract and the Listing Agreement in connection with its efforts to maximize the value of its estate in this Chapter 11 case and have determined that the assumption of such contracts is in the best interest of the Debtor and the creditors of the Debtor.  Given that the Debtor has not defaulted on the terms of the Purchase Contract or the Listing Agreement, there is no need to cure either contract and, as such, the Debtor proposes to close on the Purchase Contract in accordance with the terms thereof and to pay the Realtor pursuant to the Listing Agreement from the sale proceeds as provided herein.

9.      The sale of the Property is subject to real estate taxes and prorations calculated and identified in the Purchase Contract.  Attached hereto as Exhibit "F" is a title commitment obtained by the title company selected by the Buyer (the "Title Commitment").  As confirmed in the Title Commitment, the Debtor is the owner of the Property.  Further, in addition to real estate taxes, the Property is encumbered by (1) an Open-End Mortgage recorded on November 11, 2021 as amended, which secures the debt owing to Beck and (2) a Mechanic's Lien filed on April 20, 2022 securing a debt owed to Westech (collectively, the "Encumbrances").  Beck and Westech are receiving notice of this Motion and related documents and the Debtor is seeking authority to pay off the debts owed to Beck and Westech as secured by the Property at the closing.  No other liens, interests or encumbrances are known to the Debtor.

10.      The Title Commitment also identifies that a portion of the Property (Tracts XII and XIII) "are tracts of land as shown by the tax map records of Hamilton County, Ohio; new legal

descriptions, and Plats of Survey with closure table in a form acceptable to and approved by the county engineer are required." As such, the Debtor, through its prior counsel, engaged the services of Abercrombie & Associates, Inc. through the Survey Contract to perform a survey and prepare an updated legal description for that portion of the Property. Without obtaining the survey and an updated legal description for use in the transfer of the Property to the Buyer, the Debtor may be unable to supply recordable title to a portion of the Property, which is a violation of the Purchase Contract.

11.     The Survey Contract is an executory contract which may be necessary to facilitate the closing on the Purchase Contract. As such, and only to the extent required by the title company to close on the Purchase Contract, the Debtor is hereby requesting to be authorized (but not directed) to assume the Survey Contract, if needed. In order to assume the Survey Contract, the Debtor will need to cure through payment of the invoice in the amount of $7,250 and requests that this Court set the cure amount for the contract with the Surveyor at $7,250 and authorize (but not direct) the payment of such cure amount from the proceeds of the sale of the Property.

## LEGAL AUTHORITY

### A.     Assumption of the Purchase Contract, Listing Agreement, and (if needed) the Survey Contract is an Exercise of the Debtor's Business Judgment.

12.     Section 365 provides that a Chapter 11 debtor, subject to bankruptcy court approval, may assume or reject executory contracts at any time prior to plan confirmation. 11 U.S.C. § 365(a) and (d)(2). The standard governing bankruptcy court approval of a debtor's decision to assume or reject executory contracts is whether the debtor's reasonable business judgment supports assumption or rejection. See, e.g., In re HQ Glob. Holdings, Inc., 290 B.R. 507, 511 (Bankr. D. Del. 2003) (debtor's decision to assume or reject executory contract is governed by business judgment standard

and can only be overturned if the decision was the product of bad faith, whim, or caprice); In re

Market Square Inn, Inc., 978 F.2d 116, 121 (3d Cir. 1992) (assumption or rejection of lease "will be

a matter of business judgment by the bankruptcy court" (citation omitted)); Sharon Steel Corp. v.

Nat'l Fuel Gas Distrib. Corp., 872 F.2d 36, 39- 40 (3d Cir. 1989) (same). If the debtor's business

judgment has been reasonably exercised, a court should approve the assumption or rejection of an

unexpired lease or executory contract. See Grp. of Inst. Investors v. Chi. M. St. P. & P.R.R. Co., 318

U.S. 523 (1943); Sharon Steel, 872 F.2d at 39–40. The business judgment test "requires only that the

trustee [or debtor in possession] demonstrate that [assumption or] rejection of the contract will

benefit the estate." Wheeling-Pittsburgh Steel Corp. v. West Penn Power Co., (In re Wheeling-

Pittsburgh Steel Corp.), 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987) (quoting In re Stable Mews

Assocs., 41 B.R. 594, 596 (Bankr. S.D.N.Y 1984)). Any more exacting scrutiny would slow the

administration of a debtor's estate, increase costs, interfere with the Bankruptcy Code's provision for

private control of the administration of the estate, and threaten the court's ability to control a case

impartially. See Richmond Leasing Co. v. Capital Bank, N.A., 762 F.2d 1303, 1311 (5th Cir. 1985)

(citation omitted).

13.     Here, the Debtor's reasonable business judgment supports assumption of the Purchase

Contract, Listing Agreement, and (to the extent determined by the Debtor in consultation with the

title company) the Survey Contract.  As discussed below, the Purchase Contract is believed to be the

highest and best price the Debtor will receive for the Property and the Realtor is owed a commission

for his involvement in obtaining the Purchase Contract.  Further, the Debtor anticipates that it will

need to assume the Survey Contract as it will be required to provide a survey with an updated legal

description in order to facilitate closing on the Purchase Contract.  As such, given that the Surveyor

has already performed the services provided for under the Survey Contract (aside from delivery of

the survey and the legal description to the Debtor), it would be most time efficient for the Debtor to assume the Survey Contract and cure the contract with payment of $7,250 rather than contracting for the survey to be performed by another surveyor, wait for the survey to be performed, and pay for that survey PLUS being in a position of owing the Surveyor on the invoice for services performed to date.

**B.**      **The Debtor Has Provided Adequate Assurance Relating to Cure Amounts and Future Performance.**

14.      For a debtor to assume an executory contract, it must "cure, or provide adequate assurance that the debtor will promptly cure," any default, including compensation for any "actual pecuniary loss" relating to such default. 11 U.S.C. § 365(b)(1)(A).

15.      The Debtor has not defaulted under the Purchase Contract or the Listing Agreement and has proposed to pay the full cure amount (the total of the invoice) to the Surveyor as required by the Survey Contract (to the extent assumed) from the proceeds of the sale.  Given that the only further performance required of the Debtor under the Purchase Contract and the Listing Agreement is to close on the sale in accordance with the Purchase Contract and pay from the sale proceeds the commission provided for under the Listing Agreement, the closing will result in consummation of those contracts.  Further, to the extent the survey is needed to close on the Purchase Contract, the Debtor is seeking authority to assume the Survey Contract and to pay for the Survey Contract from the sale proceeds – which is the only performance remaining under the Survey Contract.  As such, at the closing of the sale as proposed herein, the Debtor will cure all defaults and consummate all remaining terms under the outstanding contracts that it seeks authority to assume.

### C.    Approval of the Sale is Appropriate and in the Best Interest of the Debtor's Estate and Creditors.

16.    Bankruptcy Code Section 363(b) governs transactions outside the ordinary course of business involving property of the Debtor's estate. Specifically, that section provides, in relevant part, that "[t]he trustee, after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate. . ." 11 U.S.C. § 363(b).  The Debtor's sale or use of the assets outside of the ordinary course of business should be approved by the Court if the Debtor can demonstrate a sound business justification for the proposed transaction.  *See, In re Chrysler LLC*, 576 F.3d 108, 117-18 (2ᵈᵈ Cir. 2009), citing *In re Iridium Operating LLC*, 478 F.3d 452, 466 (2nd Cir. 2007) ("In this Circuit, the sale of an asset of the estate under §363(b) is permissible if the 'judge determining [the] §363(b) application expressly find[s] from the evidence presented before [him or her] at the hearing [that there is] a good business reason to grant such an application.'") (*citing Comm. Of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.*), 772 F.2d 1063, 1071 (2nd Cir. 1983); *In re Gen. Motors Corp.*, 407 B.R. 463,491 (Bankr. S.D.N.Y. 2009).

17.    In addition, Bankruptcy Code Section 105(a) grants the Court the authority to "issue any order, process or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]" 11 U.S.C. § 105(a).  This provision is "the basis for our broad exercise of power [by the Court] in the administration of a bankruptcy case." *In re Flores*, 291 B.R. 44, 54 (Bankr. S.D.N.Y. 2003) (quoting 2 COLLIER ON BANKRUPTCY, ¶105 at 105-5, 15th ed. Rev. rel. 2000)).

18.    The Debtor submits that the purchase price is fair and reasonable in light of the circumstances surrounding the Debtor's exit from the Hamilton County, Ohio location. The Debtor does not believe that the delays attendant to further marketing would lead to a net higher value

attained for the Property as compared to the proposed sale, particularly given the potential concerns raised by the environmental surveys.

19.     As such, the Debtor submits that the sale of the Property offers the greatest benefit to the Debtor's estate, and is an exercise of the Debtor's sound business judgment.

### D.    **The Property Should be Sold Free and Clear of Liens, Claims, Encumbrances and Other Interests**

20.     The Debtor requests that the Court authorize the sale of the Property free and clear of all liens, claims, encumbrances, and other interests (collectively "Liens"). The Property is subject to the Encumbrances that secure debts to Beck and Westeck and real estate taxes (the "Secured Creditors"). To the Debtor's knowledge, no other creditors have perfected an interest in the Property.

21.     Pursuant to Section 363(f) of the Bankruptcy Code, a trustee or Debtor-in-Possession may sell property under Bankruptcy Code Section 363(b) free and clear of liens, claims and encumbrances if one of the following conditions is satisfied: (i) applicable non-bankruptcy law permits the sale of the Property free and clear of such interest; (ii) the entity holding the lien, claim or encumbrances consents to the sale; (iii) the interest is a lien and the price at which such Property is to be sold is greater than the aggregate value of all liens on the Property; (iv) the interest is in bona fide dispute; or (v) the entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of its interest. 11 *U.S.C.* §363(f). *See*, *In re Smart World Tech, LLC*, 423 F.3d 166, 169 n. 3 (2nd Cir. 2005) (Section 363 permits sales of assets free and clear of claims and interests. It thus allows purchasers . . . to acquire assets [from a debtor] without any accompanying liabilities."); *In re Dundee Equity Corp.*, No. 89-B-10233, 1992 WL 53743, at *3 (Bankr. S.D.N.Y.

Mar. 6, 1992) ("Section 363(f) is in the disjunctive, such that the sale free of the interest concerned may occur if any one of the conditions of §363(f) have been met").

22.     Any entities holding Liens on the Assets will have received notice of this Motion. All parties in interest will be given sufficient opportunity to object to the relief requested by the Debtor in this Motion. If such lienholders do not object to the proposed sale, then their consent should reasonably be presumed. See, *Futuresource LLC v. Reuters Ltd.*, 312 F.3d 281, 285-86 (7th Cir. 2002) ("It is true that the Bankruptcy Code limits the conditions under which an interest can be extinguished by a bankruptcy sale, but one of those conditions is the consent of the interest holder, and lack of objection (provided of course there is notice) counts as consent. It could not be otherwise; transaction costs would be prohibitive if everyone who might have an interest in the bankrupt's assets had to execute a formal consent before they could be sold.") (internal citations omitted); *Hargrave v. Township of Pemberton (In re Tabone, Inc.)*, 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (failure to object to sale free and clear of liens, claims and encumbrances satisfies Section 363(f)(2); *Citicorp Homeowners Serv., Inc. v. Elliot (In re Elliot)*, 94 B.R. 343, 345 (E.D. Pa 1988) (same). See also, *In re GSC, Inc.*, 453 B.R. 132, 183 (Bankr. S.D.N.Y. 2011) (order deeming all parties who did not object to proposed sale to have consented under Section 363(f)(2); *In re Borders Group, Inc.*, 453 B.R. 459, 484 (Bankr. S.D.N.Y. 2011) (failure to object to free and clear sale satisfies Section 363(f)(2); *In re Enron Corp.*, 2004 WL 5361245 at *2 (Bankr. S.D.N.Y. 2004); *In re Enron Corp.*, 2003 WL 21755006 at *2 (AJG) (Bankr. S.D.N.Y. 2003) (order deeming all parties who did not object to proposed sale to have consented under Section 363(f)(2)). Notwithstanding the above, the Debtor proposes to pay the debts owed to Beck and Westech from the sale proceeds at the time of the closing.

23.     Further, the Debtor submits that Section 363(f)(5) is satisfied by the proposed sale, as any entity holding a Lien on the Property could be compelled to accept a monetary satisfaction of its Lien, and the Debtor is proposing to pay off the debts owed to the Secured Creditors, including the Encumbrances and the real estate tax prorations as required by the Purchase Contract.  As such, the sale of the Property free and clear of all Liens satisfies Section 363(f)(5) of the Bankruptcy Code. The Debtor intends to use the net proceeds remaining from the sale of the Property in operations to help fund its operations and limit the extent of any debtor-in-possession financing it may need.

**WHEREFORE,** the Debtor respectfully requests that the Court enter an Order in substantially the form attached hereto as Exhibit "G" hereto, authorizing the Debtor to (1) assume some or all contracts relating to sale of real estate located in Hamilton County, Ohio, including the Purchase Contract, Listing Agreement and, if needed, the Survey Contract, (2) approving the cure payment to the Surveyor, to the extent assumed, from the sale proceeds; (3) sell the Property to the Buyer free and clear of all liens, claims, encumbrances, and interests pursuant to 11 U.S.C. § 363(f) and (4) employ and approve compensation to Realtor and, if needed, the Surveyor from the sale proceeds.

Respectfully submitted,

COOLIDGE WALL CO., L.P.A.

*/s/ Patricia J. Friesinger*

_____
Patricia J. Friesinger (0072807)
33 W. First Street, Ste. 200
Dayton, Ohio 45402
Tel: (937) 449-5776 Fax: (937) 223-6705
E-Mail: friesinger@coollaw.com
*Counsel for Reliable Castings Corporation,*
*Chapter 11 Debtor*

American Land Title Association

Commitment for Title Insurance
[2021 v. 01.00 (07-01-2021)]
- 1 -

## EXHIBIT A

### Tract I: Auditor's Parcel No. 190-0026-0015

Situate in the City of Cincinnati, Hamilton County, Ohio in Section 21, Town 3, Fractional Range 2 of the Miami Purchase in Millcreek Township and being known, numbered and designated as Lot 71 in Isaac Bates' Second Subdivision as recorded in Plat Book 5, Page 100 and Plat Book 7, Pages 62 and 63 to correct errors and the records of Hamilton County, Ohio, said lot being more particularly described as follows:

Commencing at a point in the east line of Colerain Avenue 75 feet North of Northeast corner of Colerain Avenue and Sassafrass Street (formerly Carroll Street); thence Eastwardly 101.56 feet to a point in the West line of Lot 75 of said subdivision; thence northwardly along the West line of Lot 75, 25 feet to a point in the South line of Lot 70 of said subdivision; thence westwardly along the south line of Lot 70 of said subdivision; thence westwardly along the south line of Lot 70, 102.08 feet along the east line of Colerain Avenue; thence Southwardly along the East line of Colerain Avenue, 25 feet to the place of beginning.

### Tract II: Auditor's Parcel No. 190-0026-0009
### Tract III: Auditor's Parcel No. 190-0026-0010 and 11 cons.
### Tract IV: Auditor's Parcel No. 190-0026-0012
### Tract VII: Auditor's Parcel No. 190-0026-0032
### Tract VIII: Auditor's Parcel No. 190-0026-0033
### Tract IX: Auditor's Parcel No. 190-0026-0034 and 35 cons.
### Tract X: Auditor's Parcel No. 190-0026-0036

Situated in the City of Cincinnati, Hamilton County, State of Ohio, and being all of Lots 49, 50, 51, 54, 55, 56, 61 and 62 and part of Lot 48, of Isaac Bates' 2nd Subdivision, as recorded in Plat Book 7, Page 62 of the Plat Books in the Recorder's Office of Hamilton County, Ohio, and included in the following boundary, to wit:

Beginning at a stake in the east line of Colerain Avenue in said City, driven at the Northwest corner of said Lot numbered forty nine (49); thence Southwardly along the East line of Colerain Avenue one hundred (100) feet to a stake driven at the Southwest corner of said Lot Sixty Two (62); thence Eastwardly along the South lines of said Lots Sixty Two (62) and Sixty One (61) to the Southeast corner of said Lot Sixty One (61); thence along the west line of Comfort Street one hundred twenty six and forty eight hundredths (126.48) feet to an iron rod driven at a point where the north line of said Lot Forty Nine (49) extended Eastwardly intersects the East line of said Lot Forty Eight (48); thence Westwardly two hundred fourteen and 04/100 (214.04) feet along the North line of Lot Forty Nine (49) as extended, to the place of beginning.

*This page is only a part of a 2021 ALTA Commitment for Title Insurance issued by Riverbend Commercial Title Services LP, as agent for old Republic National Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

Copyright 2021 American Land Title Association. All rights reserved.
The use of this Form (or any derivative thereof) is restricted to ALTA licensees and
ALTA members in good standing as of the date of use. All other uses are prohibited.
Reprinted under license from the American Land Title Association.



EXHIBIT A

American Land Title Association

Commitment for Title Insurance
[2021 v. 01.00 (07-01-2021)]
- 2 -

EXCEPTING therefrom the following described real estate conveyed to the City of Cincinnati by Deed recorded in Deed Book 2974, Page 402, of the Hamilton County, Ohio Records:

Situate, lying and being in Section 21, Town 3, Fractional Range 2, Millcreek Township, Hamilton County, Ohio, and being part of Lots 48, 51, 54, 56, and 61 of Isaac Bates' Second Subdivision as recorded in Plat Book 5, Pages 100 and 101, Hamilton County Records and more particularly described as follows:

From the intersection of the northerly line of Sassafrass Street (a 50 foot street) and the westerly line of Comfort Street (a 50 foot street) measure North 1°55' East, along the westerly line of Comfort Street, 150 feet to the southeast corner of said Lot 61 for the place of beginning; thence North 1°55' East, along the westerly line of Comfort Street, 3.24 feet to an angle; thence North 8°54' West, along the westerly line of Comfort Street, 123.53 feet to the northerly line of Albert M. Freiberg's property; thence South 85°09 West, along said northerly line, 70 feet; thence South 36°37'57" East, 148.74 feet to the southeast corner of said Lot 61 and the place of beginning and containing 4388 square feet, more or less, or 0.10 acre, more or less.

### Tract V: Auditor's Parcel No. 190-0026-0013
### Tract VI: Auditor's Parcel No. 190-0026-0014
Situated in the City of Cincinnati, County of Hamilton, State of Ohio, and described as follows:

Being Lots Nos. 63 ad 70 on the plat of Isaac Bates Second Subdivision as recorded in Plat Book 5, Page 100 of the Records of Hamilton County, Ohio, said Lot No. 63 commencing 125 feet north of the northeast corner of Colerain Avenue and Carroll Avenue, now Sassafrass Street; thence eastwardly 122.61 feet; thence northwardly 24.90 feet; thence westwardly 124.25 feet to Colerain Avenue; thence southwardly along Colerain Avenue 25 feet to the place of beginning and Lot No. 70 commencing 100 feet north of the northeast corner of Colerain and Carroll Avenue, now Sassafrass Street; thence running easterly 122.08 feet; thence northwardly 25 feet; thence westwardly 122.61 feet to Colerain Avenue and thence southwardly along Colerain Avenue 25 feet to the place of beginning.

### Tract XI: Auditor's Parcel No. 194-0008-0035
Situate, lying and being in the City of Cincinnati, County of Hamilton and State of Ohio, in Section twenty seven (27), Township three (3), Fractional Range two (2) of the Miami Purchase, more particularly described as follows:

Beginning at a point in the southwest corner of Lot No. Twelve (12) of E. C. Roll's Estate recorded in Plat Book 1, Page 306 of the records of Hamilton County, Ohio; thence North 22°50' East, 435.75 feet to a point; thence South 67°10' East, 131.50 feet to a point; thence North

*This page is only a part of a 2021 ALTA Commitment for Title Insurance issued by Riverbend Commercial Title Services LP, as agent for old Republic National Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright 2021 American Land Title Association. All rights reserved.**
The use of this Form (or any derivative thereof) is restricted to ALTA licensees and
ALTA members in good standing as of the date of use. All other uses are prohibited.
Reprinted under license from the American Land Title Association.



American Land Title Association

Commitment for Title Insurance
[2021 v. 01.00 (07-01-2021)]
- 3 -

85°46' East, 28.50 feet to a point; thence South 3°10' East, 270 feet to a point; thence South 59°35' West 162 feet to a point; thence South 89°20' West, 195.36 feet to the place of beginning, containing two and 15/100 (2.15) acres.

### Tract XII: Auditor's Parcel No. 194-0008-0036

*The Land depicted below is a tract of land as shown by the tax map records of Hamilton County, Ohio; a new legal description, and Plat of Survey with closure table in a form acceptable to and approved by the county engineer is required.*



*This page is only a part of a 2021 ALTA Commitment for Title Insurance issued by Riverbend Commercial Title Services LP, as agent for old Republic National Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright 2021 American Land Title Association. All rights reserved.**
The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.



American Land Title Association

Commitment for Title Insurance
[2021 v. 01.00 (07-01-2021)]
- 4 -

## Tract XIII: Auditor's Parcel No. 194-0008-0077

*The Land depicted below is a tract of land as shown by the tax map records of Hamilton County, Ohio; a new legal description, and Plat of Survey with closure table in a form acceptable to and approved by the county engineer is required.*



12752244.1

*This page is only a part of a 2021 ALTA Commitment for Title Insurance issued by Riverbend Commercial Title Services LP, as agent for old Republic National Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright 2021 American Land Title Association. All rights reserved.**
The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited.
Reprinted under license from the American Land Title Association.





# PURCHASE AND SALE AGREEMENT

**THIS PURCHASE AND SALE AGREEMENT** (the "Agreement") is made and entered into as of June 22 , 2023 (the "Effective Date") by and between **Reliable Castings Corporation,** an Ohio for-profit corporation (the "Seller") and **the Port of Greater Cincinnati Development Authority**, an Ohio port authority organized and existing under R.C. Chapter 4582 (the "Buyer").

## ARTICLE I

**1.1** **Agreement to Sell and Purchase**. In accordance with and subject to the terms and conditions hereof, on the date of Closing (as hereinafter defined), Seller agrees to sell to Buyer, and Buyer agrees to purchase from Seller, the Property.

**1.2** **Property.** The Property shall include and collectively means that certain real property owned by Seller together with all improvements, building and structures thereon and the common areas appurtenant thereto, including any and all easements, rights and appurtenances pertaining to the Property along with any right, title and interest of Seller in and to all tenements, hereditaments, buildings, appurtenances, rights, privileges, licenses, easements, and rights-of-way incident thereto, such Property being:

| | |
|---|---|
| 3406 Colerain Avenue, Cincinnati, Ohio | PIN: 190-0026-0015-00 |
| 3416 Colerain Avenue, Cincinnati, Ohio | PIN: 190-0026-0009-00 |
| 3416 Colerain Avenue, Cincinnati, Ohio | PIN: 190-0026-0010-00 |
| 3412 Colerain Avenue, Cincinnati, Ohio | PIN: 190-0026-0012-00 |
| 3410 Colerain Avenue, Cincinnati, Ohio | PIN: 190-0026-0013-00 |
| 3408 Colerain Avenue, Cincinnati, Ohio | PIN: 190-0026-0014-00 |
| 3421 Comfort Street, Cincinnati, Ohio | PIN: 190-0026-0032-00 |
| 3419 Comfort Street, Cincinnati, Ohio | PIN: 190-0026-0033-00 |
| 3417 Comfort Street, Cincinnati, Ohio | PIN: 190-0026-0034-00 |
| 3413 Comfort Street, Cincinnati, Ohio | PIN: 190-0026-0036-00 |
| 1867 Dreman Avenue, Cincinnati, Ohio | PIN: 194-0008-0035-00 |
| 1857 Dreman Avenue, Cincinnati, Ohio | PIN: 194-0008-0036-00 |
| Dreman Avenue, Cincinnati, Ohio | PIN: 194-0008-0077-00 |

In addition, the Property shall include any and all leases, licenses, occupancy agreements, permits, rents, warranties, construction warranties, guarantees in favor of Seller**,** indemnities in favor of Seller and security deposits with respect to the Property, or any portion thereof along with any and all mineral and water rights in, under, on or above the Property to extent they are owned by Seller. The Parties agree and acknowledge that the specific legal descriptions of the Property will be determined following a title examination and ALTA survey conducted during the Investigation Period (as hereinafter defined).

**1.3** **Purchase Price**. The purchase price (the "Purchase Price") to be paid to Seller for the sale of the Property to Buyer as provided for herein shall be one million dollars **($1,000,000.00)** payable as follows:



(A)    <u>Deposit</u>.  Within five (5) business days after the Effective Date, Buyer shall deliver a check in the amount of fifteen thousand **($15,000)** to Buyer's Title Company (the "Deposit"). If the sale is not closed hereunder because of the failure of Buyer to comply with the terms of this Agreement, the Deposit shall be forfeited by Buyer and retained by Seller as full and complete liquidated damages.  If Buyer complies with the terms of this Agreement but the sale does not close hereunder because of failure of satisfaction of the conditions to Buyer's obligations described **Article II** hereof and as otherwise set forth herein, then, upon Buyer's termination of the Agreement in accordance with its terms, the Deposit shall be promptly refunded to Buyer, and the parties shall be relieved of any further liability hereunder.  If Buyer complies with the terms of this Agreement but the sale does not close because of breach by Seller of its obligations hereunder, or due to condemnation (under **Article IV** hereof) then the Deposit and any interest thereon shall be promptly refunded to Buyer; and

(B)    <u>Closing</u>.  On the date of Closing (as hereinafter defined), Buyer shall pay to Seller, by Cashier's Check or by wire transfer of current funds, the Purchase Price, of which the Deposit given hereunder shall constitute a part, subject to adjustments as hereinafter provided and subject to all of the terms and conditions contained herein.

**1.4    Adjustments and Credits**.  The following items shall be credits towards the Purchase Price payable at Closing, unless otherwise so provided (where appropriate, such credits shall be calculated on the basis of a year of twelve (12) months, thirty (30) days to the month, Seller to have the last day, unless otherwise provided):

(A)    General property taxes (state, county, municipal, school and fire district, and other local real estate taxes and personal property taxes) accrued for the year in which the Closing occurs through the date of Closing, and, in addition, if not fully paid prior to Closing, all taxes for years prior to the year in which Closing occurs, shall be charged to Seller as a credit against the Purchase Price;

(B)    Special taxes or assessments, if any, upon the Property levied or which have accrued through the date of Closing shall be charged to Seller as a credit against the Purchase Price;

(C)    Any utility charges and other normal operating expenses, all as accrued through the date of Closing, shall either be pro-rated or charged to Seller as a credit against the Purchase Price; and

(D)    On or before the date of Closing, Seller shall cause any and all assessments, liens, previously undisclosed leases or tenancies and encumbrances affecting the Property, including, without limitation, any mechanic's lien, security interest, mortgage or deed of trust, to be satisfied and released. The proceeds due at Closing shall be applied to satisfy or pay any assessments, liens, encumbrances or other charges affecting the Property, which are to be paid, satisfied or released pursuant to this Agreement.

**1.5    Transfer Tax, Recording Costs, Etc.**  All transfer and conveyance taxes, agricultural recoupment taxes, if any, and documentary stamps shall be paid by Seller.  All recording costs, including the cost of recording the warranty deed shall be paid by Buyer.  Title examination and title premium costs shall be paid by Buyer.

**1.6    Possession**.  Seller shall transfer possession of the Property, in broom clean condition, to Buyer at Closing, with the exception that Seller has a right to retain possession of the portion of the Property located on Colerain Avenue for no more than 30 days after Closing.

**1.7    Closing**.  The closing of the transaction contemplated hereby shall be on or before thirty (30) days following satisfaction or waiver of the conditions to Buyer's obligations described in **Article II** hereof and shall take place at a location, time and date as directed by Buyer (the "Closing").

**1.8    Documents at Closing**.  On the date of Closing, Seller shall deliver or cause to be delivered to Buyer the following: (i) a limited warranty deed for the Property, transferring and conveying to Buyer marketable fee simple title to the Property, subject only to those exceptions satisfactory to Buyer pursuant to **Article II** hereof; and (ii) such reasonable and customary affidavits and other evidence of title from Seller, as may be reasonably required by the Title Company (hereafter defined), in order to issue the owner's policy of title insurance as specified in **Article II** hereof.



## ARTICLE II

**2.1    Buyer's Conditions**.  The obligation of Buyer to consummate the transaction provided for in this Agreement shall be subject to Buyer's obtainment, review and approval, as the case may be, at Buyer's expense, of the matters described in the following subparagraphs 2.1(A) and (B) (subject to the right of Buyer to waive obtainment, review or approval of any of such matters):

(A)    Investigation Period.  From the Effective Date and continuing for a period of sixty (60) days thereafter (the "Investigation Period"), Seller shall permit and, to the extent reasonably required by Buyer, Seller shall assist Buyer in the following:

(i)    within ten (10) days of the Effective Date, Seller shall deliver to Buyer: (a) copies of all existing surveys, title insurance policies, building plans, environmental or asbestos survey;

(ii)    the obtainment, review and approval of such tests, inspections, audits, engineering, feasibility, regulatory and environmental studies as Buyer in its sole discretion deems desirable;

(iii)    the obtainment, review and approval by Buyer of a survey of the Property and a commitment in favor of Buyer for an ALTA owner's policy of title insurance (the "Title Policy") from a title agency of Buyer's choice (the "Title Company") with respect to the Property, in the amount of the Purchase Price and in which the exceptions for mechanic's lien, easements not shown by public record and other standard exceptions, as well as any easements or encumbrances unacceptable to Buyer have all been deleted. The Title Policy shall expressly insure against any and all mechanics and materialmans liens and shall contain such affirmative endorsements which, in Buyer sole discretion, deems desirable; and

(iv)    the obtainment, review and approval by Buyer of all utilities, access, project feasibility, financing, marketing, and, if applicable, approvals of any zoning and development plans from all governmental agencies with authority and jurisdiction over such matters, and receiving all other certificates, permits and/or approvals from applicable governmental agencies required for Buyer's intended use of the Property.

(B)    Closing Conditions.  As a condition precedent to Buyer's obligation to close the transaction herein described:  (i) Buyer shall have obtained at Closing for the standard premium, the Title Policy; (ii) all representations and warranties of Seller shall be true, accurate, and complete in all material respects as of Closing, and all covenants and agreements of Seller herein to be complied with or performed prior to or at Closing shall have been complied with and/or performed; (iii) Buyer shall have received from Seller, on or prior to the date of Closing, the documents described in **Section 1.8** hereof; (iv) the Property shall be in the same condition as it was on the Effective Date, normal wear and tear excluded; and (v) no condemnation or taking shall have occurred on any portion of the Property.

If Buyer, after its review and inspection during the Investigation Period determines in its sole discretion and for any reason whatsoever, that it does not desire to consummate the Agreement, then Buyer's conditions precedent shall be deemed to have not been satisfied, and Buyer shall inform Seller of the same prior to the end of the Investigation Period in which case, Seller shall immediately refund the Deposit to Buyer, this Agreement shall be terminated, and neither party shall have any liability to the other, except for any obligation herein made to survive termination.

If, however, Buyer determines that the conditions precedent have been satisfied, or if Buyer shall choose to waive the same, then Buyer shall provide written notice thereof to Seller and the parties shall proceed to Closing subject to the Closing Conditions required above in Paragraph (B). Further, if Seller violates the Closing Conditions required above in Paragraph (B), then Buyer may terminate this Agreement in which case Seller shall immediately refund the Deposit to Buyer, this Agreement shall then be null and void, and neither party shall have any liability hereunder to the other, except for any obligation herein made to survive termination.

**2.2    "AS IS" Condition**.   Buyer agrees and acknowledges that Seller's transfer and its acceptance of the Property is "AS IS," "WHERE IS," and "WITH ALL FAULTS" in its present physical condition without reliance on any warranties or representations of Seller or any other party. Buyer agrees to accept all defects with the Property as of the Effective Date. The Property's "as is" condition may include

04860008-1      3 East Fourth Street, Suite 300
Cincinnati, OH 45202
(513) 621-3000



both patent and latent defects, and Buyer acknowledges that it is relying on its own investigations and inspections, and no other party's or person's representations, except those made herein.

## ARTICLE III

**3.1**    Seller covenants and agrees that from and after the date of full execution of this Agreement and until the date of Closing:

(A)    Seller shall allow Buyer and its agents and consultants, reasonable access to the Property during business hours for the purpose of conducting inspections and investigations. Such access may be exercised by Buyer or by agents of or consultants to Buyer on Buyer's behalf.  After completion of its inspection, Buyer shall restore any disruption of the physical elements of the Property caused thereby. This obligation shall survive Closing or the termination of this Agreement.

(B)    Seller shall: (i) cause the Property to be insured against all ordinary and insurable risks and to be maintained and repaired in a careful, prudent and efficient manner, in accordance with applicable requirements of all contracts, ordinances, laws and insurance policies; and (ii) bear the risk of loss to the Property, through the hour of Closing.  Seller shall promptly notify Buyer of any material damage occurring to the Property prior to Closing. If the Property suffers material damage as a result of any casualty or governmental condemnation between the Effective Date and Closing, Buyer may elect, by written notice delivered to Seller prior to Closing to: (a) terminate this Agreement by written notice to Seller, in which event this Agreement shall become null and void and thereafter neither party shall have any liability or obligation to the other; or (b) receive all insurance or other proceeds resulting from such casualty or condemnation occurring after the Effective Date, and Seller shall pay to Buyer the amount of any deductible. Seller shall not take any other action which would cause any representation, warranty or covenant set out herein to be untrue as of Closing without Buyer's prior written consent.

(C)    Seller shall maintain and operate the Property in its current order, condition and repair, normal wear excepted, and shall make all repairs, maintenance and replacements required for the continued operation of the Property in the fashion currently being operated and shall otherwise operate the Property in the same manner as before the making of this Agreement.

(D)    Seller shall not engage in or permit any sale, assignment, disposition, easement or encumbrance of the Property or any part thereof.

(E)    Seller shall not: (i) perform any act which would wrongfully terminate any existing contract;  (ii) enter into or terminate any contract or agreement relating to the Property without consent of Buyer; (iii) modify any contract or agreement pertaining to the Property without consent of Buyer; or (iv) waive any material rights of Seller thereunder, without in each case obtaining Buyer's prior written consent thereto, in Buyer's reasonable discretion.

(F)    Commissions of leasing and rental agents and tenant improvement costs for any lease entered into before Closing shall be paid by Seller prior to Closing, and reimbursed to Seller at Closing from the Buyer only for a lease entered into after the Effective Date of this Agreement, provided such lease is approved in writing by Buyer.

**3.2    Representations and Warranties**.  Seller hereby makes the following representations and warranties, each of which is true and correct on the date hereof, will be true as of the date of Closing, and will survive Closing for one year:

(A)    Seller is the sole owner of the Property and has all requisite power and authority to own the Property, to execute, deliver and perform this Agreement and to consummate the transactions contemplated hereby.  This Agreement has been duly authorized, executed and delivered by Seller and constitutes the legal, valid and binding agreement of Seller. Neither the execution, delivery and performance of this Agreement nor the consummation of the transactions contemplated hereby: (i) is prohibited by or violates any law, statute, rule, regulation, judgment, order, writ, injunction or decree which is binding upon Seller or any of its properties or assets; (ii) will violate any agreement or instrument to which Seller is a party or by which Seller is bound; or (iii) will require the consent, approval, authority or order of any party or any court, governmental agency or both that has not been obtained in writing;

(B)    There are no leases, tenancies or occupancies affecting the Property, which will

04860008-1    3 East Fourth Street, Suite 300
Cincinnati, OH 45202
(513) 621-3000



continue after the date of Closing;

(C)     To the best of Seller's knowledge, other than as disclosed to Buyer by Seller in the Phase II environmental report conducted by _____, there are no, nor have there been any hazardous wastes, toxic substances, underground storage tanks, petroleum hydro-carbons, pollutants or other contaminants of any kind whatsoever generated, released, stored, deposited, buried, or otherwise located beneath, over, in or upon, or which have been used in the construction of the Property, or which are or could be or become detrimental to such building, human health or the environment generally, or which are or could be or become a violation of or require registration under any laws or regulations, nor has Seller received any notice from any governmental authority of any violation thereof.  The Property was not built, in whole or in part, on a landfill and the soil is not chemically contaminated.  Seller has complied with all applicable laws, ordinances, regulations, statutes, rules and restrictions;

(D)     There are no purchase contracts, options or other agreements of any kind, written or oral, formal or informal, whereby any person or entity other than Seller has acquired or has any basis to assert any right, title or interest in, or right to possession, use, enjoyment or proceeds of all or any portion of the Property; and

(E)     No commitments have been made to any governmental authority, utility company, or to any other organization, group, entity or individual, relating to the Property which would impose an obligation upon Buyer, or its successors or assigns, to make any contribution or dedication of money or land, or to construct, install or maintain any improvements of a public or private nature on or off the Property. Seller has not received written notice from any governmental or quasi-governmental agency requiring the correction of any condition with respect to the Property. To Seller's knowledge, the Property is not in violation of applicable laws or regulations.

(F)     Seller has no knowledge of any pending or threatened condemnation proceeding or contemplated proceeding to modify or amend the building code or zoning or land use law or regulation against all or any portion of the Property and Seller has received no written notice of any pending or threatened litigation initiated against all or any portion of the Property or against Seller with respect to the Property.

**The representations and warranties set forth herein shall survive Closing for one year.  Seller shall notify Buyer if any of the representations, warranties or covenants of Seller become untrue prior to the date of Closing.**

## ARTICLE IV

**4.1     Indemnification**.  For a period of one year after Closing Seller shall indemnify, defend and hold harmless the Buyer, its successors and assigns, and the Property from and against: (i) any loss or damage to Buyer arising from any misrepresentation or any breach of warranty or default of any covenant or agreement of Seller under this Agreement; (ii) damages due to the presence of toxic or hazardous materials or underground storage tanks and/or the use of, disposal at or storage of toxic or hazardous materials on the Property by Seller or its agents, employees or contractors that are known to Seller and undisclosed to Buyer; and (iii) all costs and expense, including reasonable attorney's fees, related to any actions, suits, or judgments incident to any of the foregoing.

## ARTICLE V

**5.1     Binding Agreement**.  This Agreement shall be binding on and shall inure to the benefit of the parties named herein and to their respective successors and assigns.

**5.2     Assignment**.  Buyer may assign its rights and interests herein or delegate its duties hereunder without the prior written consent of Seller.

**5.3     Governing Law**.  This Agreement shall be governed, construed, and interpreted in accordance with the laws of the State of Ohio, without regard to conflicts of laws principles.  The parties agree that any litigation or arbitration arising out of or in connection with this Agreement shall be brought only in a court located in Hamilton County, Ohio. Each party consents to jurisdiction over it by such a court.



**5.4**  **Notices**.  All notices, requests, demands and other communications hereunder shall be deemed to have been dully given if the same shall be in writing and shall be delivered personally or deposited in the United States Mail by Registered or Certified Mail, return receipt requested, postage prepaid, or sent by any nationally recognized delivery service and addressed as set forth below:

(A)  If to Buyer:

Port of Greater Cinti Development Authority
Attn: Todd Castellini
3 E. Fourth St., Suite 300
Cincinnati, OH 45202

(B)  If to Seller:

Reliable Castings Corporation
Attn: _____
Address: _____

Any party may change the address to which notices are to be addressed by giving the other party notice in the manner herein set forth.  Notices sent in compliance with this Section shall be effective: (i) upon receipt or refusal if delivered personally; (ii) one (1) business day after depositing with such an overnight courier service; or (ii) three (3) business days after deposit in the mails if mailed.

**5.5**  **Buyer's Remedies**.  In the event that any of Seller's representations or warranties contained herein are untrue in any material respect or if Seller shall fail without cure to timely perform any of its obligations, covenants and/or agreements contained herein which are to be performed by Seller, then Buyer, at its option, may exercise any one or more of the following remedies in addition to any other remedies available at law or in equity: (i) waive any claim against Seller and elect to close the purchase of the Property pursuant to the provisions hereof; (ii) specifically enforce the provisions of this Agreement; and (iii) cancel and terminate this Agreement, and in such event, the Deposit and any interest earned thereon shall be immediately paid to Buyer (In such event, Buyer shall retain all rights against Seller for damages arising out of Seller's default).

**5.6**  **Entire Agreement**.  This Agreement, together with the Exhibits attached hereto and incorporated by reference herein, constitutes the entire undertaking between the parties hereto and supersedes any and all prior and contemporaneous agreements, arrangements and understandings between the parties.

**5.7**  **Survival of Obligations**.  All matters required to be performed hereunder after the date of Closing shall survive Closing.

**5.8**  **1031 Exchange**.  Buyer or Seller may wish to close this transaction in connection with an IRC Section 1031 tax-free exchange.  In such case, Buyer and Seller agree to cooperate in effecting such an exchange provided it can be accomplished with no additional cost or liability to the other party.

**5.9**  **Real Estate Commissions.**  Buyer and Seller represent and warrant that they have not dealt with any real estate brokers or agents in this transaction other than Colliers International for the Buyer and Newmark for the Seller.  This Agreement is not intended to be, and shall not create a relationship of owner and broker, or owner and salesman, between the parties. It is intended that the sole relationship shall be that of seller and buyer.  Buyer bears the responsibility for paying the Colliers International commission at Closing.

**5.10**  **Confidentiality.**  Other than as may be required to be disclosed by Hamilton County in the real property transfer process, Buyer and Seller agree to maintain the economic terms of this Agreement in strict confidence except as otherwise necessary to carry out and implement the terms and conditions hereof; provided, however, that a party shall not be liable for unauthorized disclosure of such matters to its professional advisors such as attorneys, engineers, accountants and consultants, and shall be permitted to disclose such matters if required to do so by a court of law or in connection with the enforcement of its rights hereunder. Notwithstanding the foregoing, Seller understands and acknowledges that Buyer is subject to Ohio Public Records laws.

**5.11**  **Severability.**  If any term or provision hereof, or the application thereof to any person or circumstances, shall, to any extent, be invalid or unenforceable, the remainder of this Agreement or the application of such term or provision to persons or circumstances other than those as to which it is held



invalid or unenforceable, shall be unaffected thereby; and each term, covenant, condition and provision hereof shall be valid and be enforced to the fullest extent permitted by law.

The parties hereto have executed this Agreement as of the Effective Date.

BUYER:

**The Port of Greater Cincinnati Development Authority**

By: _Laura N Brunner_

Laura N. Brunner
Its President / CEO

Date: _6/22/23_

SELLER:

**Reliable Castings Corporation**

By: _Robert J Kuhn_

Print Name: _ROBERT J. KUHN_

Title: _BOARD CHAIR_

Date: _JUNE 21, 2023_

## AMENDMENT TO
## PURCHASE AND SALE AGREEMENT

THIS AMENDMENT TO PURCHASE AND SALE AGREEMENT (this "Amendment"), dated as of August 8, 2023, is executed by and between RELIABLE CASTINGS CORP., an Ohio corporation ("Seller"), and the PORT OF GREATER CINCINNATI DEVELOPMENT AUTHORITY, an Ohio port authority created under Ohio Revised Code Chapter 4582 ("Buyer"), based upon the following premises:

WHEREAS, Buyer and Seller entered into a certain Purchase and Sale Agreement with an effective date of June 22, 2023 (the "Agreement"), wherein Buyer agreed to buy from Seller, and Seller agreed to sell to Buy, certain real property as identified in the Agreement (the "Property"); and

WHEREAS, Seller filed for Chapter 11 bankruptcy protection in Case No. 3:23-bk-31157 in the U.S. Bankruptcy Court for the Southern District of Ohio (the "Bankruptcy Court"), requiring Seller to obtain Bankruptcy Court authorization before selling its assets; and

WHEREAS, Buyer and Seller wish to amend the Agreement to extend the Investigation Period to provide additional time for Seller to request such Court authorization, as more fully set forth herein.

NOW, THEREFORE, in consideration of the foregoing premises, the mutual promises set forth herein and other good and valuable consideration, Purchaser and Seller hereby agree to the following:

1.      Defined Terms. Capitalized terms used but not defined in this Amendment shall have the meanings ascribed to such terms in the Agreement.

2.      Investigation Period. The Investigation Period, as set forth in the Agreement, shall end at 5 p.m. on the fifth business day following Seller's notifying Buyer in writing (email to counsel being acceptable) that the Bankruptcy Court entered an order ruling on Buyer's motion for authority to perform the Agreement and sell the Property to Buyer.

3.      Continuing Effect. This Amendment shall be incorporated into and made a part of the Agreement and except as specifically and expressly modified herein, all of the terms, conditions and provisions of the Agreement shall remain in full force and effect.

4.      Counterparts. This Amendment may be executed in facsimile or other counterparts by the Buyer and Seller, each of which counterpart shall constitute an original and all of which, taken together, shall constitute one and the same instrument.

IN WITNESS WHEREOF, this Amendment has been executed by Buyer and Seller as of the date first written above.

BUYER:

PORT OF GREATER CINCINNATI DEVELOPMENT AUTHORITY, an Ohio port authority created under Oho Revised Code Chapter 4582

By:  _____
Laura N. Brunner, its President/CEO

SELLER:

RELIABLE CASTINGS CORPORATION an Ohio corporation

By:  _____
RJ Kuhn, its Board Chair

## EXCLUSIVE RIGHT TO SELL LISTING AGREEMENT
### Industrial

This Exclusive Right to Sell Listing Agreement (hereinafter referred to as the "Listing Contract") is entered into as of the date of full execution of this Listing Contract by and between Newmark Real Estate of Ohio, LLC dba Newmark, a Delaware limited liability company, with a business address of One East Fourth Street, Suite 500, Cincinnati, Ohio 45202-3728 (hereinafter referred to as "Broker"), and Reliable Castings Corporation, an Ohio Corporation For Profit, with a business address of 4400 Easton Commons Way, Suite 125, Columbus, Ohio 43219 (hereinafter referred to as "Seller"), concerning the property located in the City of Cincinnati, County of Hamilton, State of Ohio, generally known as 3416 Colerain Ave, Parcels 190-0026-0009-00, 190-0026-0032-00, 190-0026-0010-00, 190-0026-0033-00, 190-0026-0034-00, 190-0026-0012-00, 190-0026-0036-00, 190-0026-0013-00, 190-0026-0014-00, 190-0026-0015-00, together with all improvements and fixtures thereon, and with all appurtenant rights, privileges, and easements ("the Property").

## 1.  Engagement of Broker and Acceptance

Seller engages Broker as Seller's sole and exclusive agent to sell or exchange the Property, and Broker accepts the engagement and agrees to use Broker's best efforts to sell or exchange the Property subject to the terms and conditions contained in this Listing Contract.

## 2.  Listing Period

In consideration of Broker using Broker's best efforts to sell or exchange the Property, Seller hereby grants to Broker the exclusive right to sell or exchange the Property beginning on May 30, 2023, and ending on May 31, 2024 (the "Listing Period").

## 3.  Terms of Sale

Seller offers the Property at a price of $1,000,000 on the following terms and conditions (if any):  N/A, which terms and conditions, including price, may be waived by Seller. The Property shall include, without limitation, the following: all electrical, plumbing, heating and air conditioning equipment, if any, except: N/A. The following items of personal property shall be included in the sale of the Property:  N/A.

Possession shall be given, subject to existing tenants' rights (if any), upon closing.  Existing tenants' rights are as follows:  None.

Real estate taxes, installments of assessments, if any, rents, and operating expenses shall be prorated as of the date of closing. Prorations of real estate taxes and installments of assessments, if any, will be based on the most recent official tax duplicate as of the date of closing.

## 4.  Brokerage Commission

A. Seller hereby agrees to pay Broker a commission of **Two Percent (2%)** of the gross selling price ("the Sale Commission") if one or more of the following occurs within the first sixty days (60 days) of the Listing Period: (1) the Property (or any part thereof) is sold or exchanged to The Port of Greater Cincinnati Development Authority or any entity related to The Port of Greater Cincinnati Development Authority; (2) a written letter of intent from with The Port of Greater Cincinnati Development Authority or any entity related to The Port of Greater Cincinnati Development Authority and/or exchange on the terms set forth above is submitted to Seller signed by a ready, willing, and able buyer or tenant and is accepted by Seller.

B. Seller hereby agrees to pay Broker a commission of **Six Percent (6%)** of the gross selling price regardless of agency relationships ("the Sale Commission") if one or more of the following occurs within the Listing Period or any extension of the Listing Period: (1) the Property (or any part thereof) is sold or exchanged; (2) a written offer to purchase and/or exchange on the terms set forth above is submitted to Seller signed by a

EXHIBIT C

ready, willing, and able buyer or tenant; and/or (3) a written offer to purchase and/or exchange is accepted by Seller.

C.  The Sale Commission will also be paid if the Property is sold, exchanged, or if a contract is entered into for the sale or exchange of the Property within one hundred eighty (180) days after the expiration of the Listing Contract or any extension thereof ("the Protection Period") to any person and/or entity with whom the Broker had any contact with respect to the Property and/or to any person or entity that expressed any interest in the Property during the Listing Period and/or any extensions of the Listing Period, provided that the Broker notifies the Seller of the name of such persons and/or entities in writing within thirty (30) days after the expiration of the Listing Contract (or any extension thereof).

D.  Seller authorizes escrow agent to accept and hold, in trust, earnest money deposits from prospective buyers or tenants making written offers to purchase the Property. At closing, Broker has the right to instruct the escrow agent to apply as much of the earnest money deposit as may be necessary to pay the Sale Commission due to Broker. In the event that any contract to purchase does not close for any reason other than as agreed, or in the event of a dispute as to the disposition of the deposit, escrow agent shall retain the deposit until (1) Seller and buyer or tenant have settled the dispute; (2) disposition has been ordered by a final court order; (3) escrow agent deposits the earnest money with a court pursuant to applicable court procedures.

E.  In the event Seller enters into any agreement to lease the Property, or a portion of the Property within the Listing Period or any extension of the Listing Period, or within the Protection Period (provided that Broker notifies Seller of the name of the prospect in writing within thirty (30) days after the expiration of the Listing Period or any extension thereof), to any prospect to whom Broker has submitted the Property or with whom Broker has negotiated in the performance of Broker's responsibilities, Seller hereby agrees to pay Broker a commission for the lease, to be paid 50% upon lease execution and 50% upon lease commencement:

> **Six Percent (6%)** of the Net Rent (which shall mean annual base rent paid by the tenant, times the number of years in the original term of the lease) for years one (1) through five (5) of the term of the lease following any free rent period, and **Three Percent (3%)** of the Net Rent for the remainder of the term of the lease.

> If such tenant subsequently purchases the Property, or any part thereof, during the term of the lease, including any renewal or extension thereof, then Seller agrees to pay Broker at closing the Sale Commission of **Six Percent (6%)** of the sale price for which the Property, or any part of the Property, is sold, less any unearned leasing commission.

E.  The Sale Commission shall be paid to Broker in full upon closing. In the event any sum of money due under this Listing Contract remains unpaid for a period of thirty (30) days, such sum shall bear interest at the rate of eighteen percent (18%) per annum from the due date until paid.

F.  In the event that a commission is paid to Broker pursuant to Section 4(E) above, in any transaction in which a tenant renews or extends the lease term ("Renewal"), Seller agrees to pay Broker one-half (1/2) of the leasing commission for the period of any Renewal. If the primary term of the lease was less than five (5) years, then Seller will pay Broker the leasing commission for the primary term of the lease, plus any portion or all of the Renewal up to five (5) years total following any free rent period, at the full leasing commission rate. Seller will pay one-half of the leasing commission for any Renewal following the initial five (5) period of the lease. Such leasing commission associated with any Renewal shall be paid to Broker in full upon the date the tenant agrees in writing to the Renewal.

G.  In the event that a commission is paid to Broker pursuant to Section 4(E) above, in any transaction in which a tenant agrees to an expansion of the Property being leased during the tenant's lease term, Broker shall be paid the leasing commission for the expansion space that is leased once the tenant agrees in writing to the expansion.

I.   If Seller and a buyer sign a contract, option to purchase real estate, and/or any similar document during the Listing Period and/or any extensions thereof, but the closing of the sale of the Property will not take place until after the Listing Period and/or any extensions thereof, then Seller's obligation to pay the Sale Commission as stated in the Listing Contract will be extended to coincide with the closing date. The Sale Commission will be payable in cash by no later than at closing. In the event Seller should be unable or refuse to convey title when there is a ready, willing and able buyer or tenant that is made known to Seller, then Seller agrees to pay Broker the Sale Commission immediately. In any event of commission nonpayment, Broker may file a broker's lien against the Property to protect Broker's right to receive the Sale or Leasing Commission, and Seller waives any possible claim Seller may have for Broker filing a broker's lien.

J.   In the event any sum of money due under this Listing Contract remains unpaid for a period of thirty (30) days, such sum shall bear interest at the rate of eighteen percent (18%) per annum from the due date until paid.

K.   Seller authorizes Broker to cooperate and divide with other brokers the Sale Commission, or any leasing commission pursuant to Section 4(E), in any manner acceptable to Broker.

### 5.  Marketing

A.   Broker shall be Seller's exclusive agent for marketing the Property for sale, and Seller shall refer to Broker all inquiries and offers received concerning the Property. Broker is explicitly empowered to act as Seller's exclusive agent for negotiating terms of sale and submitting to Seller any and all offers for approval of Seller.

B.   Broker shall provide Seller with the full benefit of the judgment, experience, and advice of Broker regarding the plan and actions to be pursued in marketing the Property. Broker shall advertise the proposed sale of the Property in the manner Broker shall choose through the use of brochures, signs, publications, other media, and/or other brokers that Broker believes may present an appropriate offering, in Broker's sole discretion. Any choices of marketing plan and actions shall not affect any Sale or Leasing Commission(s) owed. Broker is authorized to place information about the Property in informational or listing service(s) at Broker's discretion. Seller shall contribute $N/A for marketing costs.

C.   Seller hereby authorizes Broker to place sign(s) on the Property for marketing purposes and to remove all other "For Sale" and/or "For Lease" signs from and/or on the Property.

### 6.  Property Access

Seller authorizes Broker and any authorized representatives of Broker to have access to the Property including key-entry showings for the Property during the term of the Listing Period, at all reasonable times for the purpose of showing, marketing, and/or inspecting the Property. Seller represents and warrants that adequate insurance will be kept in force to protect Seller in the event of any damage, loss or claim arising from any entry to the Property by persons that access the Property and hereby agrees to indemnify, defend and hold harmless Broker, Broker's agents and employees from and against any damage, expense, loss or claim, including attorneys' fees, resulting therefrom, and Seller waives any rights of subrogation against Broker, Broker's agents and employees for the same.

### 7.  Seller's Covenants

Seller agrees to defend, indemnify, save, and hold harmless Broker and those relying on Broker's representations with respect to the Property from any and all loss, damages, suits, and/or any other claims whatsoever including attorneys' fees and costs of defense resulting from the inaccuracy and/or omission of any and all information provided by Seller or which Seller fails to provide.

## 8.  Seller's Acknowledgements and Disclosures

A   It is illegal, pursuant to the Ohio Fair Housing Law, Division (H) of Section 4112.02 of the Revised Code and the Federal Fair Housing law, 42 U.S.C.A. 3601, as amended, to refuse to sell, transfer, assign, rent, lease, sublease or finance housing accommodations, refuse to negotiate for the sale or rental of housing accommodations, or otherwise deny or make unavailable housing accommodations because of race, color, religion, sex, familial status as defined in section 4112.01 of the Revised Code, ancestry, military status as defined in that section, disability as defined in that section, or national origin or to so discriminate in advertising the sale or rental of housing, in the financing of housing, or in the provision of real estate brokerage services. It is also illegal, for profit, to induce or attempt to induce a person to sell or rent a dwelling by representations regarding the entry into the neighborhood of a person or persons belonging to one of the protected classes.

B.  Seller agrees to furnish satisfactory evidence of marketable title to the Property in the event of a sale and/or exchange of the Property, and to convey the Property by transferable and recordable general warranty deed or limited warranty deed with release of dower, if any, or fiduciary deed, as appropriate.

C.  Seller represents and warrants that: (1) no other listing contracts are in effect for the sale, exchange, and/or lease of the Property; (2) no person and/or entity has any right to purchase and/or lease the Property or to acquire any interest in the Property by virtue of any agreement, purchase option, and/or right of first refusal; and (3) there are no delinquencies or defaults under any mortgage or other obligation involving the Property.

D.  Seller will promptly disclose all information of which Seller has knowledge or notice concerning any latent material defect involving the Property, including but not limited to any past or present violation of any environmental law involving the Property. Seller authorizes Broker to disclose such information to any prospective buyer or tenant of the Property.

E.  The person signing as, by, and/or on behalf of Seller represents and warrants that the signer has full authority to sign as, by, and/or on behalf of Seller.

F.  The Property is zoned MG – Manufacturing General, is not located in an Environmental Quality District; is not in a Historic District; and is not located in a flood plain.  Seller further certifies that there are no defects or conditions known to the Seller, which would adversely affect or materially impair the fitness of the Property for the purpose of its intended use as presently zoned except N/A. Seller agrees to disclose to Broker any and all information that Seller has regarding the condition of the Property, including, but not limited to the presence and location of asbestos; the location of mineral rights and/or any outstanding mineral rights; PCB transformers and other toxic, hazardous, or contaminated substances and/or underground storage tanks located on or around the Property. A Phase I Environmental Report has not been obtained by the Seller.

## 9.  Dual Agency

Broker may act as a dual agent by representing both the Seller and the buyer or tenant in a transaction only if both parties consent after having been informed of the dual agency relationship. Broker shall not permit another agent affiliated with Broker to represent another party in a transaction involving the Property (whether as the exclusive agent for that party, a subagent, or dual agent) without obtaining the written consent of both parties to the transaction. In the event a dual agency relationship arises, buyer or tenant and Seller will be provided with a dual agency disclosure form setting forth the agent's duties and the Seller's and buyer's or tenant's options if they choose not to consent to the dual agency relationship.

## 10. Applicable State and Federal Laws

The parties hereto agree to comply with all applicable federal, state and local laws, regulations, codes, ordinances and administrative orders having jurisdiction over the parties, property or the subject matter of this Listing Contract, including but not limited to, the 1964 Civil Rights Act and all amendments thereto, the Foreign

Investment In Real Property Tax Act, the Comprehensive Environmental Response Compensation and Liability Act, and the Americans with Disabilities Act.

## 11. Binding Effect, Entire Contract, and Partial Invalidity

This Listing Contract may be assigned by Broker without Seller's prior consent to (i) any entity that is directly or indirectly controlled by Broker, its parent or any of their respective affiliates, or (ii) any entity which Broker is merged into or consolidated with or which acquires all or substantially all of Broker's assets. This is a legal and binding contract on all parties hereto, including their respective heirs, legal representatives, successors, and/or assigns. All prior negotiations and agreements between Seller and Broker are incorporated in the Listing Contract, which constitutes the entire contract. The terms of the Listing Contract are intended by Seller and Broker as a final, complete, and exclusive expression of their agreement with respect to the subject matter of the Listing Contract and may not be contradicted by evidence of any prior or contemporaneous agreement. The Listing Contract and any supplement, addendum, and/or modification may be executed in two (2) or more counterparts, all of which shall constitute one (1) and the same writing. The terms of the Listing Contract may not be amended, modified, and/or altered except through written agreement signed by Seller and Broker. Any term or provision of this Listing Contract that is found to be ambiguous will not be construed against the drafter. In the event that any provision of the Listing Contract shall be held to be invalid and/or unenforceable for any reason, such ruling will not affect the validity or enforceability of the remainder of the Listing Contract in any respect whatsoever.

## 12. Attorneys' Fees

In the event claims are asserted by either the Broker or the Seller to enforce this Listing Contract, the prevailing party will be entitled to recover from the non-prevailing party any and all court costs and reasonable attorneys' fees that the prevailing party incurs in prosecuting, defending, and/or participating in any way in any such proceedings.

## 13. Liability

The liability of the parties caused by a breach of this Listing Contract shall be limited to direct damages, and in no event will either party be liable to the other for any loss of or damage to revenues, profits, goodwill or other special, incidental, exemplary, punitive, indirect, or consequential damages of any kind resulting from the performance or failure to perform pursuant to the terms of this Listing Contract or from the provision of services hereunder, even if such party has been advised of the possibility of such damages. In no event shall the total liability of Broker to Seller for damages in connection with all claims made under the terms of this Listing Contract exceed the amount of compensation received by Broker under the terms of this Listing Contract.

## 14. Independent Advice

Seller hereby acknowledges that neither Broker nor any salesperson associated with Broker is qualified or authorized to give legal or tax advice, nor to determine if Seller desires or needs such advice. Seller agrees to consult with an attorney or accountant.

### 15. Publicity

Seller hereby authorizes Broker to publicize any transactions that occur involving the Property under this Listing Contract. Broker shall have the right to name the parties to the transaction and the character and location of the Property.

### 16. Miscellaneous

The Listing Contract shall be governed by, and construed in accordance with, the laws of the State in which Property is located (Ohio or Kentucky). Any dispute that relates in any way to the Listing Contract will be brought in a Court having venue within the State in which the Property is located. The terms and provisions of the Listing Contract will survive the execution of any agreement for the sale, exchange, and/or lease of the Property. A photocopy, facsimile, and/or electronically scanned image of the Listing Contract and any documents executed as exhibits, addenda, modifications, and/or amendments to the Listing Contract shall be binding as if it was a signed original.

[SIGNATURE PAGE FOLLOWS]

ON THE DATE MEMORIALIZED BELOW, SELLER AND BROKER AGREE TO THE TERMS SET FORTH ABOVE AND ACKNOWLEDGE RECEIPT OF A COPY OF THE LISTING CONTRACT.

| BROKER: | SELLER: |
|---|---|
| Newmark Real Estate of Ohio, LLC dba Newmark, a Delaware limited liability company | Reliable Castings Corporation, an Ohio For Profit Corporation |
| By: *Wayne F. Hach* | By: _(signature)_ |
| ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾ Wayne F. Hach, Executive Managing Director | Name: ROBERT J. KUHN Title: BOARD CHAIR |
| Address:  One East Fourth Street, Suite 500 Cincinnati, Ohio 45202-3728 | Address: 1521 MICHIGAN ST, SIDNEY, OH 45365 |
| Phone:   (513) 241-2300 | Phone:   513-368-6267 |
| Date: May 31, 2023 | Date:   5/31/2023 |

INVOICE #        81912



## Abercrombie & Associates, Inc.
### Civil Engineering + Surveying

www.abercrombie-associates.com

8111 Cheviot Road
Suite 200
Cincinnati, Ohio 45247
Phone: (513) 385-5757
Fax: (513) 245-5161

RELIABLE CASTINGS CORPORATION
1521 MICHIGAN STREET
SIDNEY, OH  45365

| | |
|---|---|
| DATE | 7/19/23 |
| CUSTOMER # | 0110A |
| JOB # | 23-0028 |

ATTN:  R.J. KUHN

---

FOR PROFESSIONAL SERVICES RENDERED

RELIABLE CASTINGS PROPERTIES, 1857 DREMAN AVENUE, CITY OF CINCINNATI,
HAMILTON COUNTY, OHIO

ITEM 1: BOUNDARY SURVEY AS PER AGREEMENT                7,250.00

| | |
|---|---|
| SUBTOTAL | $7,250.00 |
| PAYMENTS APPLIED | $0.00 |
| TOTAL DUE | $7,250.00 |

TERMS:
Net amount due within 30 days of invoice date.
A service charge of 1.5% per month (18% per annum) will be added to all balances that are not  paid by the due date.
Federal Identification Number: 31-1049328

Please refer to our invoice number when remitting payment:
Thank You

EXHIBIT D

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| IN RE: | : | Case No. 23-31157 |
| | : | |
| RELIABLE CASTINGS CORPORATION | : | Chapter 11 |
| | : | Subchapter V |
| | : | Judge Guy R. Humphrey |
| Debtor and Debtor-In-Possession | : | |

**AFFIDAVIT OF JOSH YOUNG OF NEWMARK GROUP, INC., REGARDING THE
LISTING OF REAL ESTATE IN HAMILTON COUNTY, OHIO**

**STATE OF OHIO**  )
  ) SS:
**COUNTY OF** Hamilton  )

1.  I, Josh Young of Newmark Group, Inc. ("Affiant") being first duly cautioned and
sworn, depose and say, that to the best of my knowledge and belief, I have had and
have no connection with the Debtor, or any creditor of the Debtor that would make
me not a "disinterested person" within the meaning of 11 U.S.C. § 101(14), except
as follows:

| | |
|---|---|
| Bodycote | This is a current client of Young in the area of real estate acquisitions.  Young has not been involved on behalf of this creditor as relates to the Debtor |
| Altafiber | This is a current client of Doug Altemuehle (Newmark broker) in the area of real estate acquisitions.  Altemuehle has not been involved on behalf of this creditor as relates to the Debtor |
| Rumpke | This is a current client of Young in the area of real estate industrial leasing.  Young has not been involved on behalf of this creditor as relates to the Debtor |
| Robert J Kuhn | This is a current client of Young in the area of real estate dispositions.  Young has not been involved on behalf of this creditor as relates to the Debtor |

2.  Affiant further states that I am a licensed real estate agent in the state of Ohio and

am qualified and competent to handle the marketing of the real property located in Hamilton County, Ohio.  See Exhibit "A" for the full list of properties.

3.     Affiant states he is not an officer or employee of the Judicial Branch of the United States or the United States Department of Justice.

4.     Affiant states that the gross proceeds of any sale conducted of the real estate will be distributed in accordance with any Order of this Court.

5.     Affiant further acknowledge that he will not under any circumstances, directly or indirectly, purchase or acquire any interest of the property to be sold by him pursuant to his appointment for the estate.

6.     Affiant does not hold or represent any interest adverse to the estate and is a disinterested person within the meaning of 11 U.S.C. § 327.

7.     Affiant is an agent in the firm of Newmark Real Estate of Ohio, LLC.

8.     Affiant's employment would not be prohibited by or improper under Bankruptcy Rule 5002.

FURTHER AFFIANT SAYETH NAUGHT.

_____
Josh Young

Sworn to and subscribed in my presence by the aforementioned this _8_ day of Avgust 2023 2023.

_____
Notary Public

## EXHIBIT A

- 3416 Colerain Avenue, Cincinnati, Ohio 45225

- 4575 Eastern Avenue, Cincinnati, Ohio 45226

- 9981 Harrison Avenue, Harrison, Ohio 45030

- 3015 Kustom Drive, Hebron, Kentucky 41048

- 11550 Reed Hartman Hwy, Cincinnati, Ohio 45241

- 1300 US Route 50, Milford, Ohio 45150

- 5513 Vine Street, Cincinnati, Ohio 45217

- 5568 West Chester Road, Cincinnati, Ohio 45069

- 1306 Gloria Terrell Drive, Wilder, Kentucky 41076

- 8580 Seward Road, Fairfield, Ohio 45014

- 7626 Easy Street, Mason, Ohio 45040

File No. POR700 TI0038



# ALTA COMMITMENT FOR TITLE INSURANCE

Issued by OLD REPUBLIC NATIONAL TITLE INSURANCE COMPANY

## NOTICE

**IMPORTANT—READ CAREFULLY:** THIS COMMITMENT IS AN OFFER TO ISSUE ONE OR MORE TITLE INSURANCE POLICIES. ALL CLAIMS OR REMEDIES SOUGHT AGAINST THE COMPANY INVOLVING THE CONTENT OF THIS COMMITMENT OR THE POLICY MUST BE BASED SOLELY IN CONTRACT.

THIS COMMITMENT IS NOT AN ABSTRACT OF TITLE, REPORT OF THE CONDITION OF TITLE, LEGAL OPINION, OPINION OF TITLE, OR OTHER REPRESENTATION OF THE STATUS OF TITLE. THE PROCEDURES USED BY THE COMPANY TO DETERMINE INSURABILITY OF THE TITLE, INCLUDING ANY SEARCH AND EXAMINATION, ARE PROPRIETARY TO THE COMPANY, WERE PERFORMED SOLELY FOR THE BENEFIT OF THE COMPANY, AND CREATE NO EXTRACONTRACTUAL LIABILITY TO ANY PERSON, INCLUDING A PROPOSED INSURED.

THE COMPANY'S OBLIGATION UNDER THIS COMMITMENT IS TO ISSUE A POLICY TO A PROPOSED INSURED IDENTIFIED IN SCHEDULE A IN ACCORDANCE WITH THE TERMS AND PROVISIONS OF THIS COMMITMENT. THE COMPANY HAS NO LIABILITY OR OBLIGATION INVOLVING THE CONTENT OF THIS COMMITMENT TO ANY OTHER PERSON.

## COMMITMENT TO ISSUE POLICY

Subject to the Notice; Schedule B, Part I—Requirements; Schedule B, Part II—Exceptions; and the Commitment Conditions, Old Republic National Title Insurance Company, a Florida corporation, (the "Company"), commits to issue the Policy according to the terms and provisions of this Commitment. This Commitment is effective as of the Commitment Date shown in Schedule A for each Policy described in Schedule A, only when the Company has entered in Schedule A both the specified dollar amount as the Proposed Amount of Insurance and the name of the Proposed Insured.

If all of the Schedule B, Part I—Requirements have not been met within six months after the Commitment Date, this Commitment terminates and the Company's liability and obligation end.

COUNTERSIGNED:

**RIVERBEND**
Commercial Title Services LP

By: Riverbend Commercial Title Services I,c.
its General Partner

By: _____

**Herbert B Weiss, Sr Vice President**

**OLD REPUBLIC NATIONAL TITLE INSURANCE COMPANY**
*A Stock Company*
*1408 North Westshore Blvd., Suite 900, Tampa, Florida 33607*
*(612) 371-1111*                    *www.oldrepublictitle.com*

By _____ President

Attest _____ Secretary

*This page is only a part of a 2021 ALTA Commitment for Title Insurance issued by Old Republic National Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I—Requirements; and Schedule B, Part II—Exceptions.*

**ORT Form 4757OH**
**ALTA Commitment for Title Insurance 2021 v. 01.00**
07/01/2021 (12/01/2022)

EXHIBIT F

## COMMITMENT CONDITIONS

1. DEFINITIONS

   a. "Discriminatory Covenant": Any covenant, condition, restriction, or limitation that is unenforceable under applicable law because it illegally discriminates against a class of individuals based on personal characteristics such as race, color, religion, sex, sexual orientation, gender identity, familial status, disability, national origin, or other legally protected class.

   b. "Knowledge" or "Known": Actual knowledge or actual notice, but not constructive notice imparted by the Public Records.

   c. "Land": The land described in Item 5 of Schedule A and improvements located on that land by State law constitute real property. The term "Land" does not include any property beyond that described in Schedule A, nor any right, title, interest, estate, or easement in any abutting street, road, avenue, alley, lane, right-of-way, body of water, or waterway, but does not modify or limit the extent that a right of access to and from the Land is to be insured by the Policy.

   d. "Mortgage": A mortgage, deed of trust, trust deed, security deed, or other real property security instrument, including one evidenced by electronic means authorized by law.

   e. "Policy": Each contract of title insurance, in a form adopted by the American Land Title Association, issued or to be issued by the Company pursuant to this Commitment.

   f. "Proposed Amount of Insurance": Each dollar amount specified in Schedule A as the Proposed Amount of Insurance of each Policy to be issued pursuant to this Commitment.

   g. "Proposed Insured": Each person identified in Schedule A as the Proposed Insured of each Policy to be issued pursuant to this Commitment.

   h. "Public Records": The recording or filing system established under State statutes in effect at the Commitment Date under which a document must be recorded or filed to impart constructive notice of matters relating to the Title to a purchaser for value without Knowledge. The term "Public Records" does not include any other recording or filing system, including any pertaining to environmental remediation or protection, planning, permitting, zoning, licensing, building, health, public safety, or national security matters.

   i. "State": The state or commonwealth of the United States within whose exterior boundaries the Land is located. The term "State" also includes the District of Columbia, the Commonwealth of Puerto Rico, the U.S. Virgin Islands, and Guam.

   j. "Title": The estate or interest in the Land identified in Item 3 of Schedule A.

2. If all of the Schedule B, Part I—Requirements have not been met within the time period specified in the Commitment to Issue Policy, this Commitment terminates and the Company's liability and obligation end.

3. The Company's liability and obligation is limited by and this Commitment is not valid without:

   a. the Notice;

   b. the Commitment to Issue Policy;

   c. the Commitment Conditions;

   d. Schedule A;

   e. Schedule B, Part I—Requirements; and

   f. Schedule B, Part II—Exceptions; and

   g. a counter-signature by the Company or its issuing agent that may be in electronic form.

4. COMPANY'S RIGHT TO AMEND

   The Company may amend this Commitment at any time. If the Company amends this Commitment to add a defect, lien, encumbrance, adverse claim, or other matter recorded in the Public Records prior to the Commitment Date, any liability of the Company is limited by Commitment Condition 5. The Company is not liable for any other amendment to this Commitment.

*This page is only a part of a 2021 ALTA Commitment for Title Insurance issued by Old Republic National Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I—Requirements; and Schedule B, Part II—Exceptions.*

ORT Form 4757OH
ALTA Commitment for Title Insurance 2021 v. 01.00
07/01/2021 (12/01/2022)

5. **LIMITATIONS OF LIABILITY**

    a.    The Company's liability under Commitment Condition 4 is limited to the Proposed Insured's actual expense incurred in the interval between the Company's delivery to the Proposed Insured of the Commitment and the delivery of the amended Commitment, resulting from the Proposed Insured's good faith reliance to:

        i.    comply with the Schedule B, Part I—Requirements;

        ii.    eliminate, with the Company's written consent, any Schedule B, Part II—Exceptions; or

        iii.    acquire the Title or create the Mortgage covered by this Commitment.

    b.    The Company is not liable under Commitment Condition 5.a. if the Proposed Insured requested the amendment or had Knowledge of the matter and did not notify the Company about it in writing.

    c.    The Company is only liable under Commitment Condition 4 if the Proposed Insured would not have incurred the expense had the Commitment included the added matter when the Commitment was first delivered to the Proposed Insured.

    d.    The Company's liability does not exceed the lesser of the Proposed Insured's actual expense incurred in good faith and described in Commitment Condition 5.a. or the Proposed Amount of Insurance.

    e.    The Company is not liable for the content of the Transaction Identification Data, if any.

    f.    The Company is not obligated to issue the Policy referred to in this Commitment unless all of the Schedule B, Part I—Requirements have been met to the satisfaction of the Company.

    g.    The Company's liability is further limited by the terms and provisions of the Policy to be issued to the Proposed Insured.

6. **LIABILITY OF THE COMPANY MUST BE BASED ON THIS COMMITMENT; CHOICE OF LAW AND CHOICE OF FORUM**

    a.    Only a Proposed Insured identified in Schedule A, and no other person, may make a claim under this Commitment.

    b.    Any claim must be based in contract under the State law of the State where the Land is located and is restricted to the terms and provisions of this Commitment. Any litigation or other proceeding brought by the Proposed Insured against the Company must be filed only in a State or federal court having jurisdiction.

    c.    This Commitment, as last revised, is the exclusive and entire agreement between the parties with respect to the subject matter of this Commitment and supersedes all prior commitment negotiations, representations, and proposals of any kind, whether written or oral, express or implied, relating to the subject matter of this Commitment.

    d.    The deletion or modification of any Schedule B, Part II—Exception does not constitute an agreement or obligation to provide coverage beyond the terms and provisions of this Commitment or the Policy.

    e.    Any amendment or endorsement to this Commitment must be in writing and authenticated by a person authorized by the Company.

    f.    When the Policy is issued, all liability and obligation under this Commitment will end and the Company's only liability will be under the Policy.

7. **IF THIS COMMITMENT IS ISSUED BY AN ISSUING AGENT**

The issuing agent is the Company's agent only for the limited purpose of issuing title insurance commitments and policies. The issuing agent is not the Company's agent for closing, settlement, escrow, or any other purpose.

8. **PRO-FORMA POLICY**

The Company may provide, at the request of a Proposed Insured, a pro-forma policy illustrating the coverage that the Company may provide. A pro-forma policy neither reflects the status of Title at the time that the pro-forma policy is delivered to a Proposed Insured, nor is it a commitment to insure.

9. **CLAIMS PROCEDURES**

This Commitment incorporates by reference all Conditions for making a claim in the Policy to be issued to the Proposed Insured. Commitment Condition 9 does not modify the limitations of liability in Commitment Conditions 5 and 6.

*This page is only a part of a 2021 ALTA Commitment for Title Insurance issued by Old Republic National Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I—Requirements; and Schedule B, Part II—Exceptions.*

**ORT Form 4757OH**
**ALTA Commitment for Title Insurance 2021 v. 01.00**
07/01/2021 (12/01/2022)

10. CLASS ACTION

ALL CLAIMS AND DISPUTES ARISING OUT OF OR RELATING TO THIS COMMITMENT, INCLUDING ANY SERVICE OR OTHER MATTER IN CONNECTION WITH ISSUING THIS COMMITMENT, ANY BREACH OF A COMMITMENT PROVISION, OR ANY OTHER CLAIM OR DISPUTE ARISING OUT OF OR RELATING TO THE TRANSACTION GIVING RISE TO THIS COMMITMENT, MUST BE BROUGHT IN AN INDIVIDUAL CAPACITY. NO PARTY MAY SERVE AS PLAINTIFF, CLASS MEMBER, OR PARTICIPANT IN ANY CLASS OR REPRESENTATIVE PROCEEDING. ANY POLICY ISSUED PURSUANT TO THIS COMMITMENT WILL CONTAIN A CLASS ACTION CONDITION.

11. ARBITRATION

The Policy contains an arbitration clause. All arbitrable matters when the Proposed Amount of Insurance is $2,000,000 or less may be arbitrated at the election of either the Company or the Proposed Insured as the exclusive remedy of the parties. A Proposed Insured may review a copy of the arbitration rules at http://www.alta.org/arbitration.

*This page is only a part of a 2021 ALTA Commitment for Title Insurance issued by Old Republic National Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I—Requirements; and Schedule B, Part II—Exceptions.*

ORT Form 4757OH
ALTA Commitment for Title Insurance 2021 v. 01.00
07/01/2021 (12/01/2022)



# IMPORTANT DISCLOSURES

**RELATED BUSINESS DISCLOSURE:**

Riverbend Commercial Title Services LP ("Riverbend") is wholly owned by the law firm of Keating Muething & Klekamp PLL ("KMK"). One or more KMK partners, associates or paralegals may be providing legal services on the transaction which is the subject of this title insurance commitment, as well as working on behalf of Riverbend in connection with the issuance of this commitment and/or title insurance policy to the named insured(s).

**With respect to Riverbend:**

1.      You may choose the agent and title insurance company from whom you purchase title insurance.

2.      As agent to the title insurance company, Riverbend will retain a portion of the title premium. The exact amount retained in any transaction will be furnished to you upon request.

3.      In addition to premium charges, Riverbend may make work charges including, but not limited to, charges for title examination, escrow fees, document preparation and closing services. These fees, if any, will be disclosed to you on or before the time the transaction is concluded.

4.      Riverbend may, in connection with this transaction, pay KMK an amount not to exceed the retained portion of the title insurance premium and work charges.

**With respect to KMK:**

1.      Any legal fees charged by KMK in connection with providing legal services for this transaction will be disclosed to you upon your request.

2.      You understand that no attorney/client relationship exists between you and KMK in connection with the issuance of title insurance with respect to this transaction. If KMK is simultaneously providing legal services to you, that is the subject of a separate engagement. KMK believes that its ownership of Riverbend, on the one hand, and performing any legal services in connection with this transaction, on the other hand, will not affect the exercise by KMK of its independent professional judgment.

3.      When KMK perceives a conflict of interest between its representation of a party to the transaction and its ownership of Riverbend that might affect its independent professional judgment, KMK will notify all parties concerned and:

(a)      request that the conflict be waived;
(b)      withdraw from legal representation of its client; or
(c)      request Riverbend to withdraw as agent for the issuing title insurance company.

**EXECUTED DOCUMENTS DISCLOSURE:**

Unless Riverbend is bound by more stringent written instructions with regard to collecting transaction documents, Riverbend will not require originally executed documents, except for documents to be recorded in the public records. The delivery of executed copies by a party(ies) to Riverbend shall be treated as originals for all purposes, regardless of the format or method of delivery. This includes scanned copies and/or electronic signature technology (*ex. DocuSign*). For documents to be recorded, Riverbend will require either wet-ink originals, or the equivalent executed through an approved Remote Online Notarization platform.

Should you have questions or objections to the above disclosures, please contact the undersigned.

RIVERBEND COMMERCIAL TITLE SERVICES LP
By: Riverbend Commercial Title Services Inc., General Partner

By: _____
Kenneth P. Kreider, Esq.
Executive Vice President and Chairman of the Board
Direct: (513) 579-6579; Email: kpkreider@riverbendtitle.com



# RIVERBEND COMMERCIAL TITLE SERVICES LP

One East Fourth Street, Suite 1400
Cincinnati, Ohio 45202

Tel. (513) 357-9800
Fax: (513) 579-6957
**www.riverbendtitle.com**

Please direct any inquiries you may have concerning the attached title commitment or policy to:

**Karen E. Kramer**
Direct: (513) 579-6938
Email: **kkramer@riverbendtitle.com**

or

**Gregory J. Haverkamp**, President
Direct: (513) 579-6453
Email: **ghaverkamp@riverbendtitle.com**

*NOTE: Copies of Exhibits are provided with the title commitment. Unless requested, they will not be reproduced and issued again with the title policy.*

American Land Title Association

Commitment for Title Insurance
[2021 v. 01.00 (07-01-2021)]

| | |
|---|---|
| **Issuing Agent:** | Riverbend Commercial Title Services LP |
| **Issuing Office:** | One East Fourth Street, Suite 1400, Cincinnati, OH 45202 – (513) 357-9800 |
| **Issuing Office ALTA Registry ID:** | 1057236 |
| **Loan ID No.:** | N/A |
| **Issuing Office File No./Commitment No.:** | POR700 TI0038 |
| **Property Address:** | Parcels on Colerain Avenue, Comfort Street, and Dreman Streets, Hamilton County, Ohio |
| **Revision No.:** | (Version 1) |

## 2021 ALTA COMMITMENT

## OLD REPUBLIC NATIONAL TITLE INSURANCE COMPANY

## SCHEDULE A

1.   **Commitment Date:**

<u>As to Tracts I-X:</u> June 28, 2023 at 7:59 a.m.

<u>As to Tracts XI-XIII:</u> June 27, 2023 at 7:59 a.m.

2.   **Policy or Policies to be issued:**

**2021 ALTA OWNER'S POLICY**

**Proposed Insured:**          Port of Greater Cincinnati Development Authority, an Ohio port authority created under Ohio Revised Code Chapter 4582

**Proposed Amount of Insurance:**          $1,000,000.00

**2021 ALTA LOAN POLICY**

**Proposed Insured:**          TBD

**Proposed Amount of Insurance:**          TBD

3.   **The estate or interest in the Land described or referred to in this Commitment is:**

Fee Simple

4.   **The Title is, at Commitment Date, vested in:**

<u>As to Tract I:</u>   Reliable Castings Corporation as set forth in General Warranty Deed dated September 26, 2008 and recorded October 14, 2008 in Official Record Book 10973, Page 525, Hamilton County, Ohio Records.

*This page is only a part of a 2021 ALTA Commitment for Title Insurance issued by Riverbend Commercial Title Services LP, as agent for old Republic National Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright 2021 American Land Title Association. All rights reserved.**
The use of this Form (or any derivative thereof) is restricted to ALTA licensees and
ALTA members in good standing as of the date of use. All other uses are prohibited.
Reprinted under license from the American Land Title Association.



American Land Title Association

Commitment for Title Insurance
[2021 v. 01.00 (07-01-2021)]
- 2 -

**As to Tracts II through X:**  Reliable Castings Corporation, an Ohio corporation, as set forth in Warranty Deed dated March 10, 1980 an recorded March 14, 1980 in Deed Book 4182, Page 1363, Hamilton County, Ohio Records.

**As to Tracts XI-XII:**  Reliable Castings Corporation by Corporation Deed dated August 15, 1978 and recorded November 3, 1978 in Deed Book 4125, Page 378, Hamilton County, Ohio Records.

**As to Tract XIII:**  Reliable Castings Corporation by (a) Registered Land Certificate No. 106308, and (b) Corporation Deed dated August 15, 1978 and recorded November 3, 1978 in Deed Book 4125, Page 378, Hamilton County, Ohio Records. (See Sources of Title Exhibit)

5.   **The Land referred to in the Commitment is described in Exhibit A attached hereto and made a part hereof.**

*This page is only a part of a 2021 ALTA Commitment for Title Insurance issued by Riverbend Commercial Title Services LP, as agent for old Republic National Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright 2021 American Land Title Association.  All rights reserved.**
The use of this Form (or any derivative thereof) is restricted to ALTA licensees and
ALTA members in good standing as of the date of use.  All other uses are prohibited.
Reprinted under license from the American Land Title Association.



American Land Title Association

Commitment for Title Insurance
[2021 v. 01.00 (07-01-2021)]
- 3 -

## SCHEDULE B, PART I

## REQUIREMENTS

**All of the following Requirements must be complied with:**

1.  Instrument(s) in insurable form which must be properly authorized, executed, delivered, and duly filed for record, to wit, in a form acceptable to the Company:

    A)  Release of Mechanic's Lien by Michael J. Westerfield of Westech, Inc. (See Exhibit No. 16 of Schedule B Part II)

    B)  Tracts XII and XIII of the Land depicted in Exhibit A are tracts of land as shown by the tax map records of Hamilton County, Ohio; new legal descriptions, and Plats of Survey with closure table in a form acceptable to and approved by the county engineer are required.

    C)  Quit Claim Deed from Reliable Castings Corporation, an Ohio corporation, to Reliable Castings Corporation, an Ohio corporation, establishing the legal description of Tracts XII and XIII of the Land. (Note, when presented to the Auditor, this deed must be accompanied by conveyance form DTE Form 100EX.)

    D)  Warranty Deed from Reliable Castings Corporation, an Ohio corporation, to Port of Greater Cincinnati Development Authority, an Ohio port authority created under Ohio Revised Code Chapter 4582, conveying the Land described in Schedule A hereof.  (Note, when presented to the Auditor, this deed must be accompanied by conveyance form DTE Form 100EX.)

    E)  Open-End Mortgage, and any other documentation as required by lender to secure the loan, from Port of Greater Cincinnati Development Authority, an Ohio port authority created under Ohio Revised Code Chapter 4582, encumbering the Land described in Schedule A hereof.

    F)  Documentation as approved by the title company to cancel the various mortgages, liens and other encumbrances of record.

2.  The Proposed Insured must notify the Company in writing of the name of any party not referred to in this Commitment who will obtain an interest in the Land or who will make a loan on the Land. The Company may then make additional Requirements or Exceptions.

*This page is only a part of a 2021 ALTA Commitment for Title Insurance issued by Riverbend Commercial Title Services LP, as agent for old Republic National Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

Copyright 2021 American Land Title Association.  All rights reserved.
The use of this Form (or any derivative thereof) is restricted to ALTA licensees and
ALTA members in good standing as of the date of use.  All other uses are prohibited.
Reprinted under license from the American Land Title Association.



American Land Title Association

Commitment for Title Insurance
[2021 v. 01.00 (07-01-2021)]
- 4 -

3. Payment of the premiums, fees, and charges for the Policy(ies) of title insurance to be issued.

4. Payment of the full consideration to, or for the account of, the grantors or mortgagors.

5. Payment of all taxes, charges, assessments, levied and assessed against the Land, which are due and payable.

6. Satisfactory evidence should be had that improvements and/or repairs or alterations thereto are completed; that contractor, subcontractors, labor and materialmen are all paid.

7. Furnish evidence in a form satisfactory to the Company that there are no violations of any covenants, conditions and/or restrictions in the event that an ALTA 9 series endorsement is required.

8. Any Seller, Buyer, Borrower, and/or Lender involved in the proposed transaction must complete and execute the "Notice of Availability and Offer of Closing Protection Coverage".

9. Legal descriptions incorporated along with an instrument of conveyance, such as a deed or easement, may require pre-approval/verification by the County Engineer/Auditor office(s) prior to closing of the transaction(s) contemplated herein via an online submission or otherwise. In Counties where such pre-approval/verification is applicable, the legal description to be attached to the recordable document(s) must include the requisite approval/verification stamp(s). For more information, please contact the County Engineer/Auditor in advance of closing.

10. The actual value of the estate or interest to be insured must be disclosed to the Company, and subject to the approval of the Company, entered as the amount of the Proposed Policy(ies) to be issued. An Owner's Policy should reflect the purchase price of full value of the Land. A Loan Policy should reflect the loan amount of value of the Land being used as collateral. Proposed Policy Amount(s) will be revised and premiums charged consistent therewith when the final amounts are approved. Until the Proposed Policy Amount(s) shall be determined, and entered as aforesaid, it is agreed that as between the Company, the applicant for this commitment, and every person relying on this commitment, the Company cannot be required to approve any such evaluation in excess of $100,000.00 and the total liability of the Company on account of the commitment shall not exceed said amount.

*This page is only a part of a 2021 ALTA Commitment for Title Insurance issued by Riverbend Commercial Title Services LP, as agent for old Republic National Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright 2021 American Land Title Association. All rights reserved.**
The use of this Form (or any derivative thereof) is restricted to ALTA licensees and
ALTA members in good standing as of the date of use. All other uses are prohibited.
Reprinted under license from the American Land Title Association.



American Land Title Association

Commitment for Title Insurance
[2021 v. 01.00 (07-01-2021)]
- 5 -

11.  Furnish the following organizational and authority documents for Reliable Castings Corporation, an Ohio corporation, on file with or issued by the Ohio Secretary of State, if applicable, and in a form acceptable to the Company:

    A)  Corporate Resolution(s) authorizing the transaction relating to the Land described in Schedule A attached hereto, and identifying the officer(s) and granting said officer(s) with full authority to act on behalf of said Corporation.

    B)  Certificate of Good Standing.

    C)  Copy of the Articles of Incorporation.

    D)  Copy of the Bylaws and Code of Regulations.

12.  Furnish organizational and authority documents for the Purchaser, Port of Greater Cincinnati Development Authority, an Ohio port authority created under Ohio Revised Code Chapter 4582, in a form acceptable to the Company.

13.  Please be advised that our search did not disclose any open mortgages of record. If you should have knowledge of any outstanding obligation, please contact the Company immediately for further review prior to closing.

14.  The Company reserves the right to require additional documentation, as it deems necessary.

*This page is only a part of a 2021 ALTA Commitment for Title Insurance issued by Riverbend Commercial Title Services LP, as agent for old Republic National Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright 2021 American Land Title Association.  All rights reserved.**
The use of this Form (or any derivative thereof) is restricted to ALTA licensees and
ALTA members in good standing as of the date of use.  All other uses are prohibited.
Reprinted under license from the American Land Title Association.



American Land Title Association

Commitment for Title Insurance
[2021 v. 01.00 (07-01-2021)]
- 6 -

## SCHEDULE B, PART II

## EXCEPTIONS

**Some historical land records contain Discriminatory Covenants that are illegal and unenforceable by law. This Commitment and the Policy treat any Discriminatory Covenant in a document referenced in Schedule B as if each Discriminatory Covenant is redacted, repudiated, removed, and not republished or recirculated. Only the remaining provisions of the document will be excepted from coverage.**

**The Policy or Policies to be issued will not insure against loss or damage resulting from the terms and conditions of any lease or easement identified in Schedule A, and will contain the following Exceptions unless cleared to the satisfaction of the Company:**

## AS TO ALL TRACTS UNLESS OTHERWISE STATED:

1.   Any defect, lien, encumbrance, adverse claim, or other matter that appears for the first time in the Public Records or is created, attaches, or is disclosed between the Commitment Date and the date on which all of the Schedule B, Part I – Requirements are met. **(This Item will be removed at the time of issuance of the final policy when a satisfactory gap undertaking is received by the Company.)**

2.   Any facts, rights, interests, or claims that are not shown in the Public Records but that could be ascertained by an inspection of the Land or by making an inquiry of persons in possession of the Land. **[This Item will be removed at the time of issuance of the final policy upon the Company's receipt of (a.) a satisfactory Title Affidavit and Survey, but the Company reserves the right to take exception to any specific items as disclosed thereby; and (b.) payment of the requisite premium, if applicable.]**

3.   Any encroachment, encumbrance, violation, variation, or adverse circumstance affecting the title including discrepancies, conflicts in boundary lines, shortage in area, or any other facts that would be disclosed by an accurate and complete land survey of the Land, and that are not shown in the Public Records. **[This Item will be removed at the time of issuance of the final policy upon the Company's receipt of (a.) a satisfactory Survey, but the Company reserves the right to take exception to any specific items as disclosed by such Survey; and (b.) payment of the requisite premium, if applicable.]**

4.   Rights of parties in possession of all or any part of the premises, including, but not limited to, easements, claims of easements or encumbrances that are not shown in the Public Records. **(This Item will be removed at the time of issuance of the final policy upon the Company's receipt of a satisfactory Title Affidavit, but the Company reserves the right to take exception to any specific items as disclosed thereby.)**

*This page is only a part of a 2021 ALTA Commitment for Title Insurance issued by Riverbend Commercial Title Services LP, as agent for old Republic National Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

Copyright 2021 American Land Title Association.  All rights reserved.
The use of this Form (or any derivative thereof) is restricted to ALTA licensees and
ALTA members in good standing as of the date of use.  All other uses are prohibited.
Reprinted under license from the American Land Title Association.



American Land Title Association                                              Commitment for Title Insurance
[2021 v. 01.00 (07-01-2021)]
- 7 -

5.    Any lien, or right to a lien, for services, labor or material heretofore or hereafter furnished, imposed by law and not shown in the Public Records. **[This Item will be deleted at the time of issuance of the final policy upon the Company's receipt of (a.) a satisfactory Title Affidavit, provided the Title Affidavit delivered to the Company shows no unpaid contractors for work performed or materials delivered within a six month period prior to closing; and (b.) payment of the requisite premium, if applicable.]**

6.    Pursuant to Section 1509.31(D) of the Ohio Revised Code:  Oil and gas leases, pipeline agreements, or any other instruments related to the production or sale of oil or natural gas which may arise subsequent to the Date of Policy.  **(This item will remain as an exception in the final loan policy issued pursuant hereto.)**

7.    Oil, gas, coal and other mineral interests together with the rights appurtenant thereto whether created by deed, lease, grant, reservation, severance, sufferance or exception. **(This item will remain as an exception in any policy issued pursuant hereto.)**

8.    The lien of real estate taxes or assessments imposed on the title by a governmental authority that are not shown as existing liens in the records of any taxing authority that levies taxes or assessments on real property or in the Public Records.

9.    The real estate tax, assessment, and valuation information contained in this commitment are based on the tax records issued by the Hamilton County Auditor's Office as of the effective date of this commitment.  We hereby expressly disclaim any liability for any inaccuracy in the data we receive from the County offices, and for any changes or re-evaluations in the tax amounts after the date hereof.  Tax information is as follows:

<u>**Tract I: Auditor's Parcel No. 190-0026-0015**</u>

| Valuations: | | | |
|---|---|---|---|
| Land | $ | 70.00 | |
| Building | $ | 0.00 | |
| Total | $ | 70.00 | |
| Semi-Annual Taxes: | | | |
| December, 2022 | $ | 3.17 | UNPAID/ DELINQUENT |
| June, 2023 | $ | 3.17 | UNPAID/ DELINQUENT |
| Urban Forestry Assessment: | | | |
| December, 2022 | $ | 7.98 | UNPAID/ DELINQUENT |

*This page is only a part of a 2021 ALTA Commitment for Title Insurance issued by Riverbend Commercial Title Services LP, as agent for old Republic National Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright 2021 American Land Title Association.  All rights reserved.**
The use of this Form (or any derivative thereof) is restricted to ALTA licensees and
ALTA members in good standing as of the date of use.  All other uses are prohibited.
Reprinted under license from the American Land Title Association.



American Land Title Association

Commitment for Title Insurance
[2021 v. 01.00 (07-01-2021)]
- 8 -

### Tract II: Auditor's Parcel No. 190-0026-0009

Valuations:

| | | | |
|---|---|---|---|
| Land | $ | 2,640.00 | |
| Building | $ | 60,140.00 | |
| Total | $ | 62,780.00 | |

Semi-Annual Taxes:

| | | | |
|---|---|---|---|
| December, 2022 | $ | 2,842.84 | UNPAID/ DELINQUENT |
| June, 2023 | $ | 2,842.84 | UNPAID/ DELINQUENT |

Urban Forestry Assessment:

| | | | |
|---|---|---|---|
| December, 2022 | $ | 7.97 | UNPAID/ DELINQUENT |

NOTE: A tax lien is pending on the above parcel.

### Tract III: Auditor's Parcel No. 190-0026-0010 and 11 cons.

Valuations:

| | | | |
|---|---|---|---|
| Land | $ | 3,450.00 | |
| Building | $ | 0.00 | |
| Total | $ | 3,450.00 | |

Semi-Annual Taxes:

| | | | |
|---|---|---|---|
| December, 2022 | $ | 156.22 | UNPAID/ DELINQUENT |
| June, 2023 | $ | 156.22 | UNPAID/ DELINQUENT |

Urban Forestry Assessment:

| | | | |
|---|---|---|---|
| December, 2022 | $ | 15.94 | UNPAID/ DELINQUENT |

### Tract IV: Auditor's Parcel No. 190-0026-0012

Valuations:

| | | | |
|---|---|---|---|
| Land | $ | 2,700.00 | |
| Building | $ | 300.00 | |
| Total | $ | 3,000.00 | |

Semi-Annual Taxes:

| | | | |
|---|---|---|---|
| December, 2022 | $ | 149.89 | UNPAID/ DELINQUENT |
| June, 2023 | $ | 149.89 | UNPAID/ DELINQUENT |

Urban Forestry Assessment:

| | | | |
|---|---|---|---|
| December, 2022 | $ | 8.00 | UNPAID/ DELINQUENT |

*This page is only a part of a 2021 ALTA Commitment for Title Insurance issued by Riverbend Commercial Title Services LP, as agent for old Republic National Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright 2021 American Land Title Association. All rights reserved.**
The use of this Form (or any derivative thereof) is restricted to ALTA licensees and
ALTA members in good standing as of the date of use. All other uses are prohibited.
Reprinted under license from the American Land Title Association.



American Land Title Association

Commitment for Title Insurance
[2021 v. 01.00 (07-01-2021)]
- 9 -

### Tract V: Auditor's Parcel No. 190-0026-0013

Valuations:

| | | |
|---|---|---|
| Land | $ | 2,070.00 |
| Building | $ | 300.00 |
| Total | $ | 2,370.00 |

Semi-Annual Taxes:

| | | | |
|---|---|---|---|
| December, 2022 | $ | 107.32 | UNPAID/ DELINQUENT |
| June, 2023 | $ | 107.32 | UNPAID/ DELINQUENT |

Urban Forestry Assessment:

| | | | |
|---|---|---|---|
| December, 2022 | $ | 7.98 | UNPAID/ DELINQUENT |

### Tract VI: Auditor's Parcel No. 190-0026-0014

Valuations:

| | | |
|---|---|---|
| Land | $ | 880.00 |
| Building | $ | 300.00 |
| Total | $ | 1,180.00 |

Semi-Annual Taxes:

| | | | |
|---|---|---|---|
| December, 2022 | $ | 53.43 | UNPAID/ DELINQUENT |
| June, 2023 | $ | 53.43 | UNPAID/ DELINQUENT |

Urban Forestry Assessment:

| | | | |
|---|---|---|---|
| December, 2022 | $ | 7.98 | UNPAID/ DELINQUENT |

### Tract VII: Auditor's Parcel No. 190-0026-0032

Valuations:

| | | |
|---|---|---|
| Land | $ | 10.00 |
| Building | $ | 0.00 |
| Total | $ | 10.00 |

Semi-Annual Taxes:

| | | |
|---|---|---|
| December, 2022 | $ | 0.00 |
| June, 2023 | $ | 0.00 |

Assessment(s):   NONE

*This page is only a part of a 2021 ALTA Commitment for Title Insurance issued by Riverbend Commercial Title Services LP, as agent for old Republic National Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright 2021 American Land Title Association.  All rights reserved.**
The use of this Form (or any derivative thereof) is restricted to ALTA licensees and
ALTA members in good standing as of the date of use.  All other uses are prohibited.
Reprinted under license from the American Land Title Association.



American Land Title Association

Commitment for Title Insurance
[2021 v. 01.00 (07-01-2021)]
- 10 -

### Tract VIII: Auditor's Parcel No. 190-0026-0033

Valuations:

| | | |
|---|---|---|
| Land | $ | 30.00 |
| Building | $ | 0.00 |
| Total | $ | 30.00 |

Semi-Annual Taxes:

| | | | |
|---|---|---|---|
| December, 2022 | $ | 1.36 | UNPAID/ DELINQUENT |
| June, 2023 | $ | 1.36 | UNPAID/ DELINQUENT |

Assessment(s):     NONE

### Tract IX: Auditor's Parcel No. 190-0026-0034 and 35 cons.

Valuations:

| | | |
|---|---|---|
| Land | $ | 90.00 |
| Building | $ | 0.00 |
| Total | $ | 90.00 |

Semi-Annual Taxes:

| | | | |
|---|---|---|---|
| December, 2022 | $ | 4.08 | UNPAID/ DELINQUENT |
| June, 2023 | $ | 4.08 | UNPAID/ DELINQUENT |

Urban Forestry Assessment:

| | | | |
|---|---|---|---|
| December, 2022 | $ | 0.41 | UNPAID/ DELINQUENT |

### Tract X: Auditor's Parcel No. 190-0026-0036

Valuations:

| | | |
|---|---|---|
| Land | $ | 140.00 |
| Building | $ | 0.00 |
| Total | $ | 140.00 |

Semi-Annual Taxes:

| | | | |
|---|---|---|---|
| December, 2022 | $ | 4.92 | UNPAID/ DELINQUENT |
| June, 2023 | $ | 4.92 | UNPAID/ DELINQUENT |

Assessment(s):     NONE

*This page is only a part of a 2021 ALTA Commitment for Title Insurance issued by Riverbend Commercial Title Services LP, as agent for old Republic National Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright 2021 American Land Title Association. All rights reserved.**
The use of this Form (or any derivative thereof) is restricted to ALTA licensees and
ALTA members in good standing as of the date of use. All other uses are prohibited.
Reprinted under license from the American Land Title Association.



American Land Title Association

Commitment for Title Insurance
[2021 v. 01.00 (07-01-2021)]
- 11 -

### Tract XI: Auditor's Parcel No. 194-0008-0035

Valuations:

| | | |
|---|---|---|
| Land | $ | 8,680.00 |
| Building | $ | 0.00 |
| Total | $ | 8,680.00 |

Semi-Annual Taxes:

| | | | |
|---|---|---|---|
| December, 2022 | $ | 393.05 | UNPAID/ DELINQUENT |
| June, 2023 | $ | 393.05 | UNPAID/ DELINQUENT |

Urban Forestry Assessment:

| | | | |
|---|---|---|---|
| December, 2022 | $ | 130.82 | UNPAID/ DELINQUENT |

### Tract XII: Auditor's Parcel No. 194-0008-0036

Valuations:

| | | |
|---|---|---|
| Land | $ | 2,600.00 |
| Building | $ | 0.00 |
| Total | $ | 2,600.00 |

Semi-Annual Taxes:

| | | | |
|---|---|---|---|
| December, 2022 | $ | 117.73 | UNPAID/ DELINQUENT |
| June, 2023 | $ | 117.73 | UNPAID/ DELINQUENT |

Urban Forestry Assessment:

| | | | |
|---|---|---|---|
| December, 2022 | $ | 157.30 | UNPAID/ DELINQUENT |

### Tract XIII: Auditor's Parcel No. 194-0008-0077

Valuations:

| | | |
|---|---|---|
| Land | $ | 9,870.00 |
| Building | $ | 0.00 |
| Total | $ | 9,870.00 |

Semi-Annual Taxes:

| | | | |
|---|---|---|---|
| December, 2022 | $ | 446.94 | UNPAID/ DELINQUENT |
| June, 2023 | $ | 446.94 | UNPAID/ DELINQUENT |

Assessment(s):

| | | | |
|---|---|---|---|
| December, 2022 | $ | 178.21 | UNPAID/ DELINQUENT |

10.   Taxes and assessments for the year 2022 and prior year which are unpaid and delinquent. Contact the Hamilton County Treasurer prior to closing to confirm amounts due.

11.   Taxes and assessments, if any, for the year 2023 and subsequent years which are a lien, but are not yet due and payable.

*This page is only a part of a 2021 ALTA Commitment for Title Insurance issued by Riverbend Commercial Title Services LP, as agent for old Republic National Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright 2021 American Land Title Association. All rights reserved.**
The use of this Form (or any derivative thereof) is restricted to ALTA licensees and
ALTA members in good standing as of the date of use. All other uses are prohibited.
Reprinted under license from the American Land Title Association.



American Land Title Association                                  Commitment for Title Insurance
[2021 v. 01.00 (07-01-2021)]
- 12 -

12.   Tax additions or abatements, if any, which may hereafter be made by legally constituted
      authorities.

## AS TO TRACTS I-X:

13.   Covenant by Reliable Castings Corporation, dated September 18, 1981 and recorded
      September 21, 1981 in Mortgage Book 4383, Page 608, Hamilton County, Ohio Records.
      (See Exhibit No. 13)

14.   Agreement dated August 18, 1903 and recorded September 10, 1903 in Deed Book 894,
      Page 62, Hamilton County, Ohio Records. (See Exhibit No. 14)

## AS TO TRACTS XI-XIII:

15.   Open-End Mortgage, Security Agreement, Fixture Filing and Assignment of Rents from
      Reliable Castings Corporation, an Ohio corporation, to Beck Aluminum International,
      LLC, an Ohio limited liability company, in the amount of $399,454.00, dated November
      11, 2021 and recorded November 16, 2021 in Official Record Book 14545, Page 275,
      Hamilton County, Ohio Records. (See Exhibit No. 15)

   A)   First Amendment to Open-End Mortgage, Security Agreement, Fixture Filing and
        Assignment of Rents dated January 20, 2022 and recorded January 24, 2022 in
        Official Record Book 14589, Page 793, Hamilton County, Ohio Records.

   B)   Partial Release of Mortgage dated May 31, 2022 and recorded June 7, 2022 in
        Official Record Book 14683, Page 2131, Hamilton County, Ohio Records.

   C)   Second Amendment to Open-End Mortgage, Security Agreement, Fixture Filing
        and Assignment of Rents dated July 1, 2022 and recorded July 14, 2022 in
        Official Record Book 14708, Page 1572, Hamilton County, Ohio Records.

   D)   Third Amendment to and Partial Release of Open-End Mortgage, Security
        Agreement, Fixture Filing and Assignment of Rents dated November 30, 2022
        and recorded December 15, 2022 in Official Record Book 14814, Page 1949,
        Hamilton County, Ohio Records.

16.   Mechanic's Lien in favor of Michael J. Westerfield of Westech, Inc., in the amount of
      $22,610.00, recorded April 20, 2022 in Official Record Book 14650, Page 1352,
      Hamilton County, Ohio Records. (See Exhibit No. 16)

*This page is only a part of a 2021 ALTA Commitment for Title Insurance issued by Riverbend Commercial Title Services LP, as agent for old
Republic National Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment
Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its
issuing agent that may be in electronic form.*

**Copyright 2021 American Land Title Association.  All rights reserved.**
The use of this Form (or any derivative thereof) is restricted to ALTA licensees and
ALTA members in good standing as of the date of use.  All other uses are prohibited.
Reprinted under license from the American Land Title Association.



American Land Title Association

Commitment for Title Insurance
[2021 v. 01.00 (07-01-2021)]
- 13 -

17. Utility easement in favor of The Cincinnati Gas & Electric Co., as set forth in Grant dated October 9, 1941 and recorded April 8, 1942 in Deed Book 1952, Page 423, Hamilton County, Ohio Records. (See Exhibit No. 17)

18. Utility easement in favor of The Cincinnati Gas & Electric Company, as set forth in Grant of Easement dated February 23, 1995 and recorded March 3, 1995 in Official Record Book 6699, Page 804, Hamilton County, Ohio Records. (See Exhibit No. 18)

19. Transferrable legal descriptions for Tracts XII and XIII do not exist. After the properties were acquired, a portion was conveyed to the City of Cincinnati, and residue legal descriptions were never established. *New legal descriptions, and Plats of Survey with closure table in a form acceptable to and approved by the county engineer is required.* (As to Tracts XII, and XIII only)

20. Anything to the contrary herein notwithstanding, the Land described in Schedule A of this policy shall not be deemed to include any part thereof resulting through the change in the course of the Mill Creek occasioned by other than natural causes or by natural causes other than accretion.

21. Rights of all upper and lower riparian owners and the public in general in and to the waters of the Mill Creek crossing the Land and to the uninterrupted natural unpolluted flow thereof.

22. Rights of others, if any, in, over and to that portion of the Land which lies within the public right-of-way of Dreman Avenue.

## AS TO ALL TRACTS:

23. Anything to the contrary notwithstanding, any policy issued pursuant hereto does not insure that the Land described in Schedule A hereof has the right of access to or from Interstate 75, a limited access highway.

24. Anything to the contrary notwithstanding, any policy issued pursuant hereto does not insure that the Land described in Schedule A hereof has the right of access to or from Interstate 75 South, a limited access highway.

25. The property address and/or tax parcel identification number shown herein are provided solely for informational purposes, without warranty as to accuracy or completeness and are not hereby insured.

26. This Commitment for Title Insurance is issued in contemplation of the issuance of a policy or policies of title insurance and Riverbend Commercial Title Services LP and the

*This page is only a part of a 2021 ALTA Commitment for Title Insurance issued by Riverbend Commercial Title Services LP, as agent for old Republic National Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright 2021 American Land Title Association. All rights reserved.**
The use of this Form (or any derivative thereof) is restricted to ALTA licensees and
ALTA members in good standing as of the date of use. All other uses are prohibited.
Reprinted under license from the American Land Title Association.



American Land Title Association

Commitment for Title Insurance
[2021 v. 01.00 (07-01-2021)]
- 14 -

Company shall have no obligation outside the terms of this Commitment. Specifically, any title search or examination conducted by Riverbend Commercial Title Services LP as a basis for issuing this Commitment shall be for the benefit of Riverbend Commercial Title Services LP and the Company only, and does not inure to the benefit of any other party, including any seller, purchaser or lender. This Commitment is not an abstract or opinion of title.

In the event any proposed insured(s) under this Commitment fails to acquire, or elects not to acquire, a final policy prior to the expiration date of the Commitment, said proposed insured(s) shall have no cause of action or recourse against Riverbend Commercial Title Services LP or the Company and in no event shall any proposed insured(s) have any claim or cause of action against Riverbend Commercial Title Services LP or the Company based on the title search or examination. Persons and entities not listed above as proposed insured(s) are not entitled to rely upon this commitment for any purpose. By accepting the within Commitment, the proposed insured(s), along with any other parties to the contemplated transaction, consents to and agrees with the foregoing.

*This page is only a part of a 2021 ALTA Commitment for Title Insurance issued by Riverbend Commercial Title Services LP, as agent for old Republic National Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright 2021 American Land Title Association. All rights reserved.**
The use of this Form (or any derivative thereof) is restricted to ALTA licensees and
ALTA members in good standing as of the date of use. All other uses are prohibited.
Reprinted under license from the American Land Title Association.



American Land Title Association

Commitment for Title Insurance
[2021 v. 01.00 (07-01-2021)]
- 1 -

## EXHIBIT A

**Tract I: Auditor's Parcel No. 190-0026-0015**
Situate in the City of Cincinnati, Hamilton County, Ohio in Section 21, Town 3, Fractional Range 2 of the Miami Purchase in Millcreek Township and being known, numbered and designated as Lot 71 in Isaac Bates' Second Subdivision as recorded in Plat Book 5, Page 100 and Plat Book 7, Pages 62 and 63 to correct errors and the records of Hamilton County, Ohio, said lot being more particularly described as follows:

Commencing at a point in the east line of Colerain Avenue 75 feet North of Northeast corner of Colerain Avenue and Sassafrass Street (formerly Carroll Street); thence Eastwardly 101.56 feet to a point in the West line of Lot 75 of said subdivision; thence northwardly along the West line of Lot 75, 25 feet to a point in the South line of Lot 70 of said subdivision; thence westwardly along the south line of Lot 70 of said subdivision; thence westwardly along the south line of Lot 70, 102.08 feet along the east line of Colerain Avenue; thence Southwardly along the East line of Colerain Avenue, 25 feet to the place of beginning.

**Tract II: Auditor's Parcel No. 190-0026-0009**
**Tract III: Auditor's Parcel No. 190-0026-0010 and 11 cons.**
**Tract IV: Auditor's Parcel No. 190-0026-0012**
**Tract VII: Auditor's Parcel No. 190-0026-0032**
**Tract VIII: Auditor's Parcel No. 190-0026-0033**
**Tract IX: Auditor's Parcel No. 190-0026-0034 and 35 cons.**
**Tract X: Auditor's Parcel No. 190-0026-0036**

Situated in the City of Cincinnati, Hamilton County, State of Ohio, and being all of Lots 49, 50, 51, 54, 55, 56, 61 and 62 and part of Lot 48, of Isaac Bates' 2nd Subdivision, as recorded in Plat Book 7, Page 62 of the Plat Books in the Recorder's Office of Hamilton County, Ohio, and included in the following boundary, to wit:

Beginning at a stake in the east line of Colerain Avenue in said City, driven at the Northwest corner of said Lot numbered forty nine (49); thence Southwardly along the East line of Colerain Avenue one hundred (100) feet to a stake driven at the Southwest corner of said Lot Sixty Two (62); thence Eastwardly along the South lines of said Lots Sixty Two (62) and Sixty One (61) to the Southeast corner of said Lot Sixty One (61); thence along the west line of Comfort Street one hundred twenty six and forty eight hundredths (126.48) feet to an iron rod driven at a point where the north line of said Lot Forty Nine (49) extended Eastwardly intersects the East line of said Lot Forty Eight (48); thence Westwardly two hundred fourteen and 04/100 (214.04) feet along the North line of Lot Forty Nine (49) as extended, to the place of beginning.

*This page is only a part of a 2021 ALTA Commitment for Title Insurance issued by Riverbend Commercial Title Services LP, as agent for old Republic National Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright 2021 American Land Title Association. All rights reserved.**
The use of this Form (or any derivative thereof) is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.



American Land Title Association

Commitment for Title Insurance
[2021 v. 01.00 (07-01-2021)]
- 2 -

EXCEPTING therefrom the following described real estate conveyed to the City of Cincinnati by Deed recorded in Deed Book 2974, Page 402, of the Hamilton County, Ohio Records:

Situate, lying and being in Section 21, Town 3, Fractional Range 2, Millcreek Township, Hamilton County, Ohio, and being part of Lots 48, 51, 54, 56, and 61 of Isaac Bates' Second Subdivision as recorded in Plat Book 5, Pages 100 and 101, Hamilton County Records and more particularly described as follows:

From the intersection of the northerly line of Sassafrass Street (a 50 foot street) and the westerly line of Comfort Street (a 50 foot street) measure North 1°55' East, along the westerly line of Comfort Street, 150 feet to the southeast corner of said Lot 61 for the place of beginning; thence North 1°55' East, along the westerly line of Comfort Street, 3.24 feet to an angle; thence North 8°54' West, along the westerly line of Comfort Street, 123.53 feet to the northerly line of Albert M. Freiberg's property; thence South 85°09 West, along said northerly line, 70 feet; thence South 36°37'57" East, 148.74 feet to the southeast corner of said Lot 61 and the place of beginning and containing 4388 square feet, more or less, or 0.10 acre, more or less.

### Tract V: Auditor's Parcel No. 190-0026-0013
### Tract VI: Auditor's Parcel No. 190-0026-0014
Situated in the City of Cincinnati, County of Hamilton, State of Ohio, and described as follows:

Being Lots Nos. 63 ad 70 on the plat of Isaac Bates Second Subdivision as recorded in Plat Book 5, Page 100 of the Records of Hamilton County, Ohio, said Lot No. 63 commencing 125 feet north of the northeast corner of Colerain Avenue and Carroll Avenue, now Sassafrass Street; thence eastwardly 122.61 feet; thence northwardly 24.90 feet; thence westwardly 124.25 feet to Colerain Avenue; thence southwardly along Colerain Avenue 25 feet to the place of beginning and Lot No. 70 commencing 100 feet north of the northeast corner of Colerain and Carroll Avenue, now Sassafrass Street; thence running easterly 122.08 feet; thence northwardly 25 feet; thence westwardly 122.61 feet to Colerain Avenue and thence southwardly along Colerain Avenue 25 feet to the place of beginning.

### Tract XI: Auditor's Parcel No. 194-0008-0035
Situate, lying and being in the City of Cincinnati, County of Hamilton and State of Ohio, in Section twenty seven (27), Township three (3), Fractional Range two (2) of the Miami Purchase, more particularly described as follows:

Beginning at a point in the southwest corner of Lot No. Twelve (12) of E. C. Roll's Estate recorded in Plat Book 1, Page 306 of the records of Hamilton County, Ohio; thence North 22°50' East, 435.75 feet to a point; thence South 67°10' East, 131.50 feet to a point; thence North

*This page is only a part of a 2021 ALTA Commitment for Title Insurance issued by Riverbend Commercial Title Services LP, as agent for old Republic National Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright 2021 American Land Title Association. All rights reserved.**
The use of this Form (or any derivative thereof) is restricted to ALTA licensees and
ALTA members in good standing as of the date of use. All other uses are prohibited.
Reprinted under license from the American Land Title Association.



AMERICAN
LAND TITLE
ASSOCIATION

American Land Title Association

Commitment for Title Insurance
[2021 v. 01.00 (07-01-2021)]
- 3 -

85°46' East, 28.50 feet to a point; thence South 3°10' East, 270 feet to a point; thence South 59°35' West 162 feet to a point; thence South 89°20' West, 195.36 feet to the place of beginning, containing two and 15/100 (2.15) acres.

### Tract XII: Auditor's Parcel No. 194-0008-0036

*The Land depicted below is a tract of land as shown by the tax map records of Hamilton County, Ohio; a new legal description, and Plat of Survey with closure table in a form acceptable to and approved by the county engineer is required.*



*This page is only a part of a 2021 ALTA Commitment for Title Insurance issued by Riverbend Commercial Title Services LP, as agent for old Republic National Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright 2021 American Land Title Association. All rights reserved.**
The use of this Form (or any derivative thereof) is restricted to ALTA licensees and
ALTA members in good standing as of the date of use. All other uses are prohibited.
Reprinted under license from the American Land Title Association.



American Land Title Association

Commitment for Title Insurance
[2021 v. 01.00 (07-01-2021)]
- 4 -

## Tract XIII: Auditor's Parcel No. 194-0008-0077

*The Land depicted below is a tract of land as shown by the tax map records of Hamilton County, Ohio; a new legal description, and Plat of Survey with closure table in a form acceptable to and approved by the county engineer is required.*



12752244.1

*This page is only a part of a 2021 ALTA Commitment for Title Insurance issued by Riverbend Commercial Title Services LP, as agent for old Republic National Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I-Requirements; Schedule B, Part II-Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.*

**Copyright 2021 American Land Title Association. All rights reserved.**
The use of this Form (or any derivative thereof) is restricted to ALTA licensees and
ALTA members in good standing as of the date of use. All other uses are prohibited.
Reprinted under license from the American Land Title Association.



IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION, AT DAYTON

| | | |
|---|---|---|
| IN RE: | : | Case No.  23-31157 |
| | : | |
| RELIABLE CASTINGS CORPORATION | : | Chapter 11 |
| | : | Subchapter V |
| Debtor-In-Possession | : | Judge Guy R. Humphrey |
| | : | |

**<u>ORDER GRANTING OMNIBUS MOTION OF DEBTOR IN POSSESSION TO (1)
ASSUME SOME OR ALL CONTRACTS RELATING TO SALE OF THE DEBTOR'S
REAL ESTATE LOCATED IN HAMILTON COUNTY, OHIO, INCLUDING THE
PURCHASE CONTRACT, LISTING AGREEMENT, AND, IF NEEDED, SURVEY
CONTRACT, (2) APPROVING THE CURE PAYMENT TO THE SURVEYOR, TO THE
EXTENT ASSUMED; (3) SELL THE DEBTOR'S REAL PROPERTY IN HAMILTON
COUNTY, OHIO, FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES,
AND INTERESTS PURSUANT TO 11 U.S.C. § 363(F) AND (4) EMPLOY AND
APPROVE COMPENSATION TO REALTOR AND, IF NEEDED, THE SURVEYOR
[DOC. --]</u>**

**THIS MATTER** is before the Court pursuant to the *Omnibus Motion Of Debtor In
Possession to (1) Assume Some or All Contracts Relating to Sale of the Debtor's Real Estate
Located in Hamilton County, Ohio, Including the Purchase Contract, Listing Agreement, and, if*

EXHIBIT G

*Needed, Survey Contract, (2) Approving the Cure Payment to the Surveyor, to the Extent Assumed; (3) Sell the Debtor's Real Property in Hamilton County, Ohio, Free and Clear of All Liens, Claims, Encumbrances, and Interests Pursuant to 11 U.S.C. § 363(f) and (4) Employ and Approve Compensation to Realtor and, If Needed, The Surveyor* filed on _____ [Doc. No. --] (the "Motion").

### THE COURT HEREBY FINDS THAT:

A.      The findings and conclusions set forth herein constitute the Court's finding of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this chapter 11 case pursuant to Bankruptcy Rule 9014.

B.      To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent that any of the following conclusions of law constitute findings of fact, they are adopted as such.

C.      Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Motion or the Purchase Contract.

D.      This Court has jurisdiction over the Motion and over the property of the Debtor, including the Property sought to be sold, transferred and conveyed pursuant to the Purchase Contract pursuant to 28 U.S.C. §§ 157 and 1334.  This proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue is proper in this District and in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

E.      The statutory predicates for the relief requested in this Motion are sections 105, 362, 363, 365, 503, 507 and 1106 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq*. (the "Bankruptcy Code") and Rules 2002(a)(2), 6004(a), (b), (c), (e) and (f), 9007 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

2

F.      This Sale Order constitutes a final order within the meaning of 28 U.S.C. 158(a). Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), and to any extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rule 7054, this Court finds that there is no just reason for delay in the implementation of this Sale and Order and directs entry of judgment as set forth herein.

G.      The Property constitute property of the Debtor's bankruptcy estate and title thereto is vested in the Debtor's bankruptcy estate within the meaning of § 541(a) of the Bankruptcy Code.

H.      Debtor  has articulated good and sufficient reasons for this Court to grant the relief requested in the Motion and provided for herein.

I.      Notice of the Motion has been served on all creditors and parties in interest.  Such notice is appropriate, adequate and sufficient for all purposes as required by the Bankruptcy Code, Bankruptcy Rules and the Local Rules of this Court.  No other or further notice is required.

J.      Debtor has reviewed the lien rights of Beck (securing a debt of approximately $450,000) and Westech (securing a debt of approximately $17,000) in the Property and has determined same to be valid, enforceable and properly perfected under Ohio law.

K.      Debtor marketed the Property through its Realtor.

L.      The Purchase Contract and Listing Agreement were non-collusive, proposed and executed in good faith as a result of arm's-length negotiations.

M.      The Buyer is an unrelated third party who negotiated the Purchase Contract at arm's length.

3

N.      The terms contained in the Purchase Contract constitute the highest and best offer for the Property and provide for the greatest recovery under the circumstances of this case. The Debtor's determination that the Purchase Contract constitutes the highest and best offer of the Property and constitutes a valid and sound exercise of Debtor's business judgment.

O.      No other entity or group of entities has presented a higher or otherwise better offer to Debtor to purchase the Property for greater economic value to this bankruptcy estate than the Buyer.

P.      Approval of the Motion, the Purchase Contract, the Listing Agreement, the assumption of the Survey Contract to the extent necessary or convenient to provide for a speedy closing on the sale, and the sale as a whole, is in the best interests of the Debtor, its creditors and estate and other parties in interest in this chapter 11 case.

Q.      The objection period set forth in the Motion and notice thereto afforded a full, fair and reasonable opportunity to any entity to make a higher or better offer or contest the validity of the offer by the Buyer as the highest and best offer for the Property.

R.      The objection period set forth in the Assumption and Assignment Notice afforded Counterparties a full, fair and reasonable opportunity to contest the assumption and assignment of the Assumed Contracts and the Cure Amounts, if any, with respect thereto.

S.      The Debtor  has demonstrated compelling circumstances and a good, sufficient, and sound business purpose and justification for the sale of the Property  including the assumption and assignment of the Purchase Contract, Listing Agreement and Survey Contract because among other reasons, (i) the Purchase Contract constitutes the highest and best offer for the property (ii) the Purchase Contract and the closing thereon present the best opportunity to

4

realize the value of the Property and (iii) any other transaction would not have yielded a more favorable economic result.

T.    Debtor  has, to the extent necessary, satisfied the requirements of section 365 of the Bankruptcy Code, including sections 365(b)(1)(A), 365(b)(1)(B), and 365(f) of the Bankruptcy Code, in connection with the sale and assumption of the Purchase Contract, Listing Agreement and Survey Contract and has (i) cured or will cure any default existing prior to the date hereof, if any, under any of the Assumed Leases, within the meaning of section 365(b)(l)(A) of the Bankruptcy Code; and (ii) provided compensation or adequate assurance of compensation to any party for any actual pecuniary loss to such party resulting from a default prior to the date hereof under the contracts.

U.    The consummation of the sale of the Property is legal, valid, and properly authorized under all applicable provisions of the Bankruptcy Code, including, without limitation, sections 105(a), 362, 363(b), 363(f), 363(m), 365(b), and 365(f) of the Bankruptcy Code, and all of the applicable requirements of such sections have been complied with in respect of the Sale.

V.    Given all of the circumstances of this chapter 11 case and the adequacy and fair value of the consideration provided by Buyer under the Purchase Contract, the sale constitutes a reasonable and sound exercise of Debtor's business judgment, is in the best interests of Debtor, its bankruptcy estate and creditors, and other parties in interest in this chapter 11 case, and should be approved.

**WHEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

5

The Motion shall be and hereby is, GRANTED.  The Debtor is hereby authorized to consummate the real estate transaction as set forth in the Motion without limitation other than as set forth herein and without further Order of this Court.

All objections to the Motion or the relief requested in the Motion, if any, that have not been withdrawn, waived or settled, and all reservation of rights in such objections, if any, shall be and hereby are, OVERRULED in all respects on the merits and denied.

Notice of the Motion, the Hearing, and the Sale was fair and equitable under the circumstances and complied in all respects with §102(1) of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, and 6006.

The Debtor is hereby authorized to take any and all actions to consummate, and to execute and deliver any and all instruments, agreements or other documents that the Debtor in its sole discretion may deem prudent or advisable to carry out the terms and conditions of the matters set forth in the Motion and approved by this Order, including all terms set forth in the Motion.

The Debtor is hereby authorized to assume the Listing Agreement and employ the Realtor to serve as realtor to market for sale the Property according to the terms of the Motion. Further, to the extent an updated legal description is needed for a portion of the Property, to facilitate closing on the sale of the Property, the Debtor is authorized to assume the Survey Contract and to permit payment of the cure amount to the Surveyor in the amount of $7,250, to be paid out at closing from the proceeds of the sale.  The Realtor is authorized to be employed on a commission of 2% of the purchase price, to be paid out at closing from the proceeds of the sale.

Without limiting the generality of the foregoing, the following specific actions shall occur:

6

1. The Debtor is hereby **AUTHORIZED** and **DIRECTED** to sell the Debtor's interest in the real property it owns in Hamilton County as more specifically described in Exhibit A hereto (the "Property") to private buyer Port of Greater Cincinnati Development Authority an Ohio port authority organized and existing under R.C. Chapter 4582 (the "Buyer"), granting the Buyer title to the Debtor's interest in the Property free and clear of any and all liens and encumbrances pursuant to 11 U.S.C. § 363, for the purchase price of $1,000,000 on the terms and conditions and outlined in the Purchase and Sale Agreement with an effective date of June 22, 2023, as amended, which was attached to the Motion as Exhibit "B" (the "Purchase Contract").

2. The Debtor is hereby **AUTHORIZED** and **DIRECTED** to execute and deliver a Deed and, pursuant to 11 U.S.C. § 363, to sell the Debtor's interest in the Property free and clear of all liens and encumbrances, so that the Buyer shall obtain free and clear title to the Debtor's interest in the Property at closing.

3. The Debtor is hereby **AUTHORIZED** and **DIRECTED** to have paid from the sale proceeds at closing, each of the closing costs and subject to the prorations provided for in the Purchase Contract, including, but not limited to the following:

   a. Realtors' commission in the amount of $20,000 (2% of the total purchase price);

   b. Real estate taxes and prorations calculated as identified in the Purchase Contract;

   c. Payoff of the debt owed to Beck Aluminum International, LLC ("Beck") and secured by the Open-End Mortgage recorded on November 11, 2021 as amended, to be ascertained by the title company by a payoff letter from Beck;

   d. Payoff of the debt owed to Michael J. Westerfield of Westech, Inc. ("Westech") and secured by the Mechanic's Lien filed on April 20, 2022 against the Property, to be ascertained by the title company by a payoff letter from Westech;

   e. To the extent an updated legal description is needed and the Survey Contract is assumed, $7,250 to be paid to Abercrombie & Associates, Inc.; and

   f. Other standard and customary transfer fees/taxes, conveyance fees, settlement fees, etc. in accordance with the Purchase Contract.

7

4. All persons and entities holding or claiming any interest of any kind and nature with respect to the Property are hereby enjoined from asserting, prosecuting or otherwise pursuing such interest against the Buyer, the Buyer successors or assigns, or the Debtor's interest in the Property.

5. This Order shall be binding upon and shall govern the acts of all entities, including without limitation upon (a) the Debtor, (b) the estate, (c) all creditors, (d) all holders of liens against the Property whether known or unknown, (e) the Buyer and all successors and assigns to the Buyer, (f) any trustees, including upon dismissal or conversion of this case to Chapter 7 of the Bankruptcy Code. This Order and the sale approved herein shall inure to the benefit of the Debtor, its estate and creditors, the Buyer and the respective successors and assigns of each of the foregoing.

6. The Buyer is not a successor in interest to Debtor.

7. The net proceeds from the sale shall be received by the Debtor for its use in operations without further Order of this Court.

**SO ORDERED.**

cc: Default List PLUS parties requesting service in this Case:

Josh Young, Newmark Group, Inc., One East Fourt Street, Ste. 500, Cincinnati, OH 45202
The Port, c/o Amy Higgins, Senior Real Estate Counsel, 3 East Fourth Street, Ste. 300, Cincinnati, OH 45202
Riverbend Commercial Title Services LP, c/o Karen E. Kramer, One East Fourt Street, Ste. 1400, Cincinnati, OH 45202
Abercrombie & Associates, Inc., 8111 Cheviot Road, Suite 200, Cincinnati, Ohio 45247
Westech Environmental Solutions, 8090 Furlong Drive, Cleves, OH 45002
Beck Aluminum International, LLC, c/o Christopher S. Baxter, Esq., 65 E. State Street, Suite 2500, Columbus, Ohio 43215
Beck Aluminum International, LLC, c/o Rocco Debitetto, Esq., 200 Public Square, Ste. 2800, Cleveland, Ohio 44114