**This document has been electronically entered in the records of the United States Bankruptcy Court for the Southern District of Ohio.**

**IT IS SO ORDERED.**



Guy R. Humphrey
United States Bankruptcy Judge

**Dated: December 19, 2023**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON

| | | |
|---|---|---|
| IN RE: | : | Case No. 23-31157 |
| RELIABLE CASTINGS CORPORATION, | : | Chapter 11 (Subchapter V) |
| Debtor-in-Possession. | : | Judge Guy R. Humphrey |

---

### ORDER CONFIRMING SECOND AMENDED PLAN [DOC. 170]

---

      **THIS MATTER** is before the Court pursuant to the *Second Amended Plan of Reliable Castings Corporation* ("Second Amended Plan") filed by Reliable Castings Corporation ("Debtor") on December 12, 2023 [Doc. 170]; and

      It having been determined, after hearing on notice, that the requirements for confirmation set forth in 11 U.S.C. §§ 1129, 1190 and 1191 have been satisfied as to the Second Amended Plan and that the Second Amended Plan is a consensual plan;

      **IT IS HEREBY ORDERED, ADJUDGED AND DECREED** that the Second Amended Plan is hereby confirmed pursuant to 11 U.S.C. §1191(a). A copy of the Second Amended Plan with all exhibits is attached hereto. The Debtor is further Ordered to serve a copy of this Order along with the attached Second Amended Plan upon all creditors and parties in interest in this case and to file a certificate of such service with this Court within five (5) business days of the entry of this Order.

      **IT IS SO ORDERED.**

Cc: Default List

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON

| | | |
|---|---|---|
| IN RE: | : | Case No. 23-31157 |
| | : | |
| RELIABLE CASTINGS CORPORATION | : | Chapter 11 (Subchapter V) |
| | : | |
| Debtor and Debtor-In-Possession. | : | Judge Guy R. Humphrey |

---

## SECOND AMENDED PLAN OF REORGANIZATION

OF

## RELIABLE CASTINGS CORPORATION

---

Dated: December 12, 2023

Respectfully submitted,

COOLIDGE WALL CO., L.P.A.

*/s/ Patricia J. Friesinger*

_____

Patricia J. Friesinger (0072807)
33 West First Street, Suite 600
Dayton, Ohio 45402
Tel: 937/223-8177  Fax: 937/223-6705
E-Mail: friesinger@coollaw.com

*Counsel for Debtor and Debtor-In-Possession*
*Reliable Castings Corporation*

# Table of Contents

I.   INTRODUCTION ................................................................................................. 4

  A.  Explanation of Chapter 11 ........................................................................... 4

  B.  Explanation of process of Confirmation .................................................... 4

  C.  Voting Procedures ....................................................................................... 5

  D.  Best Interests of Creditors Test ................................................................... 5

II.   DEFINITIONS ................................................................................................... 5

III.  REPRESENTATIONS ....................................................................................... 9

IV.  HISTORY ......................................................................................................... 10

  A.  Events Leading to the Commencement of the Bankruptcy Case ............. 10

  B.  Events Since the Filing of the Bankruptcy Case ...................................... 12

  C.  Risks and Benefits Related to the Reorganized Debtor ........................... 14

  D.  Ongoing Operations ................................................................................... 15

V.   LIQUIDATION ANALYSIS ............................................................................ 15

VI.  PLAN PAYMENT AND COMMITMENT PERIOD ....................................... 17

VII.  PROJECTIONS ................................................................................................ 19

VIII.   CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS19

  A.  Class 1: Administrative Claims under 11 USC 507(a) ............................ 19

  B.  Class 2: Priority Tax Claims ..................................................................... 21

  C.  Class 3: Secured Claims with Hamilton County Real Estate as Collateral ...................... 21

  D.  Class 4: Spectrum's debt from prior to the Petition Date ........................ 21

  E.  Class 5: Other Secured Claims .................................................................. 24

  F.  Class 6: Small General Unsecured Claims ............................................... 24

  G.  Class 7: Other General Unsecured Claims ............................................... 24

  H.  Class 8: Claims of OBWC ........................................................................ 24

  I.  Class 9: Equity .......................................................................................... 25

IX.  IMPLEMENTATION OF THE PLAN ............................................................ 25

  A.  Operations between the Confirmation Date and the Effective Date ........ 25

  B.  Operations of the Reorganized Debtor ..................................................... 25

  C.  Vesting of Assets in Reorganized Debtor in a Consensual Plan ............. 26

  D.  Vesting of Assets in Reorganized Debtor in a Non-Consensual Plan ...... 26

X.   EXECUTORY CONTRACTS AND UNEXPIRED LEASES ......................... 26

XI.  Provisions Governing Distributions ................................................................ 26

  A.  Delivery of Distributions ........................................................................... 26

COOLIDGE WALL CO., L.P.A.

B.   Undeliverable Distributions ............................................................................ 27

XII.   MODIFICATION, REVOCATION OR WITHDRAWAL OF THE PLAN .................. 27

XIII.   RETENTION OF JURISDICTION ............................................................... 27

A.   Continuing Jurisdiction of the Bankruptcy Court ............................................. 27

B.   District Court Jurisdiction .............................................................................. 29

XIV.   SPECIAL PROVISIONS ........................................................................... 29

A.   Fees of Professionals ..................................................................................... 29

B.   Exculpation and Limitation of Liability .......................................................... 29

C.   Subchapter V Trustee Disclosures and Fees .................................................... 29

D.   Bar Date for all Administrative Expense Claims .............................................. 30

E.   Suspension of Payments ................................................................................. 30

F.   Discharge Provisions ...................................................................................... 30

G.   Protection of Creditors if Payments are not made under the Plan or any Amended Plan . 31

H.   Treatment of Allowed Secured Claims ............................................................ 31

I.   Interest Rate ................................................................................................... 32

J.   Set Offs ......................................................................................................... 32

K.   Manner of Payments ...................................................................................... 32

L.   Time Bar to Cash Payments ........................................................................... 32

M.   Objections to Claims and Payments and Distributions on Disputed Claims ....... 33

N.   Approval of Executory Contract Rejection ...................................................... 33

O.   Post-Filing Date Contracts and Leases ........................................................... 33

P.   Notice of Default ............................................................................................ 34

XV.   DISCHARGE OF ALL CLAIMS AND RELEASES ...................................... 34

A.   Discharge pursuant to Section 1141(a) ........................................................... 34

B.   Discharge pursuant to Section 1192 ............................................................... 34

XVI.   Miscellaneous Provisions ......................................................................... 35

A.   Successors and Assigns .................................................................................. 35

B.   Binding Effect ............................................................................................... 35

C.   Modification of Payment Terms ...................................................................... 35

D.   Valuation ...................................................................................................... 35

Any claim for fees, costs, or other charges shall be made by the creditor by application to the Court. Such fees, costs or charges must be reasonable as required by Section 506(6) of the Bankruptcy Code. .......................................................................................... 35

E.   Default and Waiver ........................................................................................ 35

F.   Transferred Claims ......................................................................................... 35

3

G.   Substitution of Collateral ............................................................................. 35

H.   Exempt Property ............................................................................................ 36

I.    Termination of Subchapter V Trustee............................................................ 36

J.    Tax Consequences .......................................................................................... 36

K.   Risk to Creditors Under the Debtor's Plan ...................................................... 36

Reliable Castings Corporation, Debtor and Debtor in Possession (the "Debtor"), hereby submits this Chapter 11 Subchapter V Plan pursuant to Section 1121(a) of the Bankruptcy Code and requests confirmation of the Plan pursuant to Section 1129 and Section 1191 of the Bankruptcy Code. All holders of Claims and Interests entitled to vote to accept or reject the Plan should read the Plan in its entirety before voting to accept or reject the Plan.

## I.    __INTRODUCTION__

Debtor filed its voluntary Chapter 11 case in the Bankruptcy Court on July 25, 2023. The Debtor is foundry engaged in aluminum casting, sand molding, tooling design and fabrication, which has been continuously in existence and operations since 1922 and is now owned by the employees and former employees through an Employee Stock Ownership Plan.

### A.    Explanation of Chapter 11

Chapter 11 is the principal reorganization chapter of the Bankruptcy Code. There are different types of Chapter 11 designations. In this case, Debtor has chosen to proceed under a Subchapter V-Small Business Debtor Reorganization ("Subchapter V"). Pursuant to Subchapter V, a debtor is authorized to reorganize its business for its own benefit and that of its creditors and equity interest holders. Formulation of a plan of reorganization is the principal purpose of a Chapter 11 reorganization case. A plan of reorganization sets forth the means for satisfying claims against interests in the debtor. After a plan of reorganization has been filed, it must either be accepted by holders of claims against, or interests in, the debtor, or be found by the Court not to discriminate unfairly and that it is fair and equitable with respect to each class of claims or interests that is impaired under the plan that has not accepted the plan.

### B.    Explanation of process of Confirmation

Acceptance of a plan by the creditors and equity interest holders is important. For a plan to be accepted by each class of claims, the creditors that hold at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the allowed claims actually voting on the plan in such class must vote for the plan and the equity interest holders that hold at least two-thirds (2/3) in amount of the allowed interests actually voting on the plan in such class must vote for the plan. As set forth above, a Subchapter V Chapter 11 does not require that each holder of a claim against, or interest in, the debtor vote in favor of the plan for it to be confirmed by the Court.

Confirmation of a plan discharges a debtor from all its pre-confirmation debts and liabilities except as expressly provided for in the plan and Section 1141(d) of the Bankruptcy Code. Confirmation

4

makes the plan binding upon the debtors and all claimants, equity interest holders and other parties-in-interest, regardless of whether they have accepted the plan.

### C.      Voting Procedures

Unimpaired Class: Claimants in Class 1, 2 and 9 are not impaired under the Plan. Such Classes are deemed to have accepted the Plan.

Impaired Classes: Claimants in Classes 3-8 are impaired as defined by Section 1124 of the Bankruptcy Code. Debtor is seeking the acceptance of the Plan by Claimants in Impaired Classes. Each holder of an Allowed Claim in an Impaired Class may vote on the Plan by completing, dating and signing the ballot sent to each holder and filing such ballot.

### D.      Best Interests of Creditors Test

Section 1129(a)(7) of the Bankruptcy Code requires that each impaired class of claims or interests accept the Plan or receive or retain under the Plan on account of such claim or interest, property of a value as of the Effective Date of the Plan, that is not less than the amount that such holder would so receive or retain if the Debtor were liquidated under Chapter 7 of the Bankruptcy Code. If Section 1111(b)(2) of the Bankruptcy Code applies to the claims of such class, each holder of a claim of such class will receive or retain under the Plan, on account of such claim, property of a value, as of the Effective Date of the Plan, that is not less than the value of such holder's interest in the estate's interest in the property that secures such claims. For the Plan to be confirmed, the Bankruptcy Court must determine that the Plan is in the best interests of the Debtor's creditors. Accordingly, the proposed Plan must provide the Debtor's creditors with more than they would receive in a Chapter 7 liquidation. It is anticipated that in a Chapter 7 liquidation, the Debtor's secured creditors and priority creditors would be paid in full and the general unsecured creditors would be paid approximately 73.6% of the debt that is owed to them.  That percentage, however, is believed to be unrealistically high as is further discussed below. Accordingly, since the Plan proposes a 100% to all creditors, such creditors are receiving more than they would receive in a Chapter 7 liquidation. Accordingly, the Plan satisfies the requirements of Section 1129(a)(7).

## II.   <u>DEFINITIONS</u>

Unless the context otherwise requires, the following capitalized terms shall have the meanings indicated when used in this Plan which meaning shall be equally applicable to both the singular and plural forms of such terms. Any term in this Plan that is not defined herein but that is used in the Bankruptcy Code shall have the meaning assigned to such term in the Bankruptcy Code.

1.      "Administrative Expense" shall mean any right to payment constituting a cost or expense of administration of the Bankruptcy Case of a kind specified under Section 503(b) of the Bankruptcy Code and entitled to priority under Sections 507(a)(2), 507(b) or 1114(e)(2) of the Bankruptcy Code, including professional services.

2.      "Allowed" shall mean, with respect to (a) any Claim, (i) a Claim, proof of which was filed on or before the date designated by the Bankruptcy Court as the last date for filing proofs of claim with respect to such Claim, or (ii) a Claim that has been or hereafter is scheduled by the

Debtor as liquidated in amount or not disputed or contingent and, is scheduled by the Debtor as liquidated in amount and not disputed or contingent and, in either case, (b) a Claim as to which no objections to the allowance thereof has been filed.

3.      "Bankruptcy Case" shall mean the bankruptcy case commenced in the Bankruptcy Court by the debtor under Case No. 23-31157 currently pending in the United States Bankruptcy Court, Southern District of Ohio.

4.      "Bankruptcy Code" shall mean the Bankruptcy Reform Act of 1978, as amended, Title 11, United States Code.

5.      "Allowed Claim" shall mean any claim against the Debtor filed before the claims bar date of October 5, 2023 set by the Bankruptcy Court or is scheduled by the Debtor as liquidated or not disputed or contingent as to which no objections to allowance thereof has been filed or, if any objection is filed, such objection has been determined.

6.      "Bankruptcy Court" shall mean the court in the Southern District of Ohio conferred with authority over the Bankruptcy Case or the court so authorized with respect to any proceedings in connection therewith for the purpose of such proceedings.

7.      "Bankruptcy Rules" shall mean the Bankruptcy Rules as in effect on the filing date, together with local rules adopted by the Bankruptcy Court, or such similar rules as may be in effect from time to time in the Bankruptcy Court.

8.      "Cash" shall mean cash, cash equivalents, or other readily marketable securities or instruments.

9.      "Claim" means: (i) right of payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured; or (ii) a right to an equitable remedy for breach of performance if such breach gives rise to a right of payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured.

10.      "Claimant" means the holder of a Claim or Interest.

11.      "Class" means all the holders of Claims or Interests with respect to the Debtor as designed in a class in this Plan.

12.      "Confirmation Date" means the date of entry by the Bankruptcy Court of an Order confirming the Plan of Reorganization in accordance with the Code.

13.      "Confirmation Order" shall mean the order entered by the Bankruptcy Court confirming the Plan in accordance with the provisions of Chapter 11 of the Bankruptcy Court.

14.      "Consensual Discharge Order" shall mean an Order of the Bankruptcy Court

6

discharging the debtor pursuant to Section 1141(d) of the Bankruptcy Code, to the fullest extent provided in and permitted by Section 1141(d) of the Bankruptcy Code, of any and all debts, claims and liens that arose at any time on the debtor, its assets, or properties, which debts, claims and liens arose at any time before the entry of the Confirmation Order, any debt of a kind specified in Sections 502(g), 502(h) or 502 (i) of the Bankruptcy Code, whether or not:

    a.    A proof of claim based upon such debt is filed or deemed filed under Section 501 of the Bankruptcy Code;

    b.    A Claim based upon such debt is allowed under Section 502 of the Bankruptcy Code; or

    c.    The holder of a Claim based upon such debt has accepted the Plan.

15.    "Distribution Agent" shall mean the reorganized debtor if the Plan is consensual or the Subchapter V Trustee if the Plan is non-consensual.

16.    "Effective Date" shall mean the first day after the first full month after entry of the Confirmation Order and such Confirmation Order having become a final order not subject to stay or an appeal.

17.    "Impaired" shall mean, with respect to any Claim or class of claims, the condition or effects described in Section 1124 of the Bankruptcy Code.

18.    "Interest" means (i) the ownership interests in the Debtor and (ii) any right or option, however arising, to acquire an ownership interest or any other equity interest in the Debtor.

19.    "Non-Consensual Discharge Order" shall mean an Order of the Bankruptcy Court pursuant to Section 1192 of the Bankruptcy Code, discharging the Debtor of any and all debts, claims and liens that arose at any time on the Debtor, its assets, or properties, which debts, claims and liens arose at any time before the entry of the Confirmation Order that are provided in Section 1141(d)(l)(A) of this title, and all other debts allowed under Section 503 of this title and provided for in the Plan, except;

    a.    on which the last payment is due after the 3 years fixed by the Court; or

    b.    of the kind specified in Section 523(a) of this title.

20.    "Petition Date" shall mean July 25, 2023.

21.    "Plan" shall mean the Debtor's Plan of Reorganization filed by the Debtor together with the exhibits as may be amended and filed with the Court from time to time.

22.    "Priority Tax Claim" means all Claims for Taxes entitled to priority under Section 507(a)(8) of the Bankruptcy Code.

7

23.       "Proposed Amount of Allowed Secured Claim" shall mean the amount of any Secured Claim as set forth in the Plan.

24.       "Pro Rata Allocation" shall mean with respect to the holder of an Allowed Claim in the
Class of Claims, a fraction equal to such holder's claim divided by the total amount of all claims in the class.

25.       "Reorganized Debtor" shall mean the Debtor from and after the Effective Date.

26.       "Retained Property" shall mean (i) all other property of the Estate, and (ii) the Exempt Property which was not subject to administration but was retained by Debtor/reorganized Debtor.

27.       "Secured" shall mean, with respect to any Claims, a Claim secured by a valid and unavoidable lien on or security interest in property of the Debtor, to the extent of the value of such lien or security interest in accordance with Section 506(a) of the Bankruptcy Code, including, if such Claim is subject to setoff under Section 553 of the Bankruptcy Code, to the extent of the amount of such setoff.

28.       "Spectrum" shall mean SPECTRUM Commercial Finance, LLC f/k/a Spectrum Commercial Services Company, L.L.C.

29.       "Subordinated Claim" means (i) any Claim, or portion of a Claim, that is subject to subordination under Section 510 of the Bankruptcy Code; and (ii) any Claim, or portion of a Claim, for fines, penalties, forfeitures, for multiple exemplary, or punitive damages, or other non-pecuniary, direct or non-proximate damages.

30.       "Subchapter V Trustee" means the individual appointed as trustee under Section 1183 of the Bankruptcy Code.

31.       "Substantial Consummation" shall mean one (1) business day after first payment is made to Spectrum for its claim arising from before the Petition, which is a secured claim.

32.       "Tax" means and includes any federal, state, county, and local income, ad valorem, excise stamp and other tax of any type or nature whatsoever.

33.       "Tax Claim" means all Secured or Priority Claims of the Debtor for the payment of any Taxes: (i) accorded a priority pursuant to Section 507(a)(8) of the Bankruptcy Code; or (ii) secured by valid liens on the property of the Bankruptcy Estate existing on the Confirmation Date.

34.       "Term" shall mean from January 1, 2024 through and including December 31, 2028, at which point all creditors are paid in full under the terms of this Plan.

35.       "Unsecured" shall mean, with respect to any Claim, a Claim to the extent of the amount of such Claim that (a) is not secured by any valid and unavoidable lien on or security interest in property of the Debtor or (b) is greater than the value and unavoidable lien on or security interest

8

in property of the Debtor which secures such Claim.

## III.   **REPRESENTATIONS**

NO REPRESENTATIONS CONCERNING DEBTOR IS AUTHORIZED BY DEBTOR OTHER THAN THOSE SET FORTH IN THIS PLAN. THE DEBTOR RECOMMENDS THAT ANY REPRESENTATION OR INDUCEMENT MADE TO SECURE YOUR ACCEPTANCE OR REJECTION OF THE PLAN WHICH IS NOT CONTAINED IN THIS PLAN SHOULD NOT BE RELIED UPON BY YOU IN REACHING YOUR DECISION ON HOW TO VOTE ON THE PLAN. ANY REPRESENTATION OR INDUCEMENT MADE TO YOU NOT CONTAINED HEREIN SHOULD BE REPORTED TO THE ATTORNEYS FOR THE DEBTOR WHO SHALL DELIVER SUCH INFORMATION TO THE COURT FOR SUCH ACTION AS MAY BE APPROPRIATE.

ANY BENEFITS OFFERED TO THE CREDITORS ACCORDING TO THE PLAN WHICH MAY CONSTITUTE "SECURITIES" HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE FEDERAL SECURITIES AND EXCHANGE COMMISSION ("SEC"), THE OHIO DEPARTMENT OF COMMERCE DIVISION OF SECURITIES, OR ANY OTHER RELEVANT GOVERNMENTAL AUTHORITY IN ANY STATE OF THE UNITED STATES. IN ADDITION, NEITHER THE SEC NOR ANY OTHER GOVERNMENTAL AUTHORITY HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THIS PLAN.  ANY REPRESENTATIONS TO THE CONTRARY MAY BE A CRIMINAL OFFENSE.

THE INFORMATION CONTAINED HEREIN HAS NOT BEEN SUBJECT TO A CERTIFIED AUDIT.  FOR THE FOREGOING REASON, AS WELL AS BECAUSE OF THE IMPOSSIBILITY OF MAKING ASSUMPTIONS, ESTIMATES AND PROJECTIONS INTO THE FUTURE WITH ACCURACY, THE DEBTOR IS UNABLE TO WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN IS COMPLETELY ACCURATE, ALTHOUGH EVERY REASONABLE EFFORT HAS BEEN MADE TO ENSURE THAT SUCH INFORMATION IS ACCURATE.  THE APPROVAL BY THE COURT OF THIS PLAN DOES NOT CONSTITUTE AN ENDORSEMENT BY THE COURT OF THE PLAN OR GUARANTEE THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN.

DEBTOR BELIEVES THAT THE PLAN WILL PROVIDE CLAIMANTS WITH AN OPPORTUNITY, ULTIMATELY, TO RECEIVE MORE THAN THEY WOULD RECEIVE IN A LIQUIDATION OF THE DEBTOR'S ASSETS AND SHOULD BE ACCEPTED. CONSEQUENTLY, THE DEBTOR URGES THAT CLAIMANTS VOTE FOR THE PLAN.

DEBTOR DOES NOT WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN IS CORRECT, ALTHOUGH GREAT EFFORT HAS BEEN MADE TO BE ACCURATE.  THE STATEMENTS CONTAINED IN THIS PLAN ARE MADE AS OF THE DATE HEREOF UNLESS ANOTHER TIME IS SPECIFIED HEREIN.

9

IV.   **HISTORY**

The Debtor was initially founded in 1922. The Debtor combines foundry methods and advanced manufacturing technology to produce castings, specializing in aluminum, sand, and permanent mold castings, prototype castings, mold finishing and repair and tooling design and fabrication. The Debtor operates as a manufacturer and distributor of extruded aluminum parts primarily to the auto and truck manufacturing industry. The Debtor's industry spans auto manufacturer suppliers with competitors ranging in size from that of the Debtor to multi-national companies. The Debtor, like many small businesses, fills a niche that many competitors cannot or will not. The Debtor has historically operated from three facilities – one in the Sidney, Ohio area that specialized in servicing the automotive industry and sand moldings and two in the Cincinnati, Ohio area, which historically specialized in more complex/custom products with a smaller volume and, theoretically, a higher profit margin (the Cincinnati facilities have been sold, as further described below).

In 1994, an Employee Stock Ownership Plan ("ESOP") was established, and the Debtor was then owned 32% by the owners and the remainder by the prior owners. In 2008, the remaining stock was purchased by the ESOP. The ESOP document has been amended and restated three times with the most recent restatement effective as of January 1, 2020. The ESOP is a defined contribution plan, intended to qualify as an ESOP as defined in Section 4975(e)(7) of the Internal Revenue Code and as a Stock Bonus Plan under Section 401(a) of the Internal Revenue Code. The Plan Administrator for the ESOP is the Debtor and the Trustees of the ESOP are Thomas Barton and Robert John "RJ" Kuhn.

A.   **Events Leading to the Commencement of the Bankruptcy Case**

In 2019 and 2020, an expansion of the Sidney location was undertaken for a new automotive program, with an investment of approximately $1.2 Million. Unfortunately, that expansion strained the Debtor's financial resources and its primary secured lender put the Debtor into forbearance and forced the Debtor to hire a Chief Restructuring Officer ("CRO") to avoid the creditor declaring a default on the loan and pursuing liquidation.

The Debtor worked with its CRO to regain profitability and to refinance its existing debt. While the CRO charged the company large sums of money (over $1.5 Million in a year and a half), the Debtor did emerge with a replacement lender (Spectrum) with a lending facility described in greater detail below. The loan from the Spectrum was obtained August of 2020. The Debtor implemented the plan created by the CRO to close down the operations in Cincinnati and shift all of the remaining operations to the Sidney, Ohio location.

Following the refinance, the Debtor believed that its business was rebounding. Unfortunately, the Debtor's business was then impacted by a series of related and unrelated events that negatively impacted the Debtor's profitability, including:

    a.   The termination of the product line for which the Sidney expansion had been undertaken (the product was re-sourced to Mexico following a meeting between the customer and the CRO wherein the CRO requested a price increase);

10

b. Additional programs in excess of Five Million Dollars per year of sales were re-sourced or ended due to obsolescence between 2018 and 2022;

c. The Debtor's plan to consolidate into the Sidney, Ohio location resulted in the loss of highly skilled long-term employees of the Debtor with the knowledge to manage the more complex, custom work that had historically been performed in Cincinnati;

d. The loss of the highly skilled long-term employees in Cincinnati occurred at the same time as the economic trend referred to as the "great resignation" in which employees have voluntarily resigned from their jobs *en masse* beginning in early 2021, leading to difficulty in hiring and retaining highly skilled workers and difficulty in getting historical employees from the Cincinnati location to transfer to the Sidney, Ohio location.  This loss in highly skilled / seasoned employees has negatively impacted quality and productivity; and

e. The consolidation of business to the Sidney, Ohio location initiated needed capital investments of over $2.5 Million in 2021.

In addition to the specific occurrences that negatively affected the Debtor's business, changes in the overall industry often significantly impact the Debtor.  Car body style changes can lead to opportunities and can also lead to an end of a supply agreement.  Since the loan was obtained from Spectrum, competitive pressures continue leading to tighter pricing.  Several of the Debtor's customers have moved their work to other companies or otherwise the programs supported by the Debtor have come to an end.  The Debtor has found it difficult to take on new business due to cash flow limitations and staffing shortages.

The Debtor had a compound annual sales decrease of 13.6% between 2017 and 2021.  In 2021, sales decreased 16.1% compared to the prior year, with product sales at approximately $17.8 Million for the year.    For 2022, the Debtor had further reduced product sales of approximately $16.4 Million for the year.  In 2021 and into 2022, the Debtor consolidated its business operations to its Sidney, Ohio location.  Two facilities in Cincinnati were sold in 2022 and there is a contract for the sale of the remaining real estate in Cincinnati for $1,000,000, which the Debtor intends to consummate post-petition, but pre-confirmation[1].  That sale will eliminate the overhead associated with the other locations and finalize the shift of the Debtor's holdings to the Sidney, Ohio location. The Debtor continues to work to reduce the costs of goods sold and to "right-size" the operations to the shrinking business opportunities.  The Debtor has provided for across the board increases of $4.00 per hour to attempt to attract and retain talent, which has helped with the shortage of good employees, but this is still a difficult problem for the Debtor.

Unfortunately, the funds made available from the Debtor's financing were insufficient to keep up with these expenses and the Debtor had received shut off notices from two utility providers, had run out of metal, and was unable (without collections of its accounts receivable, which were being sent to Spectrum's lockbox) to fund wages.  The Debtor attempted to negotiate with Spectrum and other alternative lending sources to stave off the need to file bankruptcy to permit a potential sale

---

[1] This sale has closed, as reported in the report of sale and the exhibit thereto filed in the Bankruptcy Case as Docket Nos. 164 and 165 on December 7, 2023.

COOLIDGE WALL CO., L.P.A.

of the business but was unsuccessful in those negotiations.  As such, the Bankruptcy Case was filed to permit the Debtor to collect its accounts receivable (rather than having them paid into the lockbox) to provide the breathing room needed to permit reorganization or sale of the business as a going concern.

## B.      Events Since the Filing of the Bankruptcy Case

The Bankruptcy Case was filed on an emergency basis on July 25, 2023 to avoid the utilities being shut off, which would have a devastating impact on the operations of the Debtor.  Just prior to the filing of the Bankruptcy Case, the Debtor notified its customers of a price increase, which were scheduled to go into effect at the end of July of 2023.

Due to the emergency basis of the filing, the Debtor's efforts to stabilize its business and obtaining authority to engage in activities that would typically be included in the first day motions were delayed.  Additionally, immediately after the filing of the Bankruptcy Case, the then serving president of the Debtor resigned (which resignation notice was accelerated by the Debtor).  Further, given the timing of the filing of the Bankruptcy Case, the Debtor also has had to attend to paying its final health care claims to permit collection of its stop loss insurance coverage and renew its overall insurance, which included an extensive increase in the annual premium.

Since the filing of the Bankruptcy Case, the Debtor has participated in and obtained authority from the Bankruptcy Court for each of the following:

a.      To pay pre-petition wages, employee business expenses, etc. [Doc. 23];

b.      Employ counsel for the Debtor [Doc. 72];

c.      To continue workers' compensation program with self-insured position of the Debtor [Doc. 79];

d.      Continuation of utility services with directed and agreed upon adequate assurance deposits [Docs. 86 and 141];

e.      The Debtor prepared for and participated in the Initial Debtor Interview and has filed all monthly operating reports;

f.      The 341 meeting of creditors was conducted and concluded on August 28, 2023;

g.      Final approval to use cash collateral [Doc. 95];

h.      Approval to continue employee benefit programs, including self-insured healthcare [Doc. 96];

i.      Continuation of customer programs to accept returns in accordance with industry standards [Doc. 107];

12

j.      Sell the real estate owned by the Debtor as located in Hamilton County, Ohio [Doc. 135];

k.      To receive Debtor-In-Possession financing in the form of a factoring agreement with Spectrum Commercial Finance, LLC [Doc. 140] and in the form of premium financing for increased insurance premiums from AFCO Credit Corporation [Doc 139];

l.      The Status conference required by 11 USC § 1188 was held on September 20, 2023;

m.     The deadline to file claims in the case expired on October 5, 2023 [Doc. 21];

An application to employ Forevisor, LLC has been pending [Doc. 46] since August 7, 2023 and the Debtor believes a resolution of objections filed thereto has been negotiated, but is awaiting final approval of the form of an agreed order resolving that objection. In any event, Forevisor, LLC has been involved and assisting the Debtor to obtain Debtor-In-Possession financing for business operations and forecasting future income in support of this Plan.

The Court has approved the sale of the real estate owned by the Debtor in Hamilton County, and that sale has been consummated. From the sale proceeds, the Debtor anticipates paying off the two creditors with Secured Claims, which are secured by that asset. The Debtor will also need to remove the remaining equipment on site at that location in advance of the closing of the sale and anticipates scrapping some obsolete equipment at that time. To the extent a Plan is not confirmed in advance of that time, the Debtor will move the Bankruptcy Court for approval to take those actions in the Bankruptcy Case.

In addition to the approval from the Bankruptcy Court to continue as a self-insured employer for workers' compensation purposes, the Debtor also attended a hearing with the Ohio Bureau of Workers Compensation Self-Insured Review Panel on September 22, 2023 (the "BWC Hearing"). At the BWC Hearing, the Debtor learned that its continuation as a self-insured employer has been provisionally granted through August of 2024. The Debtor estimates that the continuation as a self-insured employer will save the Debtor approximately $500,000 per year in total expense otherwise associated with the workers compensation premiums. The Debtor also learned at the BWC Hearing that the claims filed by the Ohio Bureau of Workers Compensation ("OBWC") as Proof of Claim Numbers 39 and 40 were filed as place-holder claims that are intended to capture unpaid premiums and claims payments that may be owed by the Debtor to the OBWC in the event the Debtor fails to remain current in payment of claims or has its grant to remain a self-insured employer revoked. As such, the Debtor has been informed by the OBWC that it intends to withdraw its claims in the event the Debtor is able to confirm its Plan.

The Debtor-In-Possession financing obtained in the form of a factoring agreement was needed by the Debtor to permit it to increase its profitability. As was explained in the *Declaration of Thomas Barton In Support of DIP Financing* filed in the Bankruptcy Case [Doc. No. 93], the Debtor did not have sufficient access to cash to permit it to have materials and supplies on hand to efficiently manage its production, which hindered the Debtor's ability to generate profits. The Debtor also

13

has taken efforts to increase its profitability by implementing price increases that had been announced prior to the Petition Date, but went into effect after the Petition Date.  Of note: the Cash Collateral Order and the terms of the Debtor-In-Possession financed, the Debtor has committed to obtaining a confirmed plan on or before December 31, 2023.

The Debtor worked diligently to foster strong relationships with long-term customers of the Debtor and to determine what contracts were unprofitable.  The Debtor strengthened its relationships with customers through re-implementing its return policy and by having more hands-on contact with management following the exit of the former president of the company.

### C.      Risks and Benefits Related to the Reorganized Debtor

The risks associated with the Plan are that the Debtor will not be able to operate profitably going forward, that the Debtor will not be able to retain and grow its customer base and revenues and retain an adequate work force, and the Debtor will be unable to replace its operating financing established post-petition with Spectrum (which expires in August of 2024).  Debtor, however, believes those risks are relatively low, and believes it will be able to operate and generate sufficient income to pay off the secured and unsecured debts in full over the Term while maintaining operations and value for the owners of the Debtor through the ESOP.  The Debtor is already engaged with Forevisor, LLC in lining up replacement financing in the form of either a line of credit or factoring. The creditors, which include customers and vendors of the Debtor will have the Debtor as an ongoing supplier and customer for their future business.

14

### D.    Ongoing Operations

Debtor intends to continue the employment of Thomas Barton and RJ Kuhn who are insiders.  At the time of the filing of the Bankruptcy Case, Thomas Barton was being paid a $160,000 annual salary.  After the president left the Debtor, RJ Kuhn's pay was increased to match that of Barton. For so long as Barton and Kuhn continue on with their current job responsibilities, it is anticipated that their pay will remain the same or increase only with cost-of-living adjustments.  It is the Debtor's intention that the services performed by Barton and Kuhn will be reduced over time and their duties taken over by the hiring of well-qualified employees who are expected to become officers of the Debtor.  The income paid to Barton and Kuhn over time is anticipated to be reduced commensurate with their reduction in job duties.  The ongoing operations also assume that the Debtor will continue to use the post-petition factoring arrangement with Spectrum through the life of the agreement for financing (to August 18, 2024) to avoid incurring early termination fees.  The Debtor will thereafter replace the post-petition factoring arrangement with Spectrum with replacement financing, the search for which is already in process.

On the Effective Date of the Plan, the Debtor will assume: (i) the Ohio Electricity Supply Agreement dated August 19, 2022 ("Electric Contract") with Constellation NewEnergy, Inc. ("CNE") for electricity supply to the Debtor's Sidney OH location; and (ii) the Base Contract for Sale and Purchase of Natural Gas dated March 10, 2011 and related Transaction Confirmation (collectively, "Gas Contract") with Constellation NewEnergy – Gas Division, LLC ("CNEG") for natural gas supply to the Debtor's Sidney OH location.

In order to assume the Electric Contract, the Debtor will cure the pre-petition payment defaults under the Electric Contract totaling $39,027.33 ("CNE Cure Amount"). The CNE Cure Amount will be satisfied by CNE's application of its Section 366 Adequate Assurance Deposit of $43,961 to the CNE Cure Amount, leaving a deposit balance of $4,933.67 ("Deposit Balance"). In order to assume the Gas Contract, the Debtor will cure the pre-petition payment defaults under the Gas Contract totaling $247,198.82 ("CNEG Cure Amount"). The CNEG Cure Amount will be satisfied by CNEG's application of the Deposit Balance and CNEG's Section 366 Adequate Assurance Deposit of $41,306 to the CNEG Cure Amount, leaving a remaining CNEG Cure Amount balance of $200,959.15 which shall be paid in full, by wire (in accordance with the wire instructions previously provided by CNEG to the Debtor), by the Debtor/Reorganized Debtor to CNEG on the Plan Effective Date..

## V.    LIQUIDATION ANALYSIS

Attached as Exhibit 1 is the Debtor's hypothetical liquidation analysis, which assumes the conversion were to occur on or about December 31, 2023.  The liquidation analysis assumes that the real estate located in Hamilton County (anticipated to be sold at a closing at or before the end of November of 2023) has already been sold and the debt secured by that asset has been paid off. The hypothetical liquidation analysis demonstrates 73.6% in an assumed distribution to general unsecured creditors, which is believed to be a high estimate.  Some of the assumptions underlying the liquidation analysis that are not evident on the face of Exhibit 1 are outlined in this section along with some deficiencies in the liquidation analysis.  As explained in this section, it is believed that the distribution reflected in Exhibit 1 is likely to be over-stated.

While the Debtor has significant value in assets, there are also significant expenses that would be incurred by the bankruptcy estate in liquidating those assets.  The expenses to be paid from the

COOLIDGE WALL CO., L.P.A.

liquidation include, but are not limited to, taxes, wind down expenses, liquidation expenses, accounting expenses, attorney's fees, plus interest on secured claims.  The liquidation analysis attached to this Plan is believed to be an overly optimistic projection in that it assumes (1) a very short timeline for distribution and a related reduced interest accrual to be paid from the liquidation to over secured creditors, (2) assumes no rejection damages result to customers with in-process contracts, and (3) no income or capital gains taxes are owed/incurred by the estate.  An adjustment for each of these overly optimistic projections would substantially reduce the distribution available to unsecured creditors in this case.

The liquidation analysis assumes that all of the assets would be liquidated within 75 – 90 days and that the distribution to Spectrum on its pre-petition claim from its collateral would be performed on or before the end of May of 2024.  This is likely an overly optimistic time estimation for distribution in this case, particularly given the considerations to maximize the value of the Debtor's real estate in Sidney, Ohio.  The real estate owned by the Debtor in Sidney, Ohio is approximately 180,000 square feet (across 3 buildings) over approximately 34 Acres without access to rail.  Facilitating the sale of the real estate would likely require a Phase 1 (at a minimum) environmental survey, which would delay a closing to facilitate the investigation.  Additionally, the broker's price opinion of value from which the Debtor determined the hypothetical liquidation value for the real estate anticipated 9-15 months of marketing time to obtain the proposed real estate value.  As such, the final liquidation and distribution to creditors is likely to take much longer than through the end of May of 2024.  The estimated interest accrual for the pre-petition secured debt is estimated to be in excess of $41,160 per month (since Spectrum is entitled to its default rate of interest on the debt as an over-secured creditor).  As such, for each month of delay beyond May of 2024 (the projected distribution date under the hypothetical liquidation analysis), the funds available for distribution to the general unsecured creditors will be reduced by $41,160 (resulting in approximately .92% less distribution per month to general unsecured creditors).

Additionally, the hypothetical liquidation analysis assumes that the post-petition financing received from Spectrum will be paid off _immediately_ upon conversion through immediate collection of factored receivables – an unrealistically optimistic assumption.  For each day delayed in collection, Spectrum would be entitled to be paid its service fee percentage (a floating rate with a minimum of 12.5% per annum divided by 360).

The Debtor is engaged in business that includes supplying to the automotive industry.  While most of its customers own the tooling used to produce the items they purchase from the Debtor, the Debtor owns the equipment and component fixtures used together with the tooling to produce parts for its customers.  In the automotive industry, suppliers are generally held to just-in-time delivery provisions resulting in very low inventory being retained on hand.  If a delay in production by one of the Debtor's customers resulted in a plant shut-down (due to unavailable parts), the consequential damages resulting from the Debtor's default (or rejection) of the contract could result in catastrophic losses and claims against the bankruptcy estate.  Without knowing what customers' contracts may specifically be impacted, if the Debtor were to convert to Chapter 7 in the future, it is extremely difficult to predict the extent of the rejection damages that may be filed against the bankruptcy estate.  Given the Debtor's industry and customer base, it is possible that the rejection damages could result in significant claims being filed against the bankruptcy estate.  It is also possible that such rejection damages or the prospect of such rejection damages may

16

significantly delay or hamper the collection of accounts receivable – leading to an increase in the claims of Spectrum for interest on the factoring facility.

The Debtor, which is owned by an ESOP trust is tax exempt.  As such, the Debtor's historical budgets and future forecasts for its operations have not included and do not include any provision for income taxes.  In the event, however, that the Bankruptcy Case were to convert to a Chapter 7 case, the bankruptcy estate as a separate entity for tax purposes and after conversion it is no longer tax exempt.  The bankruptcy estate succeeds to the Debtor's tax basis in assets and would collect the Debtor's income.  It is difficult to project the total tax implications, given the changeover in status, but the estate would be subject to the tax rates applicable to a married individual filing separately and may itemize deductions (including Chapter 11 and Chapter 7 administrative expenses).  The income collected and to be collected plus the capital gains to be obtained from the case will likely result in taxes being owed.  Given the difficulty in calculating those amounts, however, they have been excluded from the overall liquidation analysis.

## VI.   PLAN PAYMENT AND COMMITMENT PERIOD

The Plan provides for a reorganization and restructuring of Debtor's financial obligations.  The Plan provides for a distribution to creditors in accordance with the terms of the Plan by the Distribution Agent over the course of the Term, which is a total of five years.  The Plan provides for the Debtor to continue to use the post-petition financing terms from Spectrum on its factoring relationship through August 18, 2024 (as provided for in the agreement with Spectrum).  The Plan also provides for monthly payments on the Spectrum pre-petition secured debt amortized over the Term, accruing interest at 11.5% per annum.  As to the other debt owed by the Debtor, the Plan provides for payment in full of all Allowed Claims over the life of the Plan with payments to be made twice per year (on April 15th and October 15th) through October 15, 2028 and a final payment on or before December 31, 2028 of all amounts necessary to pay off such claims.  The distributions to be made to general unsecured creditors through 2027 are as follows:

| 15-Apr-24 | $200,000.00 | Equal to 4/12ths of $600,000 |
|---|---|---|
| 15-Oct-24 | $300,000.00 | Equal to 6/12ths of $600,000 |
| 15-Apr-25 | $300,000.00 | Equal to 6/12ths of $600,000 |
| 15-Oct-25 | $300,000.00 | Equal to 6/12ths of $600,000 |
| 15-Apr-26 | $300,000.00 | Equal to 6/12ths of $600,000 |
| 15-Oct-26 | $300,000.00 | Equal to 6/12ths of $600,000 |
| 15-Apr-27 | $383,333.33 | Equal to 6/12ths of $600,000 plus 4/12ths of $850,000 |
| 15-Oct-27 | $425,000.00 | Equal to 6/12ths of $850,000 |

Then in 2028, the amounts to be paid to general unsecured creditors are based on the anticipated remaining debt, identified as follows:

| 15-Apr-28 | $438,613.00 | Equal to 2/12ths of $850,000 plus 4/12ths of actual determined remaining debt (estimated here at $579,839) |
|---|---|---|
| 15-Oct-28 | $445,419.50 | Equal to 6/12ths of actual determined remaining debt (estimated here at $579,839) |

17

| 31-Dec-28 | $148,473.17 | Equal to 2/12ths of actual determined remaining debt (estimated here at $579,839) |
|---|---|---|

The classes of claims and treatment proposed for each are summarized in the below table and further described in Section VIII, below.

As outlined below, the Plan proposes to treat the following categories and Classes of Claims as follows, assuming such claims are determined to be Allowed:

| Class | Description | Treatment Summary | Voting Status |
|---|---|---|---|
| Class 1 | Administrative Expenses | Paid in accordance with terms, in full in Cash or provided other treatment consistent with Section 1129(a)(9) | Non-voting |
| Class 2 | Priority Tax Claims | Paid in Cash or paid over the period provided for by Section 1129(a)(9)(c) | Non-voting |
| Class 3 | Creditors secured by real estate in Hamilton County | Paid in full from sale proceeds, to the extent still outstanding at confirmation | Voting |
| Class 4 | Spectrum secured pre-petition Debt | Paid in full with 11.5% interest, amortized over 66 months on principal only | Voting |
| Class 5 | Air Handling Equipment – secured debt | To the extent Allowed, Paid pursuant to agreement with the Debtor any missed payments to be added to the end of the loan | Voting |
| Class 6 | General Unsecured Creditors with Allowed Claims owed less than $7,500 | Paid in full from the first two bi-annual distributions | Voting |
| Class 7 | General Unsecured Creditors with Allowed Claims in excess of $7,500 | Paid in full through the life of the Plan | Voting |

18

| Class | Description | Treatment Summary | Voting Status |
|-------|-------------|-------------------|---------------|
| Class 8 | Claims of OBWC | Not entitled to distribution unless the case converts to Chapter 7 | Voting |
| Class 9 | Equity Interest | Retained | Non-voting |

## VII.    PROJECTIONS

Debtor anticipates it will be able to pay current operation expenses and fund the Chapter 11 Plan payments.  Forevisor LLC and the Debtor met on multiple occasions since August of 2023 to put together the projections attached hereto as Exhibit 2.  The projections utilize the proprietary software developed by Forevisor LLC and used to accurately forecast cash flow and the balance sheet of hundreds of companies since its development.  The forecast includes some historical data and projections of cash flow and the balance sheet through the anticipated date for confirmation and demonstrate the availability of funds to provide for the plan payments as set forth in this document.

The forecasts assume that the real estate in Cincinnati will be sold prior to the Confirmation Order (which they were), that the security deposits provided to gas and electric suppliers will be applied towards the debt owed to such utility providers and that the remainder of such amount will be paid to cure defaults under those contracts in January of 2024[2].  As such, in January of 2024, the forecast shows a significant reduction in the "Accounts Payable – Pre-Filing," which relates to that cure.  The forecast also shows an assumed reduction in the Accounts Payable – Pre-Filing on a monthly basis in 2024, but the distributions will actually be made in accordance with the April and October schedule identified herein.

The forecast demonstrates that the Plan is feasible.  The forecast does not anticipate any avoidance actions being brought.

## VIII.    CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS

In accordance with Section 1123(A) of the Bankruptcy Code, all Claims and Interests are placed in the Classes set forth below. A Claim or Interest shall be deemed classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of the Claim or Interest qualifies within the description of such different Class. A Claim or Interest is in a particular Class only to the extent that the Claim or Interest is Allowed.

### A.    Class 1: Administrative Claims under 11 USC 507(a)

---

[2] The projections assumed there would be $200,000 paid in the deposits, which was over-stated by approximately $101,000.  Further, the projections assumed that the cure amount required to be paid was $311,000, which was likewise overstated.  Although CNE and CNEG filed a limited objection to the Plan, they have agreed to resolve the objection as set forth in Section IV.D. above.

COOLIDGE WALL CO., L.P.A.

**Description.**  Class I consists of the Allowed Administrative Claims under Section 507(a) of the Bankruptcy Code.

Debtor's attorney's fees approved by the Court and payable to the law firm of Coolidge Wall Co., L.P.A.  will be paid following the later of the Confirmation Date or approval by the Court first from the retainer deposit on hand from prior to the Petition Date and then, if needed, out of the available Cash as may be agreed between the Debtor and such counsel.

The Subchapter V Trustee fees will be paid immediately following the later of the Confirmation Date or approval by the Court first from the funds that have been put on deposit with the Subchapter V Trustee since the Petition Date and then, if needed, out of available Cash.

Forevisor, LLC will be paid in accordance with the order anticipated to be submitted and entered by this Court for interim payment and immediately following the later of the Confirmation Date or approval by the Court out of the available Cash.

The post-petition financing agreement between the Debtor and Spectrum, as set forth in the *Final Order Pursuant to Section 364 of the Bankruptcy Code (A) Authorizing Debtor to Obtain Secured Post-Petition Financing as to Factoring Arrangement with Spectrum Commercial Finance, LLC, (B) Vacating Final Hearing On the Motion, and (C) Granting Related Relief (Doc. 116)* (the "DIP Financing Order") entered on October 16, 2023 [Doc. 140] and the *Assignment of Accounts and Security Agreement* filed herein on October 2, 2023 [Doc. 133], will be paid in accordance with its terms, including access to and use of the factoring facility up to the maximum limits of same and to be repaid in fully by the maturity date provided for therein.  Spectrum shall retain its liens granted in connection with the DIP Financing Order and the Assignment of Accounts and Security Agreement.

Other administrative claims, relating to operations of the Debtor will be paid in accordance with the terms between the Debtor and each such creditor, but only to the extent that such claims are determined to be Allowed Administrative Claims. Specifically, certain creditors asserted a portion or all of their filed proofs of claim to have administrative priority pursuant to 11 U.S.C. § 503(b)(9), which will require review by the Debtor, including the claims of Applied Industrial Technologies, Inc.

The Debtor's Bankruptcy Case will not be closed until all Allowed Administrative Expense Claims are paid in full.  Class 1 Creditor Allowed Administrative Expense Claims are estimated as of the date of the filing of this Plan, after deduction of any deposits held by the claimants, to not exceed the amount of $125,000.

If the Plan is confirmed pursuant to Section 1191(b), any and all Claims of a kind specified in Sections 507(a)(2) or 507(a)(3) of the Bankruptcy Code may be paid the Allowed amount of such Claim in equal monthly installments during the term of the Plan commencing on the Effective Date or upon such other terms as may be agreed upon by the holder of the Claim and the Debtor.

**Treatment.** All Class 1 Claims (other than as owed to Spectrum) that are due and owing as of the filing of the Plan shall be paid in full by the Effective Date or as soon as practicable thereafter

COOLIDGE WALL CO., L.P.A.

following approval of professionals fees.  The post-petition financing provided by Spectrum will be paid in accordance with the agreement between the Debtor and Spectrum, including access to and use of the factoring facility up to the maximum limits of same and to be repaid in full by the maturity date provided for therein.

**Status and Voting.** Class 1 is unimpaired under the Plan and, accordingly, is not entitled to vote to accept or reject the Plan.

### B.      Class 2: Priority Tax Claims

**Description.** Class 2 consists of certain Priority Tax Claims. None have been filed and the Debtor believes that it is current in all tax filings and payments.  The deadline for filing of Priority Tax Claims has not yet run, however, so this Plan is providing for the possibility of such claims herein.

**Treatment.** The Priority Tax Claims still outstanding as of the Effective Date will be paid in full in Cash or provided with other treatment consistent with Section 1129(a)(9) of the Bankruptcy Code within ten (10) business days after the later to occur of (1) the Effective date or (2) such Priority Tax Claim becoming an Allowed Claim.

**Status and Voting.** Class 2 is unimpaired under the Plan and, accordingly, is not entitled to vote to accept or reject the Plan.

### C.      Class 3: Secured Claims with Hamilton County Real Estate as Collateral

**Description.**  Class 3 consists of creditors secured by the real estate located in Hamilton County and include Beck Aluminum International, LLC and Westech Environmental Solutions.  The Debtor anticipates that the Hamilton County real estate will be sold prior to the Effective Date, which sale provides for the payoff of the debts owed to creditors of this class.  To the extent the closing on the sale of such property is delayed, such creditors will retain their lien positions and be paid out of the proceeds of such property upon closing.

**Treatment.**  The Class 3 claimants who have a remaining Allowed Claim as of the Effective Date shall entitled to retain their liens against the real estate owned by the Debtor in Hamilton County, Ohio and shall be entitled to payment from the sale of such asset from the closing.

**Status and Voting.**  Class 3 is impaired under the Plan and, accordingly, is entitled to vote to accept or reject the Plan.

### D.      Class 4: Spectrum's debt from prior to the Petition Date

**Description.**  Class 4 consists of the Spectrum secured debt that arose before the Petition Date along with the post-petition interest and fees.  The extent of the Debt is $2,926,830.64 in pre-petition amounts ("Principal") and post-petition interest and fees, estimated to be less than $500,000 as of December 31, 2023 ("Post-Petition Accrual").  The Class 4 Claim is secured by substantially all assets of the Debtor.

21

Pursuant to the Final Cash Collateral Order (Doc. 95), and notwithstanding anything in this Plan or the Confirmation Order to the contrary, Spectrum shall retain all of its security interests, assignments, pledges, liens and other encumbrances in and on all property or assets of the Debtor, the bankruptcy estate and the Reorganized Debtor as described in the Final Cash Collateral Order to secure the Class 4 Claim until the Class 4 Claim is paid in full.  Spectrum shall retain a lien to secure all charges, reasonable fees and expenses that Spectrum incurs on or after the Effective Date.  In the event of an interim sale of assets outside the ordinary course of business, Spectrum shall be entitled to be paid from the sale proceeds.

So long as the Class 4 Claim is outstanding, and whether or not Spectrum continues to provide working capital financing under the post-petition factoring facility (or otherwise),

(a)      Reorganized Debtor agrees that it shall provide the following to Spectrum:

(i)      Within 150 days after the end of each fiscal year, the Reorganized Debtor's annual reviewed or audited financial statements certified by its independent public accountants;

(ii)      Within 40 days after the end of each month, a balance sheet and income statement for such month and fiscal year to date certified by the Reorganized Debtor's chief executive or chief financial officer;

(iii)      Within 10 days after the end of each month, summary accounts receivable and accounts payable agings;

(iv)      Copies of Reorganized Debtor's federal income tax returns and any amendments thereto and any applicable state tax returns and amendments thereto, each as and when filed;

(v)      Annually, a copy of the Reorganized Debtor's annual Employee Stock Ownership Plan valuation; and

(vi)      Such other financial information reasonably requested by Spectrum.

(b)      Reorganized Debtor shall not, after the Effective Date, without the prior written consent of Spectrum:

(i)      Create or permit to exist any security interest or other lien on any assets now owned or hereafter acquired, except (1) those created in Spectrum's favor; (2) liens of current taxes not delinquent or taxes which are being contested in good faith for which an adequate reserve has been established, (3) purchase money security interests securing indebtedness for the acquisition of new fixed assets provided that such security interest extends only to the fixed asset(s) being acquired with the proceeds of such indebtedness, (4) first priority liens to be granted in post-petition accounts receivable and inventory for the financing to replace the post-petition financing arrangement with Spectrum (which matures on August 18, 2024); and (5) as otherwise permitted in writing by Spectrum;

22

(ii) Change its name, move or change its state of incorporation or change or move the location of its chief executive office.

Spectrum may apply payments it receives to reduce the Class 4 Claim in such order and manner as it deems appropriate. The Debtor or Reorganized Debtor shall make each and all of the payments directly to Spectrum.  In the event the Debtor or Reorganized Debtor fails to pay any amount to Spectrum, after the Cure Period set forth in Article XIV(P) expires, as and when that amount comes due under this Plan, or otherwise fails to comply with (or commits any other default under) this Plan, then, without limiting or otherwise affecting any other rights or remedies available to Spectrum under Article XIV(G) or other provisions of this Plan, at Spectrum's sole election, with or without notice to or demand upon the Debtor, Reorganized Debtor, or any other person or entity, the entire unpaid balance of the Class 4 Claim shall become immediately due and payable in full.

**Treatment.**

The Principal portion of the Class 4 Claim, shall be paid under the Plan as follows:

Amortized over 66 months, but payable with a balloon at the end of 60 months, with interest accruing at the rate of 11.5% per annum, payable in monthly payments of $60,044.20 with a balloon payment of $348,483.17 (or as much as is needed to pay the remaining accrued balance in full) on or before December 31, 2028.

In the event of interim sales of assets by the Debtor out of the ordinary course of business, Spectrum shall be entitled to be paid from such proceeds (in addition to the monthly payments) which shall reduce the Principal portion of the Class 4 Claim.  Further, the Reorganized Debtor may refinance some or all of the debt owed to Spectrum or may pay down or pay off the liability owed to Spectrum without any pre-payment penalty.  Any such additional payments shall be applied first to reduce the Principal portion of the Class 4 Claim.

The Allowed Post-Petition Accrual portion of the Class 4 Claim shall be paid under the Plan as follows:

Payment of 1/60th of the actual amount of the Post-Petition Accrual to be paid commencing on January 15, 2024 and continuing monthly thereafter for 60 months or until paid in full.

As to both the Principal Portion and the Post-Petition Accrual Portions of the Class 4 Claim, pursuant to the Final Cash Collateral Order [Doc. 95], and notwithstanding anything in this Plan or the Confirmation Order to the contrary, Spectrum shall retain all of its security interests, assignments, pledges, liens and other encumbrances in and on all property or assets of the Debtor, the bankruptcy estate and the Reorganized Debtor as described in the Final Cash Collateral Order to secure the Class 4 Claim until the Class 4 Claim is paid in full.  Spectrum shall retain a lien to secure all charges, reasonable fees and expenses that Spectrum incurs on or before the Effective Date.

Regardless of whether the Plan is confirmed consensually or not, the Reorganized Debtor (not the Subchapter V Trustee) shall be responsible for making the payments provided for Class 4 on a monthly basis.

23

**Status and Voting.**  Class 4 is impaired under the Plan and, accordingly, is entitled to vote to accept or reject the Plan.

### E.    Class 5: Other Secured Claims

**Description.** Class 5 consists of any other secured claim not included in Class 3 and Class 4.  The claim believed to exist in this class is the debt owed to Air Handling Equipment which filed a UCC financing statement.

**Treatment.** Allowed Class 5 Claims shall be paid in accordance with the terms of its financing with any payments that have been missed being added to the end of the financing term and each such creditor will retain their liens until paid in full. The Debtor is investigating the claim of Air Handling Equipment and may seek determination of the secured status.  To the extent any such claim is determined by the Bankruptcy Court not to be secured, such claim will be re-classified as a Class 6 or Class 7 Claim.

**Status and Voting.** Class 5 is impaired under the Plan and entitled to vote to accept or reject the Plan.

### F.    Class 6: Small General Unsecured Claims

**Description.**  Class 6 consists of Allowed general unsecured claims owed less than $7,500.  The claims owed to these creditors range from $14.00 to $7,434.00 and total less than $350,000.  There are approximately 150 creditors estimated to be in Class 6.

**Treatment.**  Class 6 creditors shall be paid in full through the distributions to be made on April 15, 2024 and October 15, 2024.  The distribution to each such creditor from the distribution on April 15, 2024 shall be pro rata and the distribution on October 15, 2024 shall pay the remainder of any such claim.

**Status and Voting.**  Class 6 is impaired under the Plan and entitled to vote to accept or reject the Plan.

### G.    Class 7: Other General Unsecured Claims

**Description.**  Class 7 consists of Allowed general unsecured claims owed more than $7,500.  This class of creditors is believed to consist of approximately 50 creditors owed an aggregate of $3.5 Million.

**Treatment.**  The first payment made to Class 7 creditors shall be the pro rata out of the funds remaining from the October 15, 2024 distribution after payment of the Class 6 creditors. Thereafter, the distributions outlined in Section VI of this Plan shall be distributed pro rata to the Class 7 creditors so that all such creditors are paid in full on or before December 31, 2028.

**Status and Voting.**  Class 7 is impaired under the Plan and entitled to vote to accept or reject the Plan.

### H.    Class 8: Claims of OBWC

24

**Description.**  Class 8 consists of Proof of Claim Numbers 39 and 40 filed by the Ohio Bureau of Workers' Compensation.  Proof of Claim Number 39 was filed in the amount of $804,787.93 and identifies the debt as "Cost of workers' compensation claims pursuant to Ohio Revised Code 4123.75 and appears to be anticipated future claims based upon historical averages.  Proof of Claim Number 40 is an estimation of future workers compensation premiums for 2024 – 2026.  According to the explanation received from the OBWC, both of these filed claims will be withdrawn if the Debtor confirms a plan to continue operations and is able to continue operations as a self-insured employer for workers' compensation.  The OBWC is also the holder of a letter of credit in the amount of $550,000.

**Treatment.**  Class 8 claims will be not entitled to distribution unless the case converts to Chapter 7 or the Debtor defaults on its obligations as a self-insured employer, at which point the obligations will need to be quantified (not on a hypothetical basis) and will be entitled to receive the letter of credit and the remainder of any such claim will be re-classified as a Class 7 Claim.  The letter of credit in place for the benefit of the Class 8 creditors shall remain in place.

**Status and Voting.**  Class 8 is impaired under the Plan and entitled to vote to accept or reject the Plan.

### I.        Class 9: Equity

**Description.**  Class 9 consists of the Equity ownership in the Debtor, which is held by the ESOP trust, for the benefit of employees and former employees of the Debtor.

**Treatment.**  Class 9 Equity owners shall be entitled to retain their position and the Debtor shall be required to maintain reporting, auditing, and other requirements for the administration of the ESOP.

**Status and Voting.**  Class 9 is unimpaired under the Plan and not entitled to vote on the Plan.

## IX.    IMPLEMENTATION OF THE PLAN

### A.    Operations between the Confirmation Date and the Effective Date

Debtor anticipates the continued operations of the business will be adequate to fund the Plan over the Term.

### B.    Operations of the Reorganized Debtor

In a consensual Plan, on and after the Effective Date, the Reorganized Debtor will implement the terms of the Plan. After the Effective Date, the Reorganized Debtor may buy, use, acquire and dispose of its assets, free of any restrictions contained in the Bankruptcy Code.

In a non-consensual Plan, the Debtor, in cooperation with the Subchapter V Trustee, will implement the terms of the Plan. After the Effective Date, the Reorganized Debtor may continue to operate subject to any restrictions contained in the Bankruptcy Code.

25

### C.  Vesting of Assets in Reorganized Debtor in a Consensual Plan

Except as otherwise provided herein or in the Confirmation Order, as of the Effective Date of a confirmed Plan, the Retained Property and Exempt Property shall vest in the Reorganized Debtor free and clear of all liens, claims, interests or other encumbrances except as provided in the Plan. On or after the Effective Date, except as otherwise provided in the Plan, Reorganized Debtor may operate its business and may use, acquire or dispose of property without supervision or approval of the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules. For avoidance of doubt, Spectrum shall retain its liens described in the Class 4 Claim, as well as the liens granted to Spectrum in the *Final Order Pursuant to Section 364 of the Bankruptcy Code (A) Authorizing Debtor to Obtain Secured Post-Petition Financing as to Insurance Premium Financing Provided by AFCO Credit Corporation, (B) Vacating Final Hearing on the Motion, and (C) Granting Related Relief* (Doc. 139) and the *Assignment of Accounts and Security Agreement* (Doc. 133) after the Effective Date.

### D.  Vesting of Assets in Reorganized Debtor in a Non-Consensual Plan

Property of the estate includes, in addition to the property specified in Section 541 of the Bankruptcy Code: (1) all property of the kind specified in Section 541 of the Bankruptcy Code that the debtor acquires after the date of commencement of the case but before the case is closed, dismissed, or converted to a case under chapter 7, whichever occurs first; and (2) earnings from operations of the Debtor after the date of commencement of the case but before the case is closed, dismissed, or converted to a case under chapter 7, whichever occurs first. As of the date that the case is closed, dismissed or converted to a case under chapter 7, the Retained Property and any Exempt Property shall vest in the Reorganized Debtor free and clear of all liens, claims, interests or other encumbrances except as provided in the Plan. On or after the Effective Date, except as otherwise provided in the Plan, Reorganized Debtor may operate its business and may use, acquire or dispose of property with the supervision or approval of the Subchapter V Trustee and the Bankruptcy Court.

## X.  EXECUTORY CONTRACTS AND UNEXPIRED LEASES

The executory contracts set forth on Exhibit 3 are hereby rejected.  All other executory contracts shall be assumed as of the Effective Date of the Plan and will be performed in accordance with its terms unless amended by agreement of the Debtor and applicable contract counter party.

## XI.  PROVISIONS GOVERNING DISTRIBUTIONS

### A.  Delivery of Distributions

1.  The first distribution under the Plan will be made by the Debtor to Spectrum on or before January 15, 2024.  The first distribution to general unsecured creditors shall be made on or before April 15, 2024.

2.  If the Subchapter V Trustee is the Distribution Agent under the Plan, the Debtor will pay to the Subchapter V Trustee all amounts due to be distributed under the Plan to Class 6 and Class 7 claims on or before the first of the month for each month in which

distributions are to be made in accordance with the Plan.

3.  Subject to Bankruptcy Rule 9010, all distributions to holders of Allowed Claims in Classes 6 and 7 shall be made by the Debtor (if consensual) or the Subchapter V Trustee (if nonconsensual) (a) at the addresses set forth on the proofs of claim filed by such holders (or at the last known addresses of such holders if no proof of claim is filed or if the Debtor has been notified of a change of address), (b) at the addresses set forth in any written notices of address change delivered to the Debtor after the elate of such holders' proof of claim, or (c) at the addresses reflected in the Debtor's schedules if no proof of claim has been filed.

4.  For a non-consensual plan, notwithstanding Section 1194(b) of the Bankruptcy Code, Debtor shall make the payments directly to the Class 1-5 claim holders of their respective Allowed Claims.

5.  At the close of business on the April 15, 2024, the claims register will be closed, and there will be no further changes in the record holders of any Claims. The Reorganized Debtor will have no obligation to recognize any transfer of any Claim occurring after the close of business on April 15, 2024, and will instead be entitled to recognize and deal for all purposes under the Plan (except as to voting on the Plan) with only those holders of record as of the close of business on the April 15, 2024.

6.  If any payment to a creditor would be less than $5.00, the Distribution Agent is authorized, but not required, to hold that payment until the next distribution and pay both installments at the same time.

### B.      Undeliverable Distributions

If any distribution with respect to any Claim is returned as undeliverable, no further distributions to such holder shall be made unless and until the Distribution Agent is notified of such holder's then current address, at which time all distributions owing to such holder shall be made to such holder without interest. All Claims for undelivered distributions shall be made within six (6) months of the relevant distribution date. After such date, all unclaimed distributions shall revert to the Reorganized Debtor and the Claim of any holder or successor to such holder with respect to such distribution shall be discharged and forever barred, notwithstanding any federal or state escheat laws to the contrary.

## XII.    MODIFICATION, REVOCATION OR WITHDRAWAL OF THE PLAN

The Debtor may alter, amend or modify this Plan under Section 1193(a) of the Bankruptcy Code at any time prior to the Confirmation Date so long as the Plan, as modified, meets the requirements of Sections 1122 and 1123 of the Bankruptcy Code. After the Confirmation Date, the Debtor may only alter, amend or modify the Plan in accordance with Section 1193(b) or (c), as applicable, of the Bankruptcy Code.

## XIII.   RETENTION OF JURISDICTION

### A.      Continuing Jurisdiction of the Bankruptcy Court

COOLIDGE WALL CO., L.P.A.

Pursuant to Sections 1105(a) and l 142 of the Bankruptcy Code, the Bankruptcy Court shall retain exclusive jurisdiction of these proceedings to the extent permitted by applicable law, including but not limited to:

1.   to determine any and all applications, adversary proceedings and contested matters pending as of the Effective Date;

2.   to determine any and all objections to the allowance of Claims;

3.   to determine any and all applications for allowance of compensation and reimbursement of expenses;

4.   to determine any and all controversies and disputes arising under or in connection with the Plan and such other matters as may be provided for in the Confirmation Order;

5.   to effectuate payments under and performance of the provisions of the Plan;

6.   to enter such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified or vacated;

7.   to determine the Reorganized Debtor's motion, if any, to modify the Plan in accordance with Section 1193 of the Bankruptcy Code;

8. to issue such orders in aid of execution of the Plan, to the extent authorized by Section 1142 of the Bankruptcy Code;

9. to consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

10. to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan and any related documents;

11. to hear and determine any issue for which the Plan or any related document requires a Final Order of the Bankruptcy Court;

12. to enter a final decree closing the Bankruptcy Case;

13. to determine any other matter not inconsistent with Chapter 11 of the Bankruptcy Code;

14. to determine any increase or decrease in the debtor's monthly payment, as provided in the Plan;

15. to approve, pursuant to Section 365 of the Bankruptcy Code, the assumption, assignment or rejection of any executory contract or unexpired lease, except as otherwise provided in the Plan;

16. to determine a request for payment of Claims entitled to priority under Section

28

507(a)(1) of the Bankruptcy Code, including compensation of parties entitled thereto.

### B.   District Court Jurisdiction

To the extent that the Bankruptcy Court is not permitted under applicable law to preside over any of the foregoing matters, the reference to the Bankruptcy Court in this Article shall be deemed to be a reference to the United States District Court for the Southern District of Ohio.

## XIV.   SPECIAL PROVISIONS

### A.   Fees of Professionals

Professionals employed at the expense of the estate of the Debtor and entities that may be entitled to an allowance of fees and expenses from the estate of the Debtor incurred prior to the Confirmation Date, including the Subchapter V Trustee, pursuant to Sections 503(b)(2) through 503(b)(4) of the Bankruptcy Code shall be paid by the Reorganized Debtor from the direct funds, in Cash, as soon as practicable after the order approving such allowance of compensation or reimbursement of expenses becomes a final order, or as provided in the Plan. Until the allowed fees and expenses of the professionals are paid, the professionals shall have a lien upon the Reorganized Debtor's assets. With respect to the professional fee claims arising after the Effective Date, the Reorganized Debtor shall pay such professional fee claims in the ordinary course of its business without the necessity of any professionals being required to file an application for such professional fee claims.

### B.   Exculpation and Limitation of Liability

On the Effective Date, (i) the Debtor and all holders of Claims against and Interests in the Debtor will be conclusively deemed to release all professionals retained by order of the Bankruptcy Court in the Chapter 11 Case and all of such professionals', respective officers, directors, employees, principals, partners and agents, and all officers and directors of the Debtor holding such offices at any time through the Effective Date from all liabilities, claims, costs, damages and expenses, except for Claims arising from fraud, willful misconduct or gross negligence to such persons, arising out of the Chapter 11 through the Effective Date; and (ii) the Debtor will be conclusively deemed to release Spectrum and all professionals retained by Spectrum in the Chapter 11 Case and all of such professionals' respective officers, directors, employees, principals, partners and agents from all liabilities, claims, costs, damages and expenses except for Claims arising from fraud, willful misconduct or gross negligence to Debtor arising out of the Chapter 11 through the Effective Date.

### C.   Subchapter V Trustee Disclosures and Fees

1.   For a non-consensual Plan, the Subchapter V Trustee shall continue to be paid at his hourly rate subject to fee applications under Section 330 of the Bankruptcy Code until the completion of the Plan. The Subchapter V Trustee shall file fee applications with the Court every one hundred and twenty (120) days, and Debtor will remit payment within thirty (30) days of obtaining approval.

COOLIDGE WALL CO., L.P.A.

2.   If the Plan is nonconsensual, the Debtor will provide any information to the Subchapter V Trustee that is reasonably requested in relation to the determination of any distribution.

### D.       Bar Date for all Administrative Expense Claims

All requests for payment or any Administrative Expense Claim are subject to authorization and approval of the Bankruptcy Court. Holders of Administrative Expenses Claims that do not file a request with the Bankruptcy Court and serve on all parties entitled to notice thereof no later than sixty (60) days after the Effective Date, are forever barred from asserting such claims except as provided in the Plan. Any objections to an Administrative Expense Claim shall be filed in accordance with the Bankruptcy Rules and the local rules of the Bankruptcy Court.

### E.       Suspension of Payments

If payments under a non-consensual Plan are made by the Subchapter V Trustee, the Debtor may apply to the Court for suspension of payments due to circumstances for which the Debtor may not be held accountable. Notice of such request for suspension of payments shall be given to the Trustee, the United States Trustee and all affected parties. The Court, after notice and a hearing may suspend the payments for not more than ninety (90) days. Such suspension shall extend the length of the term of the Plan by the term of the suspension.

### F.       Discharge Provisions

If the Plan is consensual, a discharge shall issue upon confirmation and the Debtor shall make all required payments under the Plan.

If the Plan is nonconsensual, payments under the Plan will be made by the Trustee appointed by the Court and a discharge under Section 1192 shall be issued when the final distribution is made under the terms of the Plan.

30

### G.    Protection of Creditors if Payments are not made under the Plan or any Amended Plan

Should the Debtor not make payments as provided in the Plan within (i) twenty (20) calendar days of the date the payment is due under the Plan or any amended Plan or as authorized by the Court, for Class 4 Claim payments, and (ii) 45 days after the date the payment is due under the Plan for any payments other than Class 4 Claim payments, unless otherwise ordered by the Court and following the filing of notice of default, secured and unsecured creditors shall not be bound by the discharge injunction (to the extent there is a Consensual Discharge Order) or automatic stay (to the extent there is a Non-Consensual Discharge Order) as to their collateral and may proceed against their security interest. The rights of unsecured creditors shall be restored to proceed against the Debtor for the total amount of the debt owed, minus any payment received under the Plan.

Notwithstanding the foregoing and notwithstanding Article XIV(P), if any payment under this Plan is not actually received by Spectrum within twenty (20) calendar days after the due date (such 20-day period is the "Cure Period") then Spectrum may (i) elect to charge a late payment fee of 10% of the outstanding payment amount plus commence charging default rate interest of 14% per annum from and after the expiration of the Cure Period, or (ii) declare a default and file (or, if the Bankruptcy Case has been closed, deliver to the Debtor) a notice of uncured payment default and, immediately upon that filing (or delivery), and without the necessity of any motion, notice, hearing, or further order of the Bankruptcy Court: (a) the automatic stay (or any discharge or plan injunction), if and to the extent it then exists, is deemed to be irrevocably terminated or vacated, as the case may be, as to Spectrum; (b) the Debtor or Reorganized Debtor shall retain, sequester, and not disburse or expend any Cash Collateral (as described or defined in the Final Cash Collateral Order), except as provided in (c) below, which each of them shall hold in trust for Spectrum's benefit; (d) the Debtor or Reorganized Debtor shall immediately turn over all Cash Collateral on hand, and shall turn over all other Cash Collateral (including collections of accounts) as and when it is received, to Spectrum; (e) Spectrum shall be authorized to make an advance under the post-petition financing arrangement for the purposes of making any past due Class 4 Claim payment; and (f) Spectrum shall be authorized to exercise or enforce any and all rights and remedies that are permitted or provided under its loan documents or by applicable law, all the same as if the Debtor's Bankruptcy Case had never commenced.

All of the foregoing relief shall apply in, and shall be binding on any trustee who succeeds to the estate of the Debtor in this Bankruptcy Case and in the event the Bankruptcy Case is converted to a case under Chapter 7.

### H.    Treatment of Allowed Secured Claims

The amount of any allowed secured claim shall be that amount as proposed in the Plan unless amended pre-confirmation by an amended Plan or by Court Order. Any deficiency amount of a proposed secured claim shall be paid as an unsecured claim, unless otherwise provided for in the Plan.

Holders of Secured Claims will retain their lien on their collateral (including, in the case of Spectrum, its pre-petition all assets security interest and its post-petition all assets security interest)

only until the amount of their allowed Secured Claim (including, as to Spectrum, its pre-petition Secured Claim and the post-petition financing) is paid in full under the Plan at which time the lien shall terminate and be released by the creditor.

Holders of judicial liens and non-purchase money security interest in personal property that impair exemptions which are avoided under Section 522(f)(1) shall be treated as unsecured creditors.

### I. Interest Rate

The interest rate applicable to the Principal portion of the Class 4 claim shall be 11.5%.

The interest rate applied to Class 3 and 5 claims shall be the regular (non-default) contract rate of interest.

No interest shall be paid on the Unsecured Claims.

### J. Set Offs

The Reorganized Debtor may, but shall not be required to, set off or recoup against any Claim and the payments or other distributions to be made pursuant to the Plan in respect of such Claim, claims of any nature whatsoever which the Reorganized Debtor may have against the holder of such Claim to the extent such claims may be set off or recouped under applicable law, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Reorganized Debtor, of any such claim or counterclaim that it may have against such holder.

Reorganized Debtor acknowledges and agrees that no events, conditions, or circumstances have arisen or exist which would give the Reorganized Debtor the right to assert a defense, counterclaim, recoupment and/or setoff to a Claim by Spectrum for payment of amounts due under the Plan and/or under Spectrum's post-petition financing agreement with the Reorganized Debtor.

### K. Manner of Payments

Unless the person or entity receiving a payment agrees otherwise, any payment of Cash to be made by the Reorganized Debtor or the Distribution Agent shall be made, at the election of the Reorganized Debtor or the Distribution Agent as the case may be, by check drawn on a domestic bank or by wire transfer from a domestic bank; provided, however, that no Cash payments shall be made to a holder of an Allowed Claim unless the amount payable thereto is equal to or greater than Five Dollars ($5.00).

### L. Time Bar to Cash Payments

Checks issued by the Reorganized Debtor or the Distribution Agent on account of Allowed Claims shall be null and void if not negotiated within ninety (90) days from and after the date of issuance thereof. Requests for reissuance of any check shall be made directly, as applicable, to either the Reorganized Debtor or Distribution Agent by the holder of the Allowed Claim with respect to which such check originally was issued.

32

Any Claim in respect of such a voided check shall be made on or before the later of (i) the first anniversary of the Effective Date or (ii) ninety (90) days after the date of issuance of such check if such check represents a final distribution hereunder on account of such Claim. After such date, all Claims in respect of voided checks shall be discharged and forever barred and forwarded to the Reorganized Debtor who shall retain all monies related thereto.

### M.      Objections to Claims and Payments and Distributions on Disputed Claims

No partial payments and no partial distributions shall be made with respect to a disputed Claim until the resolution of such disputes by settlement or final order. As soon as practicable after a disputed Claim becomes an Allowed Claim, the holder of such Allowed Claim shall receive all payments and distributions to which such holder is then entitled under the Plan.

Any objections to a Claim shall be filed within 60 days after entry of the confirmation order.  The Debtor will have the power and authority to settle and compromise a disputed claim with court approval and compliance with Federal Rule of Bankruptcy Procedure 9019.

### N.      Approval of Executory Contract Rejection and Assumption

Entry of the Confirmation Order shall constitute approval, pursuant to Section 365(a) of the Bankruptcy Code of the rejection of any executory contracts and unexpired leases rejected pursuant to the Plan. The Confirmation Order shall also constitute approval, pursuant to Section 365(a) of the Bankruptcy Code of the assumption of any executory contracts and unexpired leases assumed pursuant to the Plan. Notwithstanding anything contained herein to the contrary, the Debtor hereby retains the right to add or delete any executory contract or unexpired lease that is designated for rejection at any time prior to the Confirmation Date, upon notice to parties affected by such change.

### O.      Post-Filing Date Contracts and Leases

Executory contracts and unexpired leases entered into, and other obligations incurred after the Petition Date by the Debtor shall, unless expressly rejected, be performed by the Reorganized Debtor in the ordinary course of its business affairs.

P.      **Notice of Default**

Unless expressly provided herein to the contrary, no claimant shall have the right to enforce any rights under this Plan until the Reorganized Debtor fails to cure any default (other than a payment default under the Plan, which is set forth in subsection G., above) hereunder within fifteen (15) days of receipt of written notice of such default to the Reorganized Debtor. No notice of a payment default under the Plan is required under this subsection P. Debtor will be entitled to no more than two (2) notices of default during the term of the Plan from any creditor. Notwithstanding the foregoing, Spectrum will retain the right to provide Debtor notice of defaults under both its pre-petition loan documents (as modified herein) and its post-petition loan documents with the Debtor. Any failure to cure such non-payment defaults by the Debtor under the existing loan documents for the post-petition financing provided by Spectrum shall entitle Spectrum to exercise rights and remedies under such loan documents (e.g. implementing default rate, etc.) after the applicable cure period.

## XV.   DISCHARGE OF ALL CLAIMS AND RELEASES

A.      **Discharge pursuant to Section 1141(a)**

Upon the granting of a discharge under Section 1141(d) of the Bankruptcy Code, the Discharge Order shall operate as a discharge pursuant to, and to the fullest extent provided in and permitted by, Section 1141(d) of the Bankruptcy Code, of any and all debts of, Claims against, and liens on the Debtor, its assets, or properties, which debts, Claims and liens arose at any time before the entry of the Confirmation Order, and any debt of a kind:

    a.      a proof of claim based upon such debt is filed or deemed filed under Section 501 of the Bankruptcy Code;

    b.      a Claim based upon such debt is allowed under Section 502 of the Bankruptcy Code; or

    c.      the holder of a Claim based upon such debt has accepted the Plan as specified in Section 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not the creditor has accepted the Plan.

B.      **Discharge pursuant to Section 1192**

As soon as practicable after completion by the Debtor of all payments due not to exceed five (5) years or as the Bankruptcy Court may fix, unless the court approves a written waiver of discharge executed by the Debtor after the order for relief under this chapter, the Bankruptcy Court shall grant the Debtor a discharge of all debts provided in Section 1141(d)(l)(A) of this title, and all other debts allowed under Section 503 of this title and provided for in the Plan, except any debt:

    a.      on which the last payment is due under the Term; or

    b.      of the kind specified in Section 523(a) of this title.

34

## XVI.  **MISCELLANEOUS PROVISIONS**

### A.  **Successors and Assigns**

The rights, duties and obligations of any person named or referred to in the Plan shall be binding upon, and shall inure to the benefit of, the successors, heirs and assigns of such person.

### B.  **Binding Effect**

The Plan shall be binding upon, and shall inure to the benefit of the Debtor, the holders of all Claims and Interests and their respective successors and assigns.

### C.  **Modification of Payment Terms**

The Reorganized Debtor reserves the right to modify the treatment of any Allowed Claim in any manner adverse only to the holder of such Claim at any time after the Effective Date upon the prior written consent of the holder whose Allowed Claim treatment is being adversely affected.

### D.  **Valuation**

Any claim for fees, costs, or other charges shall be made by the creditor by application to the Court. Such fees, costs or charges must be reasonable as required by Section 506(6) of the Bankruptcy Code.

### E.  **Default and Waiver**

Any default of the Debtor that is not proposed to be cured in the Plan herein is deemed waived by the Confirmation of the Plan.

### F.  **Transferred Claims**

If any creditor has transferred its claim by assignment or otherwise, the underlying debt shall be discharged as to the transferor and the transferee upon discharge unless otherwise provided in Sections 1141(cl) or 1192, whichever is applicable. See Fed. R. Bankr. P. 3001 (e)(2).

### G.  **Substitution of Collateral**

If any collateral of the Debtor is substantially damaged while there is still an unpaid Claim which is secured by the collateral, the Debtor shall have the option of  using the insurance proceeds – subject to obtaining the prior written consent of Spectrum to the extent the insurance proceeds are in excess of $75,000 and without the need for consent to the extent the insurance proceeds are less than or equal to $75,000 – to either repair the collateral, pay off the balance of the Allowed Secured Claim if the secured creditor is a named loss payee on the policy, or to substitute collateral by purchasing replacement collateral and the Subchapter V Trustee or the Debtor will continue to pay the secured claim.

If any of Spectrum's collateral is substantially damaged while any portion of the Class 4 Claim is still unpaid, the Debtor shall have the option of using any insurance proceeds to either repair that

COOLIDGE WALL CO., L.P.A.

collateral, to reduce the unpaid balance of the Class 4 Claim, or to purchase replacement collateral (upon which Spectrum's shall hereby have a valid, attached, perfected, unavoidable, first priority lien and security interest, including pursuant to the Final Cash Collateral Order) and, in any event, the Debtor or Reorganized Debtor shall continue to pay the Class 4 Claim pursuant to this Plan.

### H.     Exempt Property

The right to property exempt under Section 522 shall remain with the Debtor under any circumstance.

### I.     Termination of Subchapter V Trustee

If the Plan is confirmed consensually, the Subchapter V Trustee shall be terminated upon Substantial Consummation.

If the Plan is Confirmed non-consensually, the Subchapter V Trustee shall be terminated after the final distribution payment made pursuant to the terms of the Plan.

The Subchapter V Trustee shall be terminated upon dismissal of the case or its conversion to another chapter.

### J.     Tax Consequences

Implementation of the Plan may result in federal income tax consequences to holders of claims, equity interest holders and to the Debtor. In this case, most of the creditors will not be in full the amount of their Claims. Tax consequences to a particular creditor or equity interest holder may depend on the particular circumstances or facts regarding the Claim of the Creditor or the interests of the equity interest holder. CLAIMANTS ARE URGED TO CONSULT THEIR OWN TAX ADVISOR AS TO THE CONSEQUENCES OF THE PLAN TO THEM UNDER FEDERAL AND APPLICABLE STATE AND LOCAL TAX LAWS.

### K.     Risk to Creditors Under the Debtor's Plan

Claimants and equity interest holders should be aware that there are a number of substantial risks involved in consummation of the Plan. The Plan contemplates that there will be funds to pay Claims of creditors.

Dated: December 12, 2023                    */s/ Robert John Kuhn* **by P. Friesinger per email authority received 12/12/2023**

_____
Robert John Kuhn, Authorized Representative

36

## Asset Liquidation Info

| Description | Value |
| --- | --- |
| Real Estate in Sidney Ohio | $4,770,000.00 |
| Cash in Regular Accounts | $666,889.00 |
| Cash as security for Letter of Credit for WC | $550,000.00 |
| | |
| Accounts Receivable $1.76 Million at 15% discount | $1,496,000.00 |
| Inventory   $1.8 Million at 50% discount | $900,000.00 |
| Prepaid Expenses (25% of $425k) | $106,250.00 |
| Certificated Motor Vehicles | $41,500.00 |
| All other Equipment | $1,000,000.00 |
| **Total Value** | **$9,530,639.00** |

## Projected Expenses of Chapter 7

| Name | Amount |
| --- | --- |
| Wind Down Costs; Final payroll accounting, w-2s, tax return | $175,000.00 |
| Auctioneer Advertising and Labor; Estimated based upon size of facility | $25,000.00 |
| | |
| Holding and Closure Costs; Assume 75-90 days post-conversion for auction; trash, utilities, heat, electric, security, | $30,000.00 |
| Broker's commission (6%) | $286,200.00 |
| Chapter 7 Trustee's fees/commission | $309,169.17 |
| | |
| Trustee Professional Fees, Accountant and Counsel | $35,000.00 |
| Total Chapter 7 Administrative Expenses | **$860,369.17** |

## Projected Distribution Info

| Ch. 11 Admin and Pre-Petition Debt | Amount |
| --- | --- |
| Chapter 11 Professionals fees & expenses and Subchapter V Trustee's fees | $125,000.00 |
| DIP Financing projected to be outstanding | $923,898.00 |
| DIP Financing early termination fees | $62,880.00 |
| Post-Petition A/P outstanding | $308,687.00 |
| Chapter 11 utilities after applying security deposits | $120,000.00 |
| Medical Claims | $40,000.00 |

Exhibit 1 - Hypothetical Liquidation Analysis

| | |
|---|---|
| Secured Claims (excludes debts to be paid off from Cincinnati Real Estate Sale, includes only Spectrum pre-petition debt) | $2,949,589.04 |
| Accrued interest and estimated attorneys fees on pre-petition Spectrum debt (through May 2024) | $650,891.96 |
| Filed Priority Claims | $78,080.24 |
| Non-Current ESOP Liabilities | $128,408.00 |
| **Total Chapter 11 Admin Secured and Priority Debt** | **$5,387,434.24** |

| **Distribution Detail** | |
|---|---|
| Total available to distribute | $9,530,639.00 |
| Total Ch. 7 and 11 Admin Secured and Priority | $6,247,803.41 |
| Net available to distribute to Unsecured Creditors | $3,282,835.59 |
| | $4,460,380.64 |
| General Unsecured Claims (includes OBWC claims of $937,770.13) | |
| Distribution percentage to General Unsecured | **73.60%** |

Exhibit 1 - Hypothetical Liquidation Analysis

Month to Month Cash Flow Reliable Castings 11 9 2023 Version 6

**RELIABLE CASTINGS CORPORTATION**
**CONSOLIDATED BALANCE SHEET**
**FOR THE YEAR ENDING DECEMBER 31, 2023**

| | Year Ending 12/31/22 Actual | January Ending 1/31/2023 Actual | February Ending 2/28/2023 Actual | March Ending 3/31/2023 Actual | April Ending 4/30/2023 Actual | May Ending 5/31/2023 Actual | June Ending 6/30/2023 Actual | July Ending 7/31/2023 Actual | August Ending 8/31/2023 Actual | September Ending 9/30/2023 Actual | October Ending 10/31/2023 Projected | November Ending 11/30/2023 Projected | December Ending 12/31/2023 Projected |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **ASSETS** | | | | | | | | | | | | | |
| **CURRENT ASSETS** | | | | | | | | | | | | | |
| Cash | $878,329 | $626,063 | $575,862 | $627,091 | $565,216 | $549,412 | $29,741 | $298,242 | $246,012 | $39,827 | $275,000 | $561,830 | $666,889 |
| Accounts Receivable-Net | $2,252,193 | $2,461,495 | $2,731,295 | $2,381,516 | $2,317,345 | $2,220,402 | $2,076,077 | $1,307,805 | $1,341,730 | $1,531,296 | $1,934,573 | $1,850,000 | $1,760,000 |
| Deposit - Utility | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $200,000 | | $200,000 |
| Workers Compensation LC | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $550,000 | $550,000 | $550,000 |
| Inventory | $1,598,066 | $1,448,191 | $1,549,727 | $1,657,135 | $1,402,329 | $1,420,549 | $1,406,540 | $1,274,700 | $1,528,795 | $1,643,772 | $1,650,000 | $1,800,000 | $1,800,000 |
| Prepaid Expenses | $152,650 | $326,801 | $306,956 | $293,072 | $289,039 | $296,674 | $384,827 | $321,323 | $478,345 | $608,345 | | $608,345 | $425,000 |
| **TOTAL CURRENT ASSETS** | **$4,881,238** | **$4,862,550** | **$5,163,840** | **$4,958,814** | **$4,554,529** | **$4,469,865** | **$4,359,032** | **$3,815,654** | **$3,987,860** | **$4,243,240** | **$5,017,918** | **$5,370,175** | **$5,401,889** |
| | | | | | | | | | | | | | |
| Property, Plant & Equipment | $32,248,123 | $32,248,123 | $32,248,123 | $32,248,123 | $32,248,123 | $32,266,284 | $32,266,284 | $32,266,284 | $32,266,284 | $32,266,284 | $32,316,284 | $32,366,284 | $32,674,284 |
| Accumulated Depreciation | ($26,714,782) | ($26,786,782) | ($26,858,782) | ($26,930,782) | ($27,002,782) | ($27,074,782) | ($27,146,782) | ($27,218,782) | ($27,290,782) | ($27,362,782) | ($27,434,782) | ($27,506,782) | ($27,578,782) |
| Net Property, Plant, & Equip | $5,533,341 | $5,461,341 | $5,389,341 | $5,317,341 | $5,245,341 | $5,191,502 | $5,119,502 | $5,047,502 | $4,975,502 | $4,903,502 | $4,881,502 | $4,859,502 | $5,095,502 |
| | | | | | | | | | | | | | |
| **TOTAL ASSETS** | **$10,414,579** | **$10,323,891** | **$10,553,181** | **$10,276,155** | **$9,799,870** | **$9,661,367** | **$9,478,534** | **$8,863,156** | **$8,963,362** | **$9,146,742** | **$9,899,420** | **$10,229,677** | **$10,497,391** |
| | | | | | | | | | | | | | |
| **LIABILITIES** | | | | | | | | | | | | | |
| **CURRENT LIABILITIES** | | | | | | | | | | | | | |
| Revolving Loan Line of Credit/DIP after July 2023 | $3,710,651 | $3,545,938 | $3,819,119 | $3,563,169 | $3,437,651 | $3,319,128 | $3,216,340 | $0 | $0 | $0 | $783,970 | $869,870 | $1,123,881 |
| Accounts Payable - Post Filing | $2,291,275 | $2,559,689 | $2,677,614 | $2,708,207 | $2,584,233 | $2,637,147 | $3,874,849 | $0 | $397,444 | $369,101 | $200,000 | $100,000 | $100,000 |
| Accrued Expenses | $542,584 | $427,223 | $398,356 | $384,542 | $312,385 | $329,525 | $231,690 | $310,056 | $104,178 | $308,678 | $308,678 | $308,678 | $308,678 |
| Beck Aluminum Secured Payable | | | | | | | | $450,000 | $450,000 | $450,000 | $450,000 | $0 | $0 |
| Vendor Note Payable | $1,343,946 | $1,343,946 | $1,278,946 | $1,208,446 | $1,144,815 | $1,124,815 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Accounts Payable - Pre - Filing | | | | | | | | $3,540,839 | $3,540,839 | $3,540,839 | $3,540,839 | $3,540,839 | $3,540,839 |
| Spectrum Line of Credit - Pre Filing | | | | | | | | $2,926,830 | $2,926,830 | $2,926,830 | $2,926,830 | $2,926,830 | $2,926,830 |
| **TOTAL CURRENT LIABILITIES** | **$7,888,456** | **$7,876,796** | **$8,174,035** | **$7,864,364** | **$7,479,084** | **$7,410,615** | **$7,322,879** | **$7,227,725** | **$7,419,291** | **$7,595,448** | **$8,210,317** | **$7,746,217** | **$8,000,245** |
| | | | | | | | | | | | | | |
| Non-Current ESOP Liabilities | $128,408 | $128,408 | $128,408 | $128,408 | $128,408 | $128,408 | $128,408 | $128,408 | $128,408 | $128,408 | $128,408 | $128,408 | $128,408 |
| Other | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Long Term Debt (See detail below) | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| | | | | | | | | | | | | | |
| **TOTAL LIABILITIES** | **$8,016,864** | **$8,005,204** | **$8,302,443** | **$7,992,772** | **$7,607,492** | **$7,559,023** | **$7,451,287** | **$7,356,133** | **$7,547,699** | **$7,723,856** | **$8,338,725** | **$7,874,625** | **$8,128,653** |
| | | | | | | | | | | | | | |
| **STOCKHOLDER'S EQUITY** | | | | | | | | | | | | | |
| Loss on Release of Shares | ($118,876) | ($118,876) | ($118,876) | ($118,876) | ($118,876) | ($118,876) | ($118,876) | ($118,876) | ($118,876) | ($118,876) | ($118,876) | ($118,876) | ($118,876) |
| Common Stock | $147,860 | $147,860 | $147,860 | $147,860 | $147,860 | $147,860 | $147,860 | $147,860 | $147,860 | $147,860 | $147,860 | $147,860 | $147,860 |
| Unearned ESOP Shares | ($1,520,538) | ($1,520,538) | ($1,520,538) | ($1,520,538) | ($1,520,538) | ($1,520,538) | ($1,520,538) | ($1,520,538) | ($1,520,538) | ($1,520,538) | ($1,520,538) | ($1,520,538) | ($1,520,538) |
| Treasury Stock | ($2,582,814) | ($2,582,814) | ($2,582,814) | ($2,582,814) | ($2,582,814) | ($2,582,814) | ($2,582,814) | ($2,582,814) | ($2,582,814) | ($2,582,814) | ($2,582,814) | ($2,582,814) | ($2,582,814) |
| Out of Balance | ($68,067) | ($68,067) | ($68,067) | ($68,067) | ($68,067) | ($68,067) | ($68,067) | ($68,067) | ($68,067) | ($68,067) | ($68,067) | ($68,067) | ($68,067) |
| Retained Earnings | $6,540,150 | $6,461,122 | $6,393,173 | $6,425,818 | $6,334,813 | $6,264,779 | $6,169,682 | $5,649,458 | $5,558,098 | $5,565,321 | $5,703,130 | $6,497,487 | $6,511,173 |
| **Total Shareholders Equity** | **$2,397,715** | **$2,319,687** | **$2,250,738** | **$2,283,383** | **$2,192,378** | **$2,122,344** | **$2,027,247** | **$1,507,023** | **$1,415,663** | **$1,422,886** | **$1,560,695** | **$2,355,052** | **$2,368,738** |
| | | | | | | | | | | | | | |
| **TOTAL LIAB/SHARE EQUITY** | **$10,414,579** | **$10,323,891** | **$10,553,181** | **$10,276,155** | **$9,799,870** | **$9,661,367** | **$9,478,534** | **$8,863,156** | **$8,963,362** | **$9,146,742** | **$9,899,420** | **$10,229,677** | **$10,497,391** |

**Exhibit 2 - Forecast**

This report and the information it contains has been generated by a licensed user of Forevisor™ financial software

Month to Month Cash Flow Reliable Castings 11 9 2023 Version 6

**RELIABLE CASTINGS CORPORATION**
**CONSOLIDATED INCOME STATEMENT**
**FOR THE YEAR ENDING DECEMBER 31, 2023**

MONTH

| | January Ending 1/31/23 Actual | February Ending 2/28/23 Actual | March Ending 3/31/23 Actual | April Ending 4/30/23 Actual | May Ending 5/31/23 Actual | June Ending 6/30/23 Actual | July Ending 7/31/23 Actual | August Ending 8/31/23 Actual | September Ending 9/30/23 Actual | October Ending 10/31/23 Projected | November Ending 11/30/23 Projected | December Ending 12/31/23 Projected | Yearly Total | Percent of Sales |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Sales** | | | | | | | | | | | | | | |
| Product Sales | 1,708,754 | 1,601,762 | 2,048,672 | 1,504,991 | 1,535,876 | 1,643,450 | 931,593 | 1,236,763 | 1,140,955 | 1,250,000 | 1,100,000 | 1,100,000 | 16,802,815 | |
| SBA Loan Forgiveness | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | | | | $0 | $0 |
| Tooling Sales | $970 | $0 | $0 | $0 | $30,831 | $92,651 | $47,117 | $0 | $17,124 | | | | $188,693 | |
| Other Income | ($4,395) | ($3,551) | ($6,221) | ($4,002) | ($3,224) | ($2,186) | $1,154 | ($2,878) | ($735) | | | | ($26,038) | |
| Returns and Allowances | ($10,670) | ($40,835) | ($52,446) | ($15,703) | ($32,631) | ($35,426) | ($290,700) | $0 | ($51) | | | | ($478,462) | |
| **Net Sales** | 1,694,658 | 1,557,377 | 1,990,004 | 1,485,286 | 1,530,852 | 1,698,489 | 689,164 | 1,233,885 | 1,157,293 | 1,250,000 | 1,100,000 | 1,100,000 | 16,487,009 | 100.00% |
| Percentage by Month | 10.28% | 9.45% | 12.07% | 9.01% | 9.29% | 10.30% | 4.18% | 7.48% | 7.02% | 7.58% | 6.67% | 6.67% | | 100.00% |
| | 33.00% | 28.27% | 22.50% | 33.20% | 24.44% | 26.07% | | | | | | | | |
| **Cost of Goods Sold** | | | | | | | | | | | | | | |
| Material Costs | 559,185 | 440,288 | 447,748 | 403,145 | 374,080 | 442,808 | 216,150 | 178,388 | 273,679 | 306,250 | 269,500 | 269,500 | 4,270,722 | 25.90% |
| Other material Costs | 16,330 | 27,707 | 30,599 | 38,080 | 28,658 | ($752) | 15,482 | 32,020 | 14,360 | | | | 202,483 | 1.23% |
| Change in Labor & Overhead | $0 | $90 | $30 | $85,690 | ($51,760) | | | | | | | | 33,930 | 0.21% |
| Purchased Production | 587,413 | 594,325 | 541,031 | 541,031 | 526,859 | 640,189 | 358,197 | 538,165 | | | | | 5,674,419 | 34.42% |
| Compensation | 104,099 | 96,915 | 188,329 | 122,625 | 129,310 | 160,751 | 139,784 | 132,001 | 153,665 | 116,350 | 116,350 | 116,350 | 1,431,375 | 8.68% |
| Temporary Help | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | 0.00% |
| Fringe Benefits | 96,351 | | 159,366 | 129,310 | 125,964 | 135,402 | 126,283 | 126,283 | 127,024 | 116,350 | 116,350 | 116,350 | | |
| Utilities | 129,758 | 128,846 | 62,357 | 18,058 | 112,174 | 80,078 | 43,702 | 36,487 | 58,382 | 55,984 | 55,984 | 55,984 | | |
| Supplies | 55,732 | 42,255 | 62,357 | 18,058 | 112,174 | 80,078 | 43,702 | 36,487 | 58,382 | 55,984 | 55,984 | 55,984 | 677,177 | 4.11% |
| Repairs and Maintenance | 11,032 | 8,080 | 10,011 | 9,017 | 17,336 | 17,316 | 9,527 | 12,060 | 7,021 | 20,000 | 20,000 | 20,000 | 165,862 | 1.00% |
| Tooling Expense | 45,625 | | | $851 | $7,787 | $1,575 | $86 | $86 | $7,021 | | | | 81,443 | 0.49% |
| Depreciation | $0 | $0 | $0 | $0 | $24,060 | | | | | | | | $0 | 0.00% |
| Other Manufacturing Costs | 43,569 | 53,212 | 66,979 | 39,581 | 62,958 | 55,600 | 51,976 | 31,637 | 67,215 | 45,000 | 45,000 | 45,000 | 607,726 | 3.69% |
| Depreciation Equipment | 72,000 | 72,000 | 72,000 | 72,000 | 72,000 | 72,000 | 72,000 | 72,000 | 72,000 | 72,000 | 72,000 | 72,000 | 864,000 | 5.24% |
| **Total Cost of Goods Sold** | 1,640,004 | 1,475,970 | 1,756,653 | 1,410,254 | 1,426,087 | 1,600,654 | 1,050,004 | 1,169,710 | 1,063,099 | 1,012,191 | 1,046,843 | 975,441 | 15,625,910 | 94% |
| Gross Margin Dollars | 54,654 | 81,407 | 233,351 | 75,032 | 104,765 | 97,835 | (360,840) | 64,175 | 94,194 | 237,809 | 54,157 | 124,559 | 861,099 | 5.22% |
| Gross Margin Percentage | 3.23% | 5.23% | 11.73% | 5.05% | 6.84% | 5.76% | -52.36% | 5.20% | 8.14% | 19.02% | 4.92% | 11.32% | | 5.22% |
| **Selling, General, and Administrative Expenses** | | | | | | | | | | | | | | |
| S G & A Expenses | 123,682 | 119,195 | 152,805 | 126,037 | 134,438 | 152,932 | 119,384 | 150,535 | 81,971 | 100,000 | 100,000 | 100,000 | 1,460,979 | 8.86% |
| Total SG&A Expenses | 123,682 | 119,195 | 152,805 | 126,037 | 134,438 | 152,932 | 119,384 | 150,535 | 81,971 | 100,000 | 100,000 | 100,000 | 1,460,979 | 8.86% |
| **Total SG&A** | 123,682 | 119,195 | 152,805 | 126,037 | 134,438 | 152,932 | 119,384 | 150,535 | 81,971 | 100,000 | 100,000 | 100,000 | 1,460,979 | 8.86% |
| Operating Income | (69,028) | (37,788) | 80,547 | (51,004) | (29,673) | (55,097) | (480,224) | (86,360) | 12,223 | 137,809 | (45,843) | 24,559 | (599,880) | -3.64% |
| **Other (Income) Expense** | | | | | | | | | | | | | | |
| Sale of Cincinnati Building | | | | | | | | | | | (850,000) | | (850,000) | -5.16% |
| Interest Expense | 10,000 | 30,161 | 47,902 | 40,000 | 40,361 | 40,000 | 40,000 | 5,000 | 5,000 | $0 | 9,800 | 10,873 | 279,097 | 1.69% |
| Total Other (Income) Expense | 10,000 | 30,161 | 47,902 | 40,000 | 40,361 | 40,000 | 40,000 | 5,000 | 5,000 | $0 | (840,200) | 10,873 | (570,503) | -3.46% |
| **Provision for Taxes** | | | | | | | | | | | | | $0 | 0.00% |
| Net Income | (79,028) | (67,949) | 32,645 | (91,004) | (70,034) | (95,097) | (520,224) | (91,360) | 7,223 | 137,809 | 794,358 | 13,686 | (28,977) | -0.18% |
| Net Income Percentage | -4.66% | -4.36% | 1.64% | -6.13% | -4.57% | -5.60% | -75.49% | -7.40% | 0.62% | 11.02% | 72.21% | 1.24% | | -0.18% |
| Cumulative Net Income | (79,028) | (146,977) | (114,332) | (205,336) | (275,371) | (370,468) | (890,692) | (982,052) | (974,829) | (837,020) | (42,662) | (28,977) | | |
| **EBITDA** | 2,972 | 34,212 | 152,547 | 20,996 | 42,327 | 16,903 | (408,224) | (14,360) | 84,223 | 209,809 | 876,157 | 96,559 | 1,114,120 | |

This report and the information it contains was generated by a licensed user of Forevisor™ financial software

Month to Month Cash Flow Reliable Castings 11 9 2023 Version 6

**RELIABLE CASTINGS CORPORTATION**
**CONSOLIDATED BALANCE SHEET**
**FOR THE YEAR ENDING DECEMBER 31, 2024**

| | Year Ending 12/31/23 Projected | January Ending 1/31/2024 Projected | February Ending 2/28/2024 Projected | March Ending 3/31/2024 Projected | April Ending 4/30/2024 Projected | May Ending 5/31/2024 Projected | June Ending 6/30/2024 Projected | July Ending 7/31/2024 Projected | August Ending 8/3/2024 Projected | September Ending 9/30/2024 Projected | October Ending 10/31/2024 Projected | November Ending 11/30/2024 Projected | December Ending 12/31/2024 Projected |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **ASSETS** | | | | | | | | | | | | | |
| **CURRENT ASSETS** | | | | | | | | | | | | | |
| Cash | $666,889 | $275,000 | $275,000 | $275,000 | $275,000 | $275,000 | $275,000 | $275,000 | $275,000 | $275,000 | $275,000 | $275,000 | $275,000 |
| Accounts Receivable-Net | $1,760,000 | $2,010,000 | $2,010,000 | $2,170,000 | $2,170,000 | $2,105,000 | $2,045,000 | $1,850,000 | $1,985,000 | $2,095,000 | $2,180,000 | $2,040,000 | $1,820,000 |
| Deposit - Utility | $200,000 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Workers Compensation LC | $550,000 | $550,000 | $550,000 | $550,000 | $550,000 | $550,000 | $550,000 | $550,000 | $550,000 | $550,000 | $550,000 | $550,000 | $550,000 |
| Inventory | $1,800,000 | $1,800,000 | $1,800,000 | $1,800,000 | $1,800,000 | $1,800,000 | $1,800,000 | $1,800,000 | $1,800,000 | $1,800,000 | $1,800,000 | $1,800,000 | $1,800,000 |
| Prepaid Expenses | $425,000 | $415,000 | $415,000 | $410,000 | $405,000 | $400,000 | $355,000 | $310,000 | $265,000 | $265,000 | $265,000 | $265,000 | $265,000 |
| **TOTAL CURRENT ASSETS** | $5,401,889 | $5,065,000 | $5,050,000 | $5,205,000 | $5,200,000 | $5,130,000 | $5,025,000 | $4,785,000 | $4,875,000 | $4,985,000 | $5,070,000 | $4,930,000 | $4,710,000 |
| Property, Plant & Equipment | $32,674,284 | $32,724,284 | $32,774,284 | $32,824,284 | $32,874,284 | $32,924,284 | $32,974,284 | $33,024,284 | $33,074,284 | $33,124,284 | $33,174,284 | $33,224,284 | $33,274,284 |
| Accumulated Depreciation | ($27,578,782) | ($27,650,782) | ($27,722,782) | ($27,794,782) | ($27,866,782) | ($27,938,782) | ($28,010,782) | ($28,082,782) | ($28,154,782) | ($28,226,782) | ($28,298,782) | ($28,370,782) | ($28,442,782) |
| Net Property, Plant, & Equip | $5,095,502 | $5,073,502 | $5,051,502 | $5,029,502 | $5,007,502 | $4,985,502 | $4,963,502 | $4,941,502 | $4,919,502 | $4,897,502 | $4,875,502 | $4,853,502 | $4,831,502 |
| **TOTAL ASSETS** | $10,497,391 | $10,128,502 | $10,101,502 | $10,234,502 | $10,207,502 | $10,115,502 | $9,988,502 | $9,726,502 | $9,794,502 | $9,882,502 | $9,945,502 | $9,783,502 | $9,541,502 |
| **LIABILITIES** | | | | | | | | | | | | | |
| **CURRENT LIABILITIES** | | | | | | | | | | | | | |
| Revolving Loan Line of Credit/DIP after July 2023 | $1,123,898 | $961,636 | $1,042,161 | $1,205,307 | $1,212,362 | $1,246,301 | $1,191,448 | $1,114,388 | $1,196,811 | $1,429,495 | $1,563,619 | $1,514,160 | $1,459,747 |
| Accounts Payable - Post Filing | $100,000 | $200,000 | $200,000 | $200,000 | $200,000 | $200,000 | $200,000 | $200,000 | $200,000 | $200,000 | $200,000 | $200,000 | $200,000 |
| Accrued Expenses | $308,678 | $308,678 | $308,678 | $308,678 | $308,678 | $308,678 | $308,678 | $308,678 | $308,678 | $308,678 | $308,678 | $308,678 | $308,678 |
| Beck Aluminum Secured Payable | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Vendor Note Payable | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Accounts Payable - Pre - Filing | $3,540,830 | $3,179,839 | $3,129,839 | $3,079,839 | $3,029,839 | $2,979,839 | $2,929,839 | $2,879,839 | $2,829,839 | $2,779,839 | $2,729,839 | $2,679,839 | $2,629,839 |
| Spectrum Line of Credit – Pre Filing | $2,928,830 | $2,894,835 | $2,862,533 | $2,829,921 | $2,796,897 | $2,763,757 | $2,730,199 | $2,696,319 | $2,662,115 | $2,627,583 | $2,592,220 | $2,557,523 | $2,521,989 |
| **TOTAL CURRENT LIABILITIES** | $8,000,245 | $7,544,988 | $7,543,211 | $7,623,745 | $7,547,676 | $7,498,575 | $7,360,164 | $7,199,224 | $7,197,443 | $7,345,595 | $7,394,866 | $7,260,200 | $7,120,260 |
| Non-Current ESOP Liabilities | $128,408 | $128,408 | $128,408 | $128,408 | $128,408 | $128,408 | $128,408 | $128,408 | $128,408 | $128,408 | $128,408 | $128,408 | $128,408 |
| Other | $491,667 | $491,667 | $483,334 | $475,001 | $466,668 | $458,335 | $450,002 | $441,669 | $433,336 | $425,003 | $416,670 | $408,337 | $400,004 |
| Long Term Debt (See detail below) | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| **TOTAL LIABILITIES** | $8,128,653 | $8,165,063 | $8,154,953 | $8,227,154 | $8,142,952 | $8,085,318 | $7,938,574 | $7,769,301 | $7,759,187 | $7,899,006 | $7,939,934 | $7,796,945 | $7,648,768 |
| **STOCKHOLDER'S EQUITY** | | | | | | | | | | | | | |
| Loss on Release of Shares | ($118,876) | ($118,876) | ($118,876) | ($118,876) | ($118,876) | ($118,876) | ($118,876) | ($118,876) | ($118,876) | ($118,876) | ($118,876) | ($118,876) | ($118,876) |
| Common Stock | $147,860 | $147,860 | $147,860 | $147,860 | $147,860 | $147,860 | $147,860 | $147,860 | $147,860 | $147,860 | $147,860 | $147,860 | $147,860 |
| Unearned ESOP Shares | ($1,520,538) | ($1,520,538) | ($1,520,538) | ($1,520,538) | ($1,520,538) | ($1,520,538) | ($1,520,538) | ($1,520,538) | ($1,520,538) | ($1,520,538) | ($1,520,538) | ($1,520,538) | ($1,520,538) |
| Treasury Stock | ($2,582,814) | ($2,582,814) | ($2,582,814) | ($2,582,814) | ($2,582,814) | ($2,582,814) | ($2,582,814) | ($2,582,814) | ($2,582,814) | ($2,582,814) | ($2,582,814) | ($2,582,814) | ($2,582,814) |
| Out of Balance | ($68,067) | ($68,067) | ($68,067) | ($68,067) | ($68,067) | ($68,067) | ($68,067) | ($68,067) | ($68,067) | ($68,067) | ($68,067) | ($68,067) | ($68,067) |
| Retained Earnings | $6,511,173 | $6,105,874 | $6,088,984 | $6,149,783 | $6,206,985 | $6,172,619 | $6,192,363 | $6,099,636 | $6,177,750 | $6,125,931 | $6,148,003 | $6,128,982 | $6,035,231 |
| Total Shareholders Equity | $2,368,738 | $1,963,439 | $1,946,549 | $2,007,348 | $2,064,550 | $2,030,184 | $2,049,928 | $1,957,201 | $2,035,315 | $1,983,496 | $2,005,568 | $1,986,557 | $1,892,796 |
| **TOTAL LIAB/SHARE EQUITY** | $10,497,391 | $10,128,502 | $10,101,502 | $10,234,502 | $10,207,502 | $10,115,502 | $9,988,502 | $9,726,502 | $9,794,502 | $9,882,502 | $9,945,502 | $9,783,502 | $9,541,502 |

This report and the information it contains has been generated by a licensed user of Foreviso™ financial software

Month to Month Cash Flow Reliable Castings 11 9 2023 Version 6

**RELIABLE CASTINGS CORPORTATION**
**CONSOLIDATED INCOME STATEMENT**
**FOR THE YEAR ENDING DECEMBER 31, 2024**

MONTH

| | January Ending 1/31/24 Projected | February Ending 2/28/24 Projected | March Ending 3/31/24 Projected | April Ending 4/30/24 Projected | May Ending 5/31/24 Projected | June Ending 6/30/24 Projected | July Ending 7/31/24 Projected | August Ending 8/31/24 Projected | September Ending 9/30/24 Projected | October Ending 10/31/24 Projected | November Ending 11/30/24 Projected | December Ending 12/31/24 Projected | Yearly Total | Percent of Sales |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Sales** | | | | | | | | | | | | | | |
| Product Sales | $1,350,000 | $1,200,000 | $1,450,000 | $1,300,000 | $1,325,000 | $1,250,000 | $1,100,000 | $1,325,000 | $1,300,000 | $1,400,000 | $1,200,000 | $1,100,000 | $15,300,000 | |
| Tooling Sales | | | | | | | | | | | | | $0 | |
| Other Income | | | | | | | | | | | | | $0 | |
| Returns and Allowances | | | | | | | | | | | | | $0 | |
| **Net Sales** | $1,350,000 | $1,200,000 | $1,450,000 | $1,300,000 | $1,325,000 | $1,250,000 | $1,100,000 | $1,325,000 | $1,300,000 | $1,400,000 | $1,200,000 | $1,100,000 | $15,300,000 | 100.00% |
| Percentage by Month | 8.82% | 7.84% | 9.48% | 8.50% | 8.66% | 8.17% | 7.19% | 8.66% | 8.50% | 9.15% | 7.84% | 7.19% | | 100.00% |
| **Cost of Goods Sold** | | | | | | | | | | | | | | |
| Material Costs | $330,750 | $294,000 | $355,250 | $318,500 | $324,625 | $306,250 | $269,500 | $324,625 | $318,500 | $343,000 | $294,000 | $269,500 | $3,748,500 | 24.50% |
| Other material Costs | | | | | | | | | | | | | $0 | 0.00% |
| Change in Labor & Overhead | | | | | | | | | | | | | $0 | 0.00% |
| Purchased Production Compensation | $15,000 | $15,000 | $15,000 | $15,000 | $15,000 | $15,000 | $15,000 | $15,000 | $15,000 | $15,000 | $15,000 | $15,000 | $180,000 | 1.18% |
| Temporary Help | $360,000 | $360,000 | $450,000 | $360,000 | $450,000 | $360,000 | $360,000 | $360,000 | $450,000 | $450,000 | $360,000 | $360,000 | $4,680,000 | 30.59% |
| | | | | | | | | | | | | | $0 | 0.00% |
| Fringe Benefits | $82,800 | $82,800 | $103,500 | $82,800 | $103,500 | $82,800 | $82,800 | $82,800 | $103,500 | $103,500 | $82,800 | $82,800 | $1,076,400 | 7.03% |
| Utilities | $116,350 | $116,350 | $116,350 | $116,350 | $116,350 | $116,350 | $116,350 | $116,350 | $116,350 | $116,350 | $116,350 | $116,350 | $1,396,200 | 9.12% |
| Supplies | $55,984 | $55,984 | $55,984 | $55,984 | $55,984 | $55,984 | $55,984 | $55,984 | $55,984 | $55,984 | $55,984 | $55,984 | $671,808 | 4.39% |
| Repairs and Maintenance | $20,000 | $20,000 | $20,000 | $20,000 | $20,000 | $20,000 | $20,000 | $20,000 | $20,000 | $20,000 | $20,000 | $20,000 | $240,000 | 1.57% |
| Tooling Expense | | | | | | | | | | | | | $0 | 0.00% |
| Depreciation | | | | | | | | | | | | | $0 | 0.00% |
| Other Manufacturing Costs | $45,000 | $45,000 | $45,000 | $45,000 | $45,000 | $45,000 | $45,000 | $45,000 | $45,000 | $45,000 | $45,000 | $45,000 | $540,000 | 3.53% |
| Depreciation Equipment | $72,000 | $72,000 | $72,000 | $72,000 | $72,000 | $72,000 | $72,000 | $72,000 | $72,000 | $72,000 | $72,000 | $72,000 | $864,000 | 5.65% |
| **Total Cost of Goods Sold** | $1,097,884 | $1,061,134 | $1,233,084 | $1,085,634 | $1,202,459 | $1,073,384 | $1,036,634 | $1,091,759 | $1,196,334 | $1,220,834 | $1,061,134 | $1,036,634 | $13,396,908 | 87.56% |
| Gross Margin Dollars | $252,116 | $138,866 | $216,916 | $214,366 | $122,541 | $176,616 | $63,366 | $233,241 | $103,666 | $179,166 | $138,866 | $63,366 | $1,903,092 | 12.44% |
| Gross Margin Percentage | 18.68% | 11.57% | 14.96% | 16.49% | 9.25% | 14.13% | 5.76% | 17.60% | 7.97% | 12.80% | 11.57% | 5.76% | | 12.44% |
| **Selling, General, and Administrative Expenses** | | | | | | | | | | | | | | |
| S G & A Expenses | $620,000 | $120,000 | $120,000 | $120,000 | $120,000 | $120,000 | $120,000 | $120,000 | $120,000 | $120,000 | $120,000 | $120,000 | $1,940,000 | 12.68% |
| **Total SG&A Expenses** | $620,000 | $120,000 | $120,000 | $120,000 | $120,000 | $120,000 | $120,000 | $120,000 | $120,000 | $120,000 | $120,000 | $120,000 | $1,940,000 | 12.68% |
| **Total SGA** | $620,000 | $120,000 | $120,000 | $120,000 | $120,000 | $120,000 | $120,000 | $120,000 | $120,000 | $120,000 | $120,000 | $120,000 | $1,940,000 | 12.68% |
| **Operating Income** | ($367,884) | $18,866 | $96,916 | $94,366 | $2,541 | $56,616 | ($56,634) | $113,241 | ($16,334) | $59,166 | $18,866 | ($56,634) | ($36,908) | -0.24% |
| **Other (Income) Expense** | | | | | | | | | | | | | | |
| Interest Expense | $37,415 | $35,756 | $36,118 | $37,164 | $36,907 | $36,872 | $36,093 | $35,127 | $35,485 | $37,093 | $37,877 | $37,127 | $439,034 | 2.87% |
| **Total Other (Income) Expense** | $37,415 | $35,756 | $36,118 | $37,164 | $36,907 | $36,872 | $36,093 | $35,127 | $35,485 | $37,093 | $37,877 | $37,127 | $439,034 | 2.87% |
| Provision for Taxes | | | | | | | | | | | | | $0 | 0.00% |
| **Net Income** | ($405,299) | ($16,890) | $60,798 | $57,202 | ($34,366) | $19,744 | ($92,727) | $78,114 | ($51,819) | $22,073 | ($19,011) | ($93,761) | ($475,942) | -3.11% |
| Net Income Percentage | -30.02% | -1.41% | 4.19% | 4.40% | -2.59% | 1.58% | -8.43% | 5.90% | -3.99% | 1.58% | -1.58% | -8.52% | | -3.11% |
| **Cumulative Net Income** | ($405,299) | ($422,188) | ($361,390) | ($304,188) | ($338,554) | ($318,810) | ($411,537) | ($333,423) | ($385,242) | ($363,169) | ($382,181) | ($475,942) | | |
| **EBITDA** | ($296,884) | $90,866 | $168,916 | $166,366 | $74,541 | $128,616 | $15,366 | $185,241 | $55,666 | $131,166 | $90,866 | $15,366 | $827,092 | |

This report and the information it contains has been generated by a licensed user of Forevisor™ financial software

Month to Month Cash Flow Reliable Castings 11 9 2023 Version 6

## RELIABLE CASTINGS CORPORATION
### CONSOLIDATED BALANCE SHEET
### FOR THE YEARS ENDING 2025, 2026, 2027, AND 2028

| | Year Ending 12/31/24 Projected | Year Ending 2025 Projected | Year Ending 2026 Projected | Year Ending 2027 Projected | Year Ending 2028 Projected |
|---|---|---|---|---|---|
| **ASSETS** | | | | | |
| **CURRENT ASSETS** | | | | | |
| Cash | $275,000 | $275,000 | $275,000 | $275,000 | $275,000 |
| Accounts Receivable-Net | $1,820,000 | $2,065,500 | $2,230,740 | $2,409,199 | $2,601,935 |
| Deposit - Utility | $0 | $0 | $0 | $0 | $0 |
| Workers Compensation LC | $550,000 | $550,000 | $550,000 | $550,000 | $550,000 |
| Inventory | $1,800,000 | $2,000,000 | $2,000,000 | $2,000,000 | $2,000,000 |
| Prepaid Expenses | $265,000 | $265,000 | $265,000 | $265,000 | $265,000 |
| **TOTAL CURRENT ASSETS** | **$4,710,000** | **$5,155,500** | **$5,320,740** | **$5,499,199** | **$5,691,935** |
| | | | | | |
| Property, Plant & Equipment | $33,274,284 | $33,874,284 | $34,474,284 | $35,074,284 | $35,674,284 |
| Accumulated Depreciation | ($28,442,782) | ($29,393,182) | ($30,438,622) | ($31,588,606) | ($32,853,588) |
| Net Property, Plant, & Equip | $4,831,502 | $4,481,102 | $4,035,662 | $3,485,678 | $2,820,696 |
| | | | | | |
| **TOTAL ASSETS** | **$9,541,502** | **$9,636,602** | **$9,356,402** | **$8,984,877** | **$8,512,631** |
| | | | | | |
| **LIABILITIES** | | | | | |
| **CURRENT LIABILITIES** | | | | | |
| **Revolving Loan Line of Credit/DIP after July 2023** | **$1,459,794** | **$2,609,033** | **$3,450,470** | **$4,490,235** | **$5,571,296** |
| Accounts Payable - Post Filing | $200,000 | $200,000 | $200,000 | $200,000 | $200,000 |
| Accrued Expenses | $308,678 | $308,678 | $308,678 | $308,678 | $308,678 |
| Beck Aluminum Secured Payable | $0 | $0 | $0 | $0 | $0 |
| Vendor Note Payable | $0 | $0 | $0 | $0 | $0 |
| Accounts Payable - Pre - Filing | $2,629,839 | $2,029,839 | $1,429,839 | $579,839 | $0 |
| Spectrum Line of Credit - Pre Filing | $2,521,987 | $2,068,053 | $1,559,076 | $988,380 | $0 |
| **TOTAL CURRENT LIABILITIES** | **$7,120,298** | **$7,215,603** | **$6,948,063** | **$6,567,132** | **$6,079,974** |
| | | | | | |
| Non-Current ESOP Liabilities | $128,408 | $128,408 | $128,408 | $128,408 | $128,408 |
| Other | $400,000 | $300,000 | $200,000 | $100,000 | |
| Long Term Debt (See detail below) | $0 | $0 | $0 | $0 | $0 |
| | | | | | |
| **TOTAL LIABILITIES** | **$7,648,706** | **$7,644,011** | **$7,276,471** | **$6,795,540** | **$6,208,382** |
| | | | | | |
| **STOCKHOLDER'S EQUITY** | | | | | |
| Loss on Release of Shares | ($118,876) | ($118,876) | ($118,876) | ($118,876) | ($118,876) |
| Common Stock | $147,860 | $147,860 | $147,860 | $147,860 | $147,860 |
| Unearned ESOP Shares | ($1,520,538) | ($1,520,538) | ($1,520,538) | ($1,520,538) | ($1,520,538) |
| Treasury Stock | ($2,582,814) | ($2,582,814) | ($2,582,814) | ($2,582,814) | ($2,582,814) |
| Out of Balance | ($68,067) | ($68,067) | ($68,067) | ($68,067) | ($68,067) |
| Retained Earnings | $6,035,231 | $6,135,026 | $6,222,366 | $6,331,772 | $6,446,684 |
| **Total Shareholders Equity** | **$1,892,796** | **$1,992,591** | **$2,079,931** | **$2,189,337** | **$2,304,249** |
| | | | | | |
| **TOTAL LIAB/SHARE EQUITY** | **$9,541,502** | **$9,636,602** | **$9,356,402** | **$8,984,877** | **$8,512,631** |

This report and the information it contains has been generated by a licensed user of Forevisor™ financial software

Month to Month Cash Flow Reliable Castings 11 9 2023 Version 6

**RELIABLE CASTINGS CORPORATION**
**CONSOLIDATED INCOME STATEMENT**
**FOR THE YEARS ENDING 2025, 2026, 2027, AND 2028**

| | Year Ending 2025 Projected | Year Ending 2026 Projected | Year Ending 2027 Projected | Year Ending 2028 Projected |
|---|---|---|---|---|
| **Sales** | | | | |
| Product Sales | $16,524,000 | $17,845,920 | $19,273,594 | $20,815,481 |
| Tooling Sales | | | | |
| Other Income | | | | |
| Returns and Allowances | | | | |
| **Net Sales** | **$16,524,000** | **$17,845,920** | **$19,273,594** | **$20,815,481** |
| Percentage by Month | 108.00% | 116.64% | 125.97% | 136.05% |
| **Cost of Goods Sold** | | | | |
| Material Costs | $4,048,380 | $4,372,250 | $4,722,030 | $5,099,793 |
| Other material Costs | | | | |
| Change in Labor & Overhead | | | | |
| Purchased Production | $198,000 | $217,800 | $239,580 | $263,538 |
| Compensation | $4,914,000 | $5,159,700 | $5,417,685 | $5,688,569 |
| Temporary Help | $0 | $0 | $0 | $0 |
| Fringe Benefits | $1,184,040 | $1,302,444 | $1,432,688 | $1,575,957 |
| Utilities | $1,535,620 | $1,689,402 | $1,858,342 | $2,044,176 |
| Supplies | $738,989 | $812,888 | $894,176 | $983,594 |
| Repairs and Maintenance | $264,000 | $290,400 | $319,440 | $351,384 |
| Tooling Expense | $0 | $0 | $0 | $0 |
| Depreciation | $0 | $0 | $0 | $0 |
| Other Manufacturing Costs | $594,000 | $653,400 | $718,740 | $790,614 |
| Depreciation Equipment | $950,400 | $1,045,440 | $1,149,984 | $1,264,982 |
| **Total Cost of Goods Sold** | **$14,427,629** | **$15,543,724** | **$16,752,666** | **$18,062,608** |
| **Gross Margin Dollars** | **$2,096,371** | **$2,302,196** | **$2,520,927** | **$2,752,873** |
| Gross Margin Percentage | 12.69% | 12.90% | 13.08% | 13.23% |
| **Selling, General, and Administrative Expenses** | | | | |
| S G & A Expenses | $1,584,000 | $1,742,400 | $1,916,640 | $2,108,304 |
| **Total SG&A Expenses** | **$1,584,000** | **$1,742,400** | **$1,916,640** | **$2,108,304** |
| **Total SGBA** | **$1,584,000** | **$1,742,400** | **$1,916,640** | **$2,108,304** |
| **Operating Income** | **$512,371** | **$559,796** | **$604,287** | **$644,569** |
| **Other (Income) Expense** | | | | |
| Interest Expense | $412,576 | $472,456 | $494,881 | $529,657 |
| **Total Other (Income) Expense** | **$412,576** | **$472,456** | **$494,881** | **$529,657** |
| Provision for Taxes | | | | |
| **Net Income** | **$99,795** | **$87,340** | **$109,406** | **$114,912** |
| Net Income Percentage | 0.60% | 0.49% | 0.57% | 0.55% |
| Cumulative Net Income | | | | |
| **EBITDA** | **$1,462,771** | **$1,605,236** | **$1,754,271** | **$1,909,551** |

This report and the information it contains has been generated by a licensed user of Forevisor™ financial software

## EXHIBIT 3 – Rejected Executory Contracts

The following contracts are rejected by the Debtor.

1.  Any and all contracts with Cintas Corporation;

2.  Any and all contracts with Kollmorgen, a Regal Rexnord Brand; and

3.  Any and all contracts with Parker-Hannifin Corporation.